Andrew G. Deiss (Utah Bar # 7184)
Corey D. Riley (Utah Bar # 16935)
Andrew D. Miller (Utah Bar # 19625)
DEISS LAW PC
10 West 100 South, Suite 700
Salt Lake City, UT 84101
Telephone: (801) 433-0226
deiss@deisslaw.com
criley@deisslaw.com
amiller@deisslaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHN WEBER; GAYLE WEBER; CLUB FITNESS, INC.; PETER ROSS WEBER; YOLANDA ALTAGRACIA COSME DE WEBER; COMPOSTELA LIMITED, LLC; DAVID ELTON; ALYCE WEBER; JAMES BLAISDELL; BRYSON OCKEY; KRISTINE OCKEY; CLAUDIA GRIFFIN; ERIC STAMM; THE BETTY L. GRIFFIN 1999 REVOCABLE TRUST;<br><br>    *Plaintiffs,*<br><br>v.<br><br>COLLIERS INTERNATIONAL GROUP, INC.; COLLIERS INTERNATIONAL HOLDINGS (USA), INC.; COLLIERS INTERNATIONAL INTERMOUNTAIN, LLC; KEVIN LONG; MILLCREEK COMMERCIAL PROPERTIES, LLC; MILLROCK INVESTMENT FUND 1, LLC; MILLROCK INVESTMENT FUND 1 MANAGEMENT, LLC; BLAKE MCDOUGAL; SPENCER TAYLOR; SPENCER STRONG; BRENT SMITH; | **FIRST AMENDED COMPLAINT**<br><br>**JURY DEMANDED**<br><br>Case No. 2:25-cv-00162<br><br>Judge David Barlow |

1

MARK MACHLIS; GREEN IVY REALTY, INC.; 13 INVESTMENTS, LLC; LADY MIRA BLUE MACHLIS; THOMAS SMITH; LEW CRAMER; MATTHEW HAWKINS; GIL BOROK; DAVID JOSKER; JERALD ADAM LONG; KGL REAL ESTATE DEVELOPMENT, PLLC; SMART COVE, LLC; GTR HOLDINGS, LLC; LONG HOLDINGS, LLC; KGL ADVISORS, LLC; MARY STREET; CAMS REALTY, LLC; MOUNTAIN WEST COMMERCIAL, LLC; STEVE CATON; SARC DRAPER, LLC; ROBERT M. LEVENSON BLACKACRE 1031 EXCHANGE SERVICES LLC; ADP-MILLCREEK 2, LLC; ADP-MILLCREEK 3, LLC;

     *Defendants.*

By and through undersigned counsel, Plaintiffs complaint of Defendants as follows:

## INTRODUCTION

At least by 2020, Kevin Long, Millcreek Commercial, Colliers, and related entities and associates began to develop, market, and sell or facilitate the sale of investments in in commercial properties—Tenant in Common (or "TIC") investments. These investments were designed to take advantage of so-called 1031 exchanges, whereby individuals wanted to exchange an investment in one business for another— "a like kind exchange"— to avoid paying capital gains tax at the time of the transaction. 1031 exchanges were named after Section 1031 of Internal Revenue 26 U.S. Code § 1031

2

which was created to allow taxes to be deferred until later—typically upon the death of the investor. A 1031 exchange, thus, was particularly attractive to a certain type of investor, namely retirees who wanted to maximize their income stream for themselves and their partners during their final years to pay mortgages and costs of everyday living without worry. After all, many of these elderly folks had worked their entire lives to earn the income to invest. They would be unable to go back to work should their investment fail. Although many other types of unsophisticated retail investors were caught by Defendants' net, it was this population that Long et al. publicly declared to be the target of their 1031 program.

Long's first target in this case—and apparently the first target of the entire disastrous program that has ruined hundreds of lives—were John and Gayle Weber: both nearly eighty years old; both with declining health associated with age and therefore uniquely vulnerable. Long personally induced the elderly, infirm Webers to agree to invest in the Pine Bluff Property. He had Gayle Weber, 76 years old, suffering from Parkinson's and bound to a wheelchair, physically come to his office and sign the papers effecting the purchase. It now appears that in reality, Long used the Webers' "investment" to fund most of Long's purchase of the Pine Bluff Property—which Long immediately turned around and sold at inflated rates to other subsequent targets. Pine Bluff was only the first such property marketed by the Colliers/Long Parties; dozens

followed.  This case centers on four: the Pine Bluff, Arkansas; Draper, Utah; Lehi, Utah; and Crockett, Texas Properties.

Long, through his position as Senior Vice President and Executive Vice President at the Utah division of Colliers, and President and founder of Millcreek Commercial Properties, marketed the TIC opportunities through word of mouth, publications, and by obtaining referrals from a network of real estate and 1031 exchange specialists, many of whom were paid to refer investors.

Long conspired with others to market these properties to investors as ideal 1031 exchange properties.  According to Long and his affiliates, these properties were an excellent 1031 investment because the location and condition of the buildings made them very valuable in themselves; the properties had already been leased by one of several medical company tenants (one of which they called "the tenant of your dreams"); the tenants had been thoroughly "vetted" by Collier's team of analysts; some leases were guaranteed by publicly traded companies and others were backed by guarantors with very strong financials; the leases had "extremely attractive terms"; the leases were long term, typically 20 years; they were triple net leases ("NNN"), which meant the tenant would pay insurance, day-to-day maintenance, and property taxes; some leases were insured by Lloyds of London; and that the investment was unquestionably "safe, secure, and stable" with a capitalization rate of 6-9% over the term of the lease.  All of them met Long's and Colliers' "pillars of success."

In fact, these claims were false and replete with material omissions.  The tenants quickly had difficulty making rent payments and ultimately defaulted on all their leases.  The tenants at each of the properties turned out to be shell companies with no assets and no realistic ability to meet their lease obligations.  Of course, none of the corporate guarantors honored their obligations to cover the payments, and themselves also turned out to be shell companies with no assets like the tenant companies they supposedly backed.  Nor was there ever the advertised bond issued by Lloyds of London at the Pine Bluff or Draper Properties.  The funds for promised equipment went missing; renovations were delayed and incomplete.  Investors discovered that the leases packaged with their TIC interests were radically overvalued compared to fair market rates, making it impossible to recover the lost value of the investment by re-leasing on similar terms.   In fact, both the Pine Bluff and Draper tenant and the guarantor, as well as the individual who controlled the development company for both, had easily discovered histories of fraud.

Long and Colliers should have known this.  In fact, it is likely that they did. Long had known the man behind American Development Partners (ADP), one of the developer parties responsible for renovations, improvement and construction on the Pine Bluff and Draper Properties, as well as many others in Long's portfolio, for many years.  In fact, records indicate that Long and Emanuel Butera (the owner and operator of ADP) had been partners in Utah businesses that sold TIC investments years before.

5

Colliers knew or should have known of Butera's shady past, not the least because Long was a broker, Senior Vice President, and Executive Vice President with the Utah division of Colliers.  And the tenant companies at Lehi (Neuragenex) and Crockett (Pulse Healthcare) and the purported "corporate guarantors" behind them were similarly shell companies without meaningful assets or operations, which Millcreek, Colliers and their affiliates either were aware of or should have been when they developed these investments.

Despite this knowledge, Long, Colliers, and their affiliates deliberately marketed these fatally flawed properties to vulnerable, unsophisticated, often retirement aged investors, leaving Plaintiffs with title to properties that are some combination of unfinished, over-priced, subject to maintenance fees, insurance, management fees, taxes, and an investment many Plaintiffs fear will not be covered by the IRS 1031 exemption.  As one might expect, many of the Plaintiffs, particularly the elderly and vulnerable, have suffered very real and physical and emotional injury from these acts.

This Complaint arises from the omissions, misstatements, and outright lies that led to financial ruin and broken retirement dreams for the Plaintiffs.  Defendant Kevin Long, acting in concert with others, including the named Defendants, systematically targeted vulnerable investors with promises of nearly-risk-free investments in real property.  He and his affiliates used lies and misdirection in conjunction with the strict

timeline of the IRS 1031 exchange program to pressure his marks into investing in deals that were designed to fail and did in fact fail.

## PARTIES

### **Defendants**

1.      Defendant Colliers International Intermountain, LLC ("Colliers Intermountain") is a Delaware limited liability company with its principal place of business in Salt Lake County, Utah. Defendant Colliers International Holdings (USA), Inc. ("Colliers USA") is a Delaware corporation that is the majority member of Colliers International intermountain, LLC, a wholly owned subsidiary of Defendant Colliers International Group, Inc. ("CIGI"), a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. CIGI controls the real estate and investment services provided by subsidiaries and affiliates using the "Colliers International" and "Colliers" brands and trademarks, and the profits from such services inure to CIGI's benefit (Colliers International Intermountain, LLC, Colliers International Holdings (USA), Inc., and CIGI are referred to as "Colliers" or "Colliers International").

2.      Among other things, Colliers develops, markets, and sells commercial real estate, and provides investment management services to institutional investors, sovereign wealth funds, public and corporate pension funds, endowments, insurance companies, foundations, and family offices.

3.      There are 4 Colliers offices located in Utah.

4.    Colliers' acts that are the subject of this lawsuit were performed in close association with Millcreek, Long, and their affiliates, and directed towards transactions having a nexus in Utah.

5.    Colliers International Intermountain, LLC, Colliers International Holdings (USA), Inc., and CIGI employ uniform branding as "Colliers" or "Colliers International" in order create the impression and hold themselves out as a single international entity in order to foster a sense of confidence, trust, quality, and uniformity and to induce the reliance of potential customers, clients, and investors on their services.

6.    Colliers' global website (colliers.com) lists properties sold or leased by its subsidiaries, or for which its subsidiaries otherwise provide professional services, including Colliers International Intermountain, Inc.  Colliers' global website also lists and provides means to contact the agents of its subsidiaries, including Colliers International Intermountain, Inc., to employ their professional services.

7.    The Colliers agents named as Defendants herein are or were listed with their contact information on Colliers' global website at all material times.

8.    On information and belief, the Pine Bluff, Draper, Lehi, and Crockett Properties that are the subject of this suit were listed on Colliers' global website at all material times.

9.      Matthew Hawkins is an individual residing, on information and belief, in Toronto, Ontario, Canada.

10.     Gil Borok is an individual residing, on information and belief, in California.

11.     Gil Borok and Matthew Hawkins are managers of Colliers International Intermountain, LLC, and on information and belief held those positions at all times material to the allegations herein.

12.     Colliers' global website describes Gil Borok, President and CEO of the USA division of Colliers, as "lead[ing] Colliers for the United States [] region[]," which includes the Utah division of Colliers.

13.     Colliers' global website describes Matthew Hawkins as "Vice President" and "Legal Counsel" for CIGI, with "primary responsibility for CIGI's legal, corporate secretarial and regulatory status" with additional responsibilities extending to "oversight of any significant legal matters arising in CIGI's operating subsidiaries, with a focus on North America," which includes the USA and Utah divisions of Colliers.

14.     David Josker is an individual residing, on information and belief, in California.

15.     Colliers' global website describes David Josker as "President of the Western Region Brokerage for Colliers," "responsible for the performance and

entrepreneurial initiatives of the firm's offices across Arizona, California, Colorado, Hawaii, Nevada, Oregon, Texas, Utah, and Washington."

16.     David Josker, on Colliers' behalf, approved draw payments for sales agents selling TIC offerings through the Colliers/Long TIC Program.

17.     As alleged herein, a Colliers subsidiary, Colliers International North Texas, was a defendant in a suit alleging a fraudulent real estate scheme with a non-paying medical tenant similar to the scheme alleged in this case.

18.     Gil Borok is the manager and director of Colliers International North Texas, LLC.

19.     Matthew Hawkins is the secretary of Colliers International North Texas, LLC.

20.     David Josker is the vice president of Colliers International North Texas, LLC.

21.     Defendant Millcreek Commercial Properties, LLC ("Millcreek" or "Millcreek Commercial") is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

22.     At all material times, Millcreek's members were KGL Real Estate Development, PLLC, Smart Cove, LLC, GTR Holdings, LLC, and Long Holdings, LLC.

23.     Millcreek Commercial is managed by KGL Real Estate Development, PLLC, which at all material times directed, permitted, and was aware of Millcreek's conduct alleged herein.

24.     KGL Real Estate Development, PLLC is a Utah professional limited liability company. On information and belief Kevin Long is its sole member and manager.

25.     At all material times Kevin Long and KGL Real Estate Development, PLLC directed, permitted, and was aware of Millcreek Commercial's conduct alleged herein.

26.     Kevin G. Long ("Long") is an individual residing in Utah.

27.     Long was Principal Broker and COO of CBC Advisors, a real estate professional services and investment company acquired by Colliers in 2017.

28.     After Colliers' acquisition of CBC Advisors, Long worked as a broker for Colliers.

29.     In 2017 Long founded Millcreek Commercial and affiliated commercial real-estate investment funds, including Millrock Investment Fund 1, LLC ("Millrock").

30.     At all material times, Long was "President of Millcreek with Colliers."

31.     At all material times, Long was an employee and agent of Millcreek.

32.     At all material times, Long was an employee and agent of Colliers.

33.     Millrock Investment Fund 1, LLC ("Millrock") is a Utah limited liability corporation with its principal place of business in Lehi, Utah.

11

34.     Millrock Investment Fund 1 Management, LLC is a Utah limited liability corporation.  Kevin Long is the manager of Millrock Investment Fund 1 Management, LLC.

35.     At all material times Millrock Investment Fund 1 Management, LLC directed, permitted, and was aware of Millrock Investment Fund 1's conduct alleged herein.

36.     Brent Smith is an individual residing in Utah.

37.     At all material times, Brent Smith was an employee and agent of Millcreek.

38.     At all material times, Brent Smith was an agent and representative of Millrock Investment Fund 1.

39.     GTR Holdings, LLC is a Utah limited liability company with its principal place of business in South Jordan, Utah.  Brent Smith is one of its two members.

40.     At all material times GTR Holdings was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct alleged herein.

41.     Thomas Smith ("Tom Smith") is an individual residing in Utah.

42.     At all material times, Tom Smith was an agent and representative of Millcreek.

43.     At all material times, Tom Smith was an agent and representative of Millrock Investment Fund 1.

44.     Blake McDougal ("McDougal") is an individual residing in Utah.

45.     At all material times, McDougal was an employee and agent of Millcreek.

46.     At all material times, McDougal was an employee and agent of Colliers.

47.     Spencer Strong ("Strong") is an individual residing in Utah.

48.     At all material times, Strong was an employee and agent of Millcreek.

49.     At all material times, Strong was an employee and agent of Colliers.

50.     Spencer Taylor ("Taylor") is an individual residing in Utah.

51.     At all material times, Taylor was an employee and agent of Millcreek.

52.     At all material times, Taylor was a representative and agent of Millrock Investment Fund 1 LLC.

53.     Smart Cove, LLC is a Utah limited liability company with its principal place of business in South Jordan, Utah.  Smart Cove's sole member is Spencer Taylor.

54.     At all material times Smart Cove, LLC was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct alleged herein.

55.     Green Ivy Realty, Inc. is a Utah corporation with its principal place of business in Salt Lake City, Utah.  Mark Machlis is its president and, on information and belief, its sole owner.

56.     13 Investments LLC is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.  Mark Machlis is its president, and, on information and belief, its sole owner and manager.

57.    Mark Machlis ("Machlis") is an individual residing in Utah.

58.    At all material times, Mark Machlis was an agent and representative of Millcreek.

59.    Lady Mira Blue Machlis is an individual residing in Utah.

60.    On information and belief, at all material times, Lady Mira Blue Machlis was an agent and representative of Green Ivy Realty.

61.    At all material times, Millcreek, Colliers, Green Ivy Realty, ADP-Millcreek 2, ADP-Millcreek 3, Mountain West Commercial Real Estate, CAMS Realty, 13 Investments, Millrock Investment Fund 1, Millrock Investment Fund 1 Management, KGL Real Estate Development PLLC; Smart Cove LLC, GTR Holdings, LLC, Long Holdings LLC, Blackacre 1031 Exchange Services and their agents and employees acted as close business associates of one another, including through the development of the Colliers/Long TIC Program joint marketing, communications, social media, and transactional commission payments.

62.    Collectively, Millcreek Commercial, Colliers, Green Ivy Realty, Long, Strong, McDougal, Taylor, Mark and Lady Mira Blue Machlis, Brent Smith, Tom Smith, Millrock Investment Fund 1, Millrock Investment Fund 1 Management, KGL Real Estate Development PLLC, Smart Cove LLC, GTR Holdings LLC, Long Holdings LLC are referred to herein as the "Colliers/Long Parties."

14

63.    Lew Cramer ("Cramer") is an individual, on information and belief residing in Utah.  At all material times Lew Cramer was an agent and representative of Colliers.

64.    Jerald Adam Long ("Adam Long") is an individual temporarily residing in Massachusetts but is a citizen of Utah.  He is Kevin Long's son.

65.    Long Holdings, LLC is a Utah limited liability company with its principal place of business in Provo, Utah.  Long Holdings' sole member is Jerald Adam Long.

66.    At all material times Long Holdings was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct alleged herein.

67.    ADP-Millcreek 2, LLC ("ADP-Millcreek 2") was represented to be a Utah limited liability company, but there is no record of any such entity being registered with the State of Utah.  On information and belief, it is an unofficial dba of either Kevin Long as a sole proprietorship or of a partnership which includes Kevin Long.  The ADP-Millcreek 2 name was used by the Colliers/Long Parties in their acquisition and marketing of the Pine Bluff Property.

68.    ADP-Millcreek 3, LLC is an administratively dissolved Utah limited liability company.  Millrock Investment Fund 1 is its registered agent and, on information and belief, its sole member.  On information and belief, it is an alter ego of Kevin Long and/or Millcreek Commercial.

69.     In at least some instances ADP-Millcreek 3, LLC identified its mailing address as 111 S. Main St., Ste. 2200, Salt Lake City Utah—the same as that used by Colliers, Millcreek, and other Millcreek-affiliated entities.

70.     Steve Caton is an individual residing in Illinois.

71.     SARC Draper, LLC is a Missouri limited liability company.  Steve Caton is its managing member.

72.     Robert M. Levenson is an individual, on information and belief residing in Maryland.

73.     Blackacre 1031 Exchange Services, LLC, is, on information and belief, a Maryland limited liability company with its principal office in Maryland.  At all material times Robert M. Levenson was its representative, agent, and owner.

74.     Mary Street is an individual residing in Utah. She acted as lease administrator and property manager of the Pine Bluff, Draper, Lehi, and Crockett Properties, among other properties in the Colliers/Long TIC Program.

75.     CAMS Realty, LLC is a Utah limited liability company. It is a division of Mountain West Commercial Real Estate. Mary Street is its managing member and was its representative and agent at all material times.

76.     Mountain West Commercial, LLC, dba Mountain West Commercial Real Estate, is a Utah limited liability company with its primary place of business in Salt

Lake City, Utah. At all material times CAMS Realty and Mary Street were its representatives and agents.

77. Defendant KGL Advisors, LLC is a Utah domestic limited liability corporation with its principal place of business in Lindon, Utah. On information and belief, KGL Advisors, LLC is managed by Defendant Kevin Long.

78. On information and belief, and based on the fact that in about late 2024 Millcreek Commercial indicated that it was closing but that KGL Advisors would assist Millcreek Commercial's former clients and that KGL Advisors' website adopted and incorporated large portions of Millcreek Commercial's website, KGL Advisors is an alter ego and/or successor in interest of Millcreek Commercial, continuing substantially similar operations and activities with substantially similar personnel, and should be held jointly and severally liable for any judgment against Millcreek Commercial in this case.

79. Because Millcreek is dissolved, and pursuant to Utah Code § 48-3a-706(4)(b), claims against Millcreek may be enforced against its members KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; and Long Holdings, LLC.

**Plaintiffs**

17

80.     *John and Gayle Weber* are residents of Utah and were aged 78 and 76 respectively at the time they purchased TIC ownership in the Pine Bluff Property.

81.     At all material times herein John Weber and Gayle Weber suffered from serious physical and mental decline associated with aging.  Gayle Weber has been diagnosed with Parkinson's and was wheelchair-bound at the time she and her husband purchased TIC ownership in the Pine Bluff Property and at the present time. John Weber has suffered multiple strokes.

82.     *Club Fitness, Inc.* is a Utah corporation. John and Gayle Weber are its owners.

83.     John and Gayle Weber and Club Fitness, Inc. are referred to herein as the Pine Bluff Plaintiffs.

84.     *Peter Ross Weber ("Ross") and Yolanda Altagracia Cosme de Weber* are residents of the Dominican Republic and purchased TIC ownership in the Draper Property.  Ross is John and Gayle Weber's son.

85.     *Compostela Limited, LLC* is a Wyoming limited liability company. Ross Weber and Yolanda Altagracia Cosme de Weber are its members.

86.     *David Elton and Alyce Weber* are residents of Washington and purchased TIC ownership in the Draper Property.  Alyce Weber is John and Gayle Weber's daughter and Ross Weber's sister.

87. *James Blaisdell* is a resident of California and purchased TIC ownership in the Draper Property.

88. Collectively, Ross Weber, Yolanda Altagracia Cosme de Weber, David Elton, Alyce Weber, and James Blaisdell are referred to herein as the Draper Plaintiffs.

89. *Bryson and Kristine Ockey* are residents of Utah and purchased TIC ownership in the Lehi Property.

90. *Eric Stamm and Claudia Griffin* are residents of Colorado and were aged 67 and 61 respectively at the time they purchased TIC ownership in the Lehi and Crockett Properties.

91. The *Betty L. Griffin 1999 Revocable Trust* is a Colorado revocable trust and Claudia Griffin is its successor trustee.

92. Collectively, Bryson and Kristine Ockey, Eric Stamm and Claudia Griffin, and the Betty L. Griffin 1999 Revocable Trust are referred to herein as the Lehi Plaintiffs.

93. Collectively, Eric Stamm and Claudia Griffin and the Betty L. Griffin 1999 Revocable Trust are referred to herein as the Crockett Plaintiffs.

## JURISDICTION

94. Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws

of the United States, including specifically Plaintiffs' claims asserted under 15 U.S.C. §

78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.F

§240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

95.    The Court has supplemental jurisdiction over the claims asserted herein

under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the

claims arising under the laws of the United States that they form part of the same case

or controversy under Article III of the United States Constitution.

96.    Venue is appropriate in this forum pursuant to 28 U.S.C § 1391 (b)(2) and

15 U.S.C. § 78aa.

97.    In connection with the conduct alleged in this Complaint, Defendants

directly and indirectly used the means and instruments of interstate commerce,

including mail, telephone, and internet communications.

## THE COLLIERS/LONG TIC PROGRAM

### Overview of the Colliers/Long TIC Program

98.    Over the last several years, Millcreek Commercial and its agents have

conspired with third parties in a sophisticated scheme to fraudulently induce

vulnerable, often elderly investors to purchase TIC investments in commercial

properties located throughout the United States at grossly inflated prices (the

"Colliers/Long TIC Program").

99. Millcreek marketed TIC interests in real properties at multiple locations, including Naperville, Illinois; Romeoville, Illinois; Pine Bluff, Arkansas; Blytheville, Arkansas; Alpharetta, Georgia; Kennesaw, Georgia; Draper, Utah; Keller, Texas; Lehi, Utah; Bluffdale, Utah; South Jordan, Utah; Crockett, Texas; Tomball, Texas; and Katy, Texas.

100. Affiliates of the Colliers/Long Parties, such as Millrock Investment Fund 1, contracted with developers to make renovations, improvements, construction, and equipment purchases for the buildings at properties in the Colliers/Long TIC Program.

101. The Colliers/Long Parties represented that they had already secured for each property a paying tenant with sufficient revenue to service their long-term leases.

102. The tenant at the Pine Bluff and Draper Properties was identified as Healthcare Solutions Holdings Inc. ("HSH").

103. HSH is a Delaware corporation with its principal place of business in Glen Cove, New York.

104. HSH is a wholly owned subsidiary of Healthcare Solutions Management Group.

105. Healthcare Solutions Management Group, Inc. ("HSMG") is a Delaware corporation with its principal place of business in Glen Cove, New York.

106. Joshua Constantin ("Constantin") is an individual residing in Louisiana.

107. Justin Smith ("Smith") is an individual residing in Ohio.

21

108.    At all material times, Constantin acted as the Head of Commercial Real Estate for HSH.

109.    At all material times, Smith acted as HSMG's Chief Executive Officer.

110.    While not named as defendants in this lawsuit, collectively, HSH, HSMG, Constantin, Smith, and their affiliates and subsidiaries are referred to herein as the "HSH Parties."

111.    The HSH Parties are not parties in this action but allegations regarding them are included as context for claims against Defendants.

112.    Either the HSH Parties or their affiliates entered long-term leases to operate the Romeoville, Pine Bluff, Blytheville, Alpharetta, Kennesaw, and Naperville properties as urgent care centers or advanced care medical centers.

113.    Either the HSH Parties or their affiliates entered long-term leases to operate the Draper Property and the Pine Bluff Property as surgical ambulatory regional centers ("SARCs").

114.    The tenant at the Lehi Property was identified as Neuragenex, which was contracted to operate a "treatment center" at the Lehi Property.

115.    According to the Colliers/Long Parties, "Neuragenex [was] the nation's fastest growing healthcare brand and platform," "founded by Doctors," and under a "[l]ong term, corporate-guaranteed lease."  The investment as a whole, they said, "[s]atisfies IRS requirements for 1031 exchanges."

22

116.    Neuragenex Treatment Centers, LLC, was the guarantor on the lease.

117.    Collectively, Neuragenex and its affiliates, subsidiaries, and principals are referred to herein as "Neuragenex" or the "Neuragenex Parties."

118.    The Neuragenex Parties are not parties in this action but allegations regarding it are included as context for claims against Defendants.

119.    The tenant at the Crockett Property was identified as Pulse Physician Organization, PLLC.

120.    This tenant, the Colliers/Long Parties said, was under a "[l]ong term, NNN lease" with a "Full Corporate Guarantee from Pulse Healthcare" that would impose no landlord responsibilities on potential investors.

121.    Collectively, Pulse Physician Organization, PLLC and its affiliates, subsidiaries, and principals are referred to herein as "Pulse Healthcare" or the "Pulse Healthcare Parties."

122.    The Pulse Healthcare tenant, the Colliers/Long Parties said, had nine clinic locations in Texas, equipped with the best technology and treatment options.

123.    The Pulse Healthcare Parties are not parties in this action but allegations regarding them are included as context for claims against Defendants.

124.    The leases with the aforementioned tenants were bundled with the sale of TIC interests in each property.

125.    Millcreek Commercial represented this would result in investors receiving a return on their investment of about 6.3-7.59% over the term of each lease.

126.    Millcreek Commercial represented that these leases would result in a steady stream of income along the way.

127.    The Colliers/Long Parties represented that the rent payments from the Pine Bluff and Draper leases were backed by two failsafe mechanisms to protect investors from potential losses.

128.    The first of these was a corporate guarantee backing the lease.

129.    The corporate guarantor for the Pine Bluff and Draper leases was HSMG.

130.    The second of these was represented by Millcreek to be a bond issued by Lloyds of London, the world's leading insurance/reinsurance market.

131.    The leases at Lehi and Crockett were similarly backed, the Colliers/Long Parties said, by the failsafe mechanisms of corporate guarantees backing each lease in case of a default on the leases.

132.    To locate potential investors and induce their investments, Millcreek Commercial and its agents relied on a network of referring parties, including real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents to locate and refer potential investors to them.

133.    While not named as defendants in this lawsuit, these referring parties are described collectively herein as "Advisors" and allegations regarding them are added to provide context to Plaintiffs' claims.

**The Colliers/Long Parties Jointly Target Retirement Investors**

134.    From 2013 to 2016, Kevin Long was the Principal Broker and COO of CBC Advisors, a real estate company.

135.    Kevin Long worked with Brandon Fugal at CBC Advisors.

136.    Long and Fugal, at CBC Advisors, worked with Lew Cramer at Colliers.

137.    Mary Street was an Associate Broker and Senior Vice President of Land and Investments at CBC Advisors.

138.    All of the above-mentioned individuals can be seen in the following picture, published in a newsletter celebrating CBC Advisors' accomplishments:



## CBC Advisors: Redefining Commercial Real Estate


Meg Walter • Jul 14, 2016 • 2 min read

139.    Lew Cramer went on to become Chief Executive Officer of the Utah division of Colliers.

140.    In 2017, Colliers acquired Long's company, CBC Advisors.

141.    Brandon Fugal went on to become Chairman of the Utah division of Colliers after the acquisition.

142.    After the acquisition, Long worked as a broker for Colliers.

143.    Long represented he was the Senior Vice President of the Utah division of Colliers, as shown in this email signature from communications with Plaintiffs below:



144.    Long represented he was also Executive Vice President of the Utah division of Colliers, as shown in his email signature from communications with Plaintiffs below:




**Kevin G. Long**

Executive Vice President
**Direct +1 801 947-8324 | Mobile +1 801 400-2080**
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

145.    On or about April 27, 2017, Kevin Long founded Millrock Investment Fund 1, LLC and Millrock Investment Fund 1 Management, LLC.

146.    In or about September 26, 2019, Kevin Long also founded Millcreek Commercial Properties, LLC.

147.    Long was "President of Millcreek Commercial with Colliers", as shown in this excerpt from his personal LinkedIn page:



Kevin Long
President, CEO and Co-Founder of Millcreek Commercial

## Experience



**President of Millcreek Commercial with Colliers International | Utah**
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

27

148.    Long represented that Millcreek and Colliers worked in partnership with each other, as shown in this excerpt from Millcreek's website:

In his previous position, Scott was the Executive Vice President of Sales and Marketing for the largest provider of Real Estate partial ownership projects in the United States. Through his efforts, he developed an impeccable reputation and a nationwide client base. The alliance between the Rutherfords and Millcreek Commercial will enable Millcreek to become the preeminent provider of tenant-in-common real estate in the US. Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners provide Millcreek Commercial with an unsurpassed national platform.

149.    At all material times, Millcreek Commercial used headers on their marketing materials, announcements, and other relevant documents that highlight their partnership with Colliers, as shown in the excerpts below:



150.    In about 2020, Lew Cramer, on Colliers' behalf, approved terms with Kevin Long and his affiliates by which Colliers would partner with Long in the Colliers/Long TIC Program, including through brokerage activities, due diligence activities, and marketing.

28

151.    By at least about 2020, Adam Long was an owner of Defendant Millrock Investment Fund 1 Management, together with his father, Kevin Long.  Together, they managed Millrock Investment Fund 1 as it developed the Colliers/Long TIC Program.

152.    At about the same time, Adam Long worked, in part, at Colliers' Toronto, Canada executive offices, and, along with Lew Cramer, mentored sales agents employed in the Colliers/Long TIC Program, including, on information and belief, Defendants Taylor, McDougal, and Strong.

153.    At all material times, Defendants Kevin Long, McDougal, Brent Smith, Strong, Taylor, Mark Machlis, and other agents of Millcreek Commercial Properties and Colliers International were close business associates, including through joint marketing, communications, social media, and transactional commission payments.

154.    By at least 2020, Millcreek Commercial Properties and its agents McDougal, Strong, Taylor, and Mark Machlis, under Long's leadership, began marketing and selling TIC interests in real property including the Pine Bluff, Draper, Lehi, and Crockett Properties.

155.    On information and belief, Brent Smith performed an instrumental role in developing the Colliers/Long TIC Program, including by identifying potential tenants and properties and calculating and arranging the terms and details of leases, corporate guarantees, bonds, and other aspects of each TIC offering in order to package and sell a final TIC offering to potential investors.

29

156.    Kevin Long described Brent Smith as the "numbers guy" for the Colliers/Long TIC Program.

157.    At the Draper Property, he provided financial data to investors that was intended to validate the tenant as a profitable company.

158.    Tom Smith provided "Oversight & Leadership" for the Colliers/Long TIC Program and was a financial partner for it, as shown in this slide from a presentation given by Scott Rutherford:



159.    Tom Smith's responsibilities with regard to the Colliers/Long TIC Program included "Accountability oversight," as shown in this slide from a presentation given by Scott Rutherford:



160.    Scott Rutherford stated that Tom Smith was "the main financial partner" for Millcreek and provided training to sales agents under Millcreek and Colliers' umbrella.

161.    On information and belief, Tom Smith performed an instrumental role in developing and executing the Colliers/Long TIC Program including the development, marketing and sale of the Pine Bluff, Draper, Lehi, and Crockett Properties at issue in this case, including by providing necessary funding for the Colliers/Long TIC Program, including the Pine Bluff, Draper, Lehi, and Crockett Properties at issue in this case, and providing oversight and management of the Colliers/Long TIC Program and its sales agents including the development, marketing and sale of the Pine Bluff, Draper, Lehi, and Crockett Properties at issue in this case, including by identifying potential tenants and properties and calculating and arranging the terms and details of leases, corporate

guarantees, bonds, and other aspects of each TIC offering in order to package and sell a final TIC offering to potential investors.

162.    From about 2018-2020, Mary Street represented that she was an Executive Vice President of Colliers International.

163.    On or about April 6, 2020, Mary Street registered CAMS Realty, LLC in Utah, dba Colliers Asset Management Services.

164.    On or about April 7, 2020, Mary Street registered Colliers Asset Management Services in Utah.

165.    Mary Street also registered the business name Commercial Asset Management Services.

166.    In or about 2020, Mary Street represented that she was the Principal Broker of Colliers Asset Management Services.

167.    Mary Street identifies herself as an Associate Broker with Mountain West Commercial Real Estate and manager of CAMS Realty, LLC.

168.    On information and belief, Defendants Colliers International, Millcreek Commercial, Long, Strong, Machlis, Taylor, and McDougal are not registered with FINRA (the Financial Industry Regulatory Authority) to sell securities.

169.    On information and belief, Defendants Long, Strong, Taylor, Mark Machlis, and McDougal are not licensed with the states of Texas or Arkansas to sell real estate.

170.     The TIC interests sold by the Colliers/Long TIC Program, including the Pine Bluff, Draper, Lehi, and Crockett Properties, were not registered as securities by the filing of a registration statement, nor were they exempt under the 1933 Securities Act.

171.     The Colliers/Long Parties marketed TIC interests to potential buyers who wished to take advantage of the IRS Section 1031 exchange program.

172.      A 1031 exchange permits those who sell business or investment property to postpone paying tax on the gain if the funds are reinvested in a "like-kind exchange"—i.e., property of the same nature or character as the sold property.

173.     1031 exchanges must take place over a constrained time frame, by law.

174.     From the date the original property is sold, the purchase of the new property must be completed within 180 days.

175.     Millcreek "markets to middle class retirement investors," as shown in this excerpt from the Frequently Asked Questions page of Millcreek's website:

## What is the exit strategy?

Each co-owner has a separate deeded interest in the property and can buy and sell their interests as real estate independent of other owners. Every NNN leased investment, whether purchased as a Tenant In Common or as the sole owner, should be purchased as part of a long term investment strategy. But, as Robert Burns wrote, even "the best laid plans... can go awry". Because Millcreek Commercial Properties keeps minimums low and markets to middle class retirement investors we anticipate securing multiple retirement account investors in our properties. These investors have been coached to utilize a roll-up strategy whereby they leave their cash in their retirement account and compound their investment when additional shares of their investment property become available. There are no minimums on exchanges within a property.

Millcreek will facilitate these deed modifications and charge no marketing fees. If after your shares are offered to your partners and you still have a portion of your investment left to sell on the open market. Millcreel will market your property on our sales platform for a discounted listing fee of 3%. We are committed to maintaining the best resale program in the industry.

176.    The tax-deferral advantages of a 1031 exchange are appealing to retirees, particularly when such an exchange came with a promise of large monthly returns on which they could rely during their final years.

177.    Millcreek marketed that "Millcreek Commercial generates passive income for you."

178.    Typically, the Colliers/Long Parties bundled long-term, triple net leases with the sale of TIC interests.

179.    That is, they offered TIC interests in properties that already had leases in place with tenants.

180.    The lease connected with each TIC property was designed to be the income stream for the Colliers/Long Parties' targeted investors.

181.    Millcreek marketed their properties as a way to "leave the headaches of being a landlord behind."

182.    Millcreek also coaxed possible investors by saying "[r]est assured that our portfolio is rock solid. We rigorously vet every property that we offer," as shown in this excerpt from Millcreek's website, on a page called "1031 Exchange":

# Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

183.    Typically, on information and belief, a tenant was identified and acquired by the Developer Parties.

184.    Starting by at least early 2020, the Colliers/Long Parties, under Long's direction, began marketing the Pine Bluff Property.

185.    Starting by at least August 2020, the Colliers/Long Parties, under Long's direction, began marketing the Draper Property.

186.    Starting by at least April 2022, the Colliers/Long Parties, under Long's direction, began marketing the Lehi and Crockett Properties.

187.    The Colliers/Long Parties represented on the Pine Bluff Property's Offering Memorandum that the "[y]ear [b]uilt [was] 2019-2020".

188.    The Colliers/Long Parties represented on the Pine Bluff Property's Offering Memorandum that the rent commencement date would be as soon as April 2020.

189.    The Colliers/Long Parties represented that the Draper Property was a pre-existing building and that renovations would be performed to prepare it for the tenant.

190.    The Colliers/Long Parties represented on the Draper Property's Offering Memorandum that the rent commencement date would be as soon as July 2020.

191.    The Colliers/Long Parties represented on the Lehi Property's Offering Memorandum that the rent commencement date would be as early as October 2022.

192.    The Colliers/Long Parties represented on the Crockett Property's Offering Memorandum that the rent commencement date would be as early as May 2022.

193.    According to the Colliers/Long Parties' marketing materials, the Properties were each under long-term lease to a single tenant.

194.    According to the Colliers/Long marketing materials, the lease at each of the Pine Bluff, Draper, Lehi, and Crockett Properties was backed by a corporate guarantor.

195.    At Pine Bluff and Draper, according to the Colliers/Long marketing materials, the lease was additionally under a bond from Lloyds of London.

196.    Each of the Plaintiffs in this action purchased TIC interests for the desired purpose of deferring capital gains tax and to obtain an income-generating property.

197.    As part of all or nearly all of Plaintiffs' purchases of TIC interests in the Pine Bluff, Draper, Lehi, and Crockett Properties, Colliers acted as the broker and received commission payments.

**The Colliers/Long TIC Program Sales Pitch**

198.    Plaintiffs communicated directly with representatives of Millcreek, including Long, Strong, Taylor, Mark Machlis, and McDougal.

199.    Additionally, Long, Strong, and McDougal used email addresses with Colliers' domain and Millcreek's domain at the time they sold TIC investments to Plaintiffs.

200.    Each of the Millcreek representatives with whom Plaintiffs talked strongly recommended they invest in one of a portfolio of TIC properties sold by Millcreek.

201.    Each of the Plaintiffs was informed that a Colliers/Long TIC was a great investment because Millcreek always "hand-select[s] the best properties," as shown in this excerpt from Millcreek's promotional materials:

We help each of our investors enjoy monthly passive income by co-owning premium commercial real estate that is both recession-resilient and fully managed.  How do we achieve this?

Removing Barriers to Investing in Commercial Real Estate

First, we hand-select the best properties. Each property is thoroughly examined and vetted. It must meet at least three of these four criteria:

- Single tenant (avoids complexity)
- Long-term lease (15+ years reduces tenant shuffling)
- Triple net lease (tenants are responsible for improvements, taxes, maintenance, etc.)
- Backed by a corporate guarantee (a larger company guarantees the lease)

202.    Plaintiffs were told that "[i]n terms of commercial real estate, a 'bad investment' could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors," as shown in this excerpt from Millcreek's website:

Choosing a bad investment

Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment.  The types of properties included in Millcreek Commercial's portfolio include pharmacies, convenience stores, and medical centers.

203.    Each Plaintiff was told that with every property, investors could "enjoy a quality property that has been identified and vetted by seasoned professionals," as stated in this excerpt from the Millcreek website:

> After identifying the property, Millcreek will ensure that the property meets three of four requirements: single tenant, long-term lease, investment grade, and triple-net leased. In addition, Millcreek Commercial will travel to the property for a personalized inspection of the property, building, and the surrounding area. Millcreek Commercial's years of experience in identifying profitable properties allows investors to avoid having to fear getting stuck with a "bad investment". Their expertise can help investors enjoy a quality property that has been identified and vetted by seasoned professionals.

204.    Moreover, the Colliers/Long Parties represented that they had already secured "the tenant of your dreams" for the Pine Bluff and Draper Properties, namely, HSH or one of its affiliates.

205.    They touted the Lehi and Crockett tenants in similarly glowing terms: Neuragenex was "the nation's fastest growing healthcare brand and platform," and Pulse Healthcare was an established organization that "prioritizes state-of-the-art resources" and had "clinics [] equipped with the best technology and treatment options."

206.    The Colliers/Long Parties represented that the Crockett tenant, Pulse Healthcare, was "expanding with the goal of becoming a Preferred Provider with Medicare."

207.    According to the Colliers/Long Parties, the tenants for the Pine Bluff, Draper, Lehi, and Crockett Properties had already signed 15- or 20-year leases with annual rent increases and an average return on investment over that period of 6-7.5%.

208.    Millcreek Commercial represented that the lease on each of its TIC properties in Pine Bluff, Draper, Lehi, and Crockett was triple-net ("NNN")—meaning the tenant, not the owner, would be responsible for paying taxes, paying insurance, and maintaining the property.

209.    Millcreek Commercial stated that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors.  Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income," as shown in this excerpt from an article from Millcreek Commercial titled "Investing Isn't Scary":

> Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income.

210.    Accordingly, the Colliers/Long Parties stated the leases at Pine Bluff and Draper were "backed by strength" by HSMG, the guarantor on the lease and a member of the HSH Parties.

211.    The Colliers/Long Parties represented that HSMG was "a publicly traded medical service and device company," as shown in this excerpt from the Pine Bluff Property's Offering Memorandum:

## Backed By Strength

Healthcare Solutions Holdings, Inc. "HSI" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSI's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

HSI not only helps physicians deliver better healthcare but also assists them in remaining compliant with industry best practices.

212.    Millcreek represented that HSMG working "'in cooperation' with Millcreek" was developing a nationwide network of surgery centers.

213.    The Colliers/Long Parties represented that "Healthcare Solutions Holdings, Inc. (HSH), meets [their] pillars for success," as shown in this excerpt from the Pine Bluff Property's Offering Memorandum:

## The Tenant of Your Dreams

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

214.    Neuragenex Treatment Centers, LLC was identified in marketing materials as the corporate guarantor for the Lehi lease and a member of the NGX Parties.

215.    The Colliers/Long Parties represented that the Lehi Property was under a "[l]ong term, corporate-guaranteed lease."

42

216.    The Colliers/Long Parties represented that "Neuragenex is the nation's fastest growing healthcare brand and platform, consisting of multiple avenues of care and expanding across the nation to offer the latest and safest healthcare programs and treatments," as shown in this excerpt from the Lehi Property's Offering Memorandum:

**Neuragenex Company Overview**

Neuragenex is the nation's fastest growing healthcare brand and platform, consisting of multiple avenues of care and expanding across the nation to offer the latest and safest healthcare programs and treatments. Neuragenex consists of four primary avenues of care.

217.    The Colliers/Long Parties represented that, "[i]n addition to offering these vital services, Neuragenex is bringing the combination of dental and aesthetics to market with the first ever nationwide chain of dual purpose dental and aesthetic offices, upping the standard even further by offering patented medical spa treatments that no other practice can provide," as shown in this excerpt from the Lehi Property's Offering Memorandum:

Neuragenex offers highly effective pain treatment therapies and protocols while addressing the underlying chronic metabolic conditions that drive chronic pain and chronic health decline. In addition to combating the opioid crisis with non-narcotic therapies, Neuragenex is also addressing the vastly underserved category of Behavioral Health by offering advanced FDA approved non-pharmaceutical treatments for depression and anxiety, while screening and addressing a wide range of Behavioral Health conditions. In addition to offering these vital services, Neuragenex is bringing the combination of dental and aesthetics to market with the first ever nationwide chain of dual purpose dental and aesthetic offices, upping the standard even further by offering patented medical spa treatments that no other practice can provide.

218.    The Colliers/Long Parties represented that there was a "Full Corporate Guarantee From Pulse Healthcare," as shown in this excerpt from the Crockett Property's Offering Memorandum:

•  Full Corporate Guarantee From Pulse Healthcare

43

219.    Achy Legs Clinics, LLC and Spectre Innovations, LLC were also identified as corporate guarantors for lease at the Crockett Property and members of the Pulse Parties.

220.    The Colliers/Long Parties represented that the Crockett Property had a "Pandemic, Recession and Internet Resistant Tenant with 8 clinics throughout the Greater Houston Area," as shown in this excerpt from the Crockett Property's Offering Memorandum:

• Pandemic, Recession and Internet Resistant Tenant with 8 clinics throughout the Greater Houston area.

221.    The Colliers/Long Parties represented that the leases at the Draper and Pine Bluff Properties were insured by the prestigious Lloyds of London insurance entity, as shown in the excerpt above.

222.    In the case of a default of the HSH Parties, the Colliers/Long parties represented that a "Default Bond" would activate, ensuring that "1 year of rent payments [would be paid] if in the first 48 months," as shown in the excerpt below:

| Option Increases | Yes |
|---|---|
| Lease Type | Absolute NNN bonded |
| Landlord Responsibilities | Zero |
| Insurance/Taxes/CAM/Utilities | Tenant |
| ROFO | No |
| Estoppel | As needed |
| Default Bond | 1 year of rent payments if in the first 48 months |
| Ownership Interest | TIC fee simple estate |

223.    The Colliers/Long Parties meant to imply, and Plaintiffs in fact inferred, that the involvement of Lloyds of London meant that reputable and reliable vetting and evaluation of the leases at Pine Bluff and Draper had been performed in connection with issuance of the bond.

224.    The Colliers/Long Parties told Plaintiffs that they could rest assured that their investments would be "safe, stable, [and] secure," as shown in this excerpt from marketing materials provided by Millcreek:

**Invest with Us**
At Millcreek Commercial, we take the benefits of investing in commercial real estate to the next level. Our "all-gain, no-pain model" produces monthly passive income, requires zero heavy-lifting, and tax-protects our co-owners.

Invest with us today and access premium commercial real estate that is a safe, secure, and stable place to put your hard-earned dollars to work.

225.    The Colliers/Long Parties represented that "every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction," as per this excerpt from Millcreek's Frequently Asked Questions page on their website:

45

**How is a purchase executed?**

Every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction. After you have reviewed the Offering Memorandum and decided to proceed we enter into a Purchase and Sale Agreement. Once the property is under contract all the detailed source documents that are referenced in the Offering Memorandum are made available for your review. Once you are confident you want to proceed we make an appointment for you with Old Republic Title. We have associated with this national title company to provide title insurance (at our costs) and reduced administrative fees shared by us. Because our properties are debt free you have very few documents to sign. Outside of the Purchase and Sale Agreement you will also be required to sign a Tenant In Common agreement that sets forth your relationship with the other owners and a Lease Administration Agreement.

226.    According to Millcreek Commercial, the Pine Bluff, Draper, Lehi, and Crockett Properties passed its "relative test."

227.    The "relative test," as Millcreek explained in its marketing material, was whether "we would sell [the property] to our mother, grandmother, best friend, or son."

228.    Millcreek Commercial stated that "our acquisition team only purchases properties that our principals want to hold in our portfolios," as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**4. Philosophy and Core Values**

Our acquisition team only purchases properties that our principals want to hold in our portfolios. We purchase these properties debt free and then invite others to join us as Tenant In Common owners. Every property must pass the relative test – we would sell this to our mother, grandmother, best friend or son.

229.    Millcreek stated that "we typically stay in our deals for the long term [...] This commitment provides our partners with added assurance that we believe in and are committed to our products", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**5. Long Term Partners**

Millcreek Commercial typically stays in our deals for the long term. There are situations where we could sell all of a syndication, but our business model is for one of our partners or family member to stay in a deal for the long term. This commitment provides our partners added assurance that we believe in and are committed to our products.

230.    The Colliers/Long Parties represented that they had done many such deals before.

231.    Colliers/Long Parties told Plaintiffs that Millcreek "utilizes Colliers International as [its] brokerage partner."

232.    The Colliers/Long Parties represented to the Plaintiffs that the Colliers/Long partnership extended internationally because Colliers was Millcreek's "global partner," as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

47

**2. A National Platform**

Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform.

233.    The Colliers/Long TIC Program's representatives communicated with Plaintiffs using their official Colliers email addresses.

234.    Colliers' logo was prominently placed right next to Millcreek's logo on the Pine Bluff, Draper, Lehi and Crockett Properties' Offering Memoranda.

235.    Colliers' logo was also prominently displayed on emails and marketing materials used by Long and other Millcreek Commercial Properties agents.

236.    Below is the front page of the Colliers/Long' parties Offering Memorandums for TIC investments in the Pine Bluff, Draper, Lehi, and Crockett Properties:



Surgical Ambulatory Regional Centers | Draper, UT

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.MILLCREEKCOMMERCIAL.com

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT











CROCKETT ASC
**CROCKETT, TEXAS**

Office: 801.899.1943 | www.**MILLCREEKCOMMERCIAL**.com

Millcreek Commercial | 2100 Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT 84062

237.     Below is the heading of the second page of the Offering Memorandum for the Pine Bluff, Draper, Lehi, and Crockett Properties, again prominently featuring the logos of both Millcreek and its partner, Colliers International:



238.     Plaintiffs relied on these representations when each eventually purchased a TIC interest in the Pine Bluff, Draper, Lehi, and Crockett Properties.

**The Referrer Parties' Role in the Colliers/Long TIC Program**

239.     Plaintiffs were typically referred to the Colliers/Long TIC Program by a real estate professional and/or 1031 exchange specialist (collectively, the "Referrers").

240.    Not all the Referrers are parties in this action but allegations regarding them are included as context for claims against Defendants.

241.    Referrers typically recommended a TIC investment through the Colliers/Long TIC Program and assured the would-be owner that Kevin Long and Millcreek had great TIC investment opportunities that would be 1031-exchange compliant.

242.    Referrers typically pointed out that Kevin Long and Millcreek Commercial had partnered with Colliers with respect to the TIC investments in the Colliers/Long TIC Program.

243.    Each of the Defendant Referrers (Mark Machlis and Robert M. Levenson) counseled the respective Plaintiff with whom they were dealing that a TIC investment through Kevin Long and Millcreek partnered with Colliers would provide a 1031-compliant property that featured the kind of professional, safe, reliable, low-risk, and well-vetted investment that Plaintiffs were seeking.

244.    Upon information and belief, the Defendant Referrer parties engaged in a referral agreement, referred to as an "Ambassador Agreement," with Millcreek Commercial and were paid a commission for successful referrals.

245.    The amount of commission the "Ambassador" would receive was based on three tiers of sales, as pictured from a Millcreek Ambassador Agreement excerpt attached below.

| Calendar Year Sales Volume | |
|---|---|
| Up to $1,000,000 | 3.0% Commission |
| $1,000,000 to $2,000,000 | 3.5% Commission |
| Greater than $2,000,000 | 4.0% Commission |
| MCP may, at their discretion, from time to time, offer additional cash, merchandise, or travel as incentives based on transaction or deal volume. | |

246. None of the Defendant Referrers mentioned to Plaintiffs that they would receive a commission or a similar type of compensation from the Colliers/Long Parties for the referral.

247. None of the Defendant Referrers disclosed to Plaintiffs whether they had already engaged in the Ambassador Agreement with the Colliers/Long parties before referring Plaintiffs to the Colliers/Long TIC Program.

**The Developer Parties' Role in the Colliers/Long TIC Program**

248. American Development Partners ("ADP") is a Tennessee company with its principal place of business in Franklin, Tennessee.

249. Emanuel Butera ("Butera") is an individual residing in Tennessee.

250. At all material times, Butera acted as the owner and operator of ADP.

251. 13 Investments, LLC is a Utah limited liability company.

252. Mark Machlis is an individual residing in Utah.

253. At all material times, Mark Machlis acted as the manager, registered agent, and on information and belief the owner of 13 Investments.

54

254.    While not all are named as defendants in this lawsuit, collectively, ADP, Butera, 13 Investments, and Mark Machlis, are referred to herein as the "Developer Parties," and allegations regarding all of them are included as context for claims against Defendants.

255.    Millcreek or its affiliates, including ADP-Millcreek 3 and Millrock Investment Fund 1, entered a series of contracts with one or more of the Developer Parties wherein the Developer Parties would develop, renovate, purchase equipment, and/or acquire tenants for the Pine Bluff, Draper, and Lehi Properties (among others in the Colliers/Long TIC Program).

256.    In approximately 2018, "Millcreek Commercial Properties [partnered] with American Development Partners to develop $50 million in single-tenant triple-net lease assets throughout the US."

257.    "Millcreek [served] as the capital partner for American Development, which [would] build multiple single-tenant properties, including two facilities for Healthcare Solutions Holdings."

258.    Long stated: "They [ADP] have an extensive background in single tenant net lease product across the US.  We spent months exploring a venture together.  We have come together and are excited about the synergy that these two companies bring together for the American public."

259.    Two of these single-tenant properties that Millcreek contracted ADP to develop were the Pine Bluff and Draper Properties.

260.    Millcreek contracted with 13 Investments to develop the Lehi Property.

261.    On information and belief, Millcreek may have contracted with either the tenant or a tenant affiliate at the Crockett Property, or another developer party, to develop the Crockett Property.

**Mary Street and CAMS Realty's Role in the Colliers/Long TIC Program**

262.    When Plaintiffs ultimately purchased the TIC interests in this case, they were introduced for the first time to Mary Street of CAMS Realty, whom the Colliers/Long Parties had enlisted as the lease administrator at the Pine Bluff, Draper, Lehi, and Crockett Properties.

263.    To Plaintiffs, it initially appeared (and the other Colliers/Long Parties represented) that Mary Street was a neutral, professional, trustworthy third-party who would act in the new TIC owners' best interests as lease administrator.

264.    In reality, and as Plaintiffs did not fully discover until much later, Mary Street had a long history of professional collaboration with the Colliers/Long Parties in developing and implementing the Colliers/Long TIC Program.

265.    While purporting to represent Plaintiffs' best interests as owners of the ill-fated TIC investments offered by the Colliers/Long Parties, Mary Street collaborated

with the Colliers/Long Parties to keep Plaintiffs and other investors in the dark and string them further along the disastrous path that was the Colliers/Long TIC Program.

### The Previous TIC Owners' Roles in the Colliers/Long TIC Program

266.    While the TIC interests ultimately purchased by Plaintiffs were marketed and sold to them by the Colliers/Long Parties, none of the TIC interests were owned by Millcreek or Colliers themselves.

267.    Instead, the TIC interests Plaintiffs purchased through the Colliers/Long TIC Program were owned by Defendant Millrock Investment Fund 1, LLC, or SARC Draper, LLC.

268.    The Colliers/Long Parties did not disclose to Plaintiffs who really owned the TIC interests during the investment process, and Plaintiffs did not know that the TIC interests they were being induced to purchase were owned by other individuals and entities, not Millcreek or Colliers, until the final stages of the sale.

269.    Millrock Investment Fund 1 and SARC Draper LLC were development partners of the Colliers/Long TIC Program and aided in the development and execution of the Colliers/Long TIC Program, including through the development, marketing, and/or sale of Colliers/Long TIC offerings, including those in this case.

270.    Additionally, because each sold TIC interests to Plaintiffs at a drastically inflated rate, each received a direct financial benefit for their participation in the Colliers/Long TIC Program.

**Background of Defendants' Previous Negligence, Schemes, Frauds, and Investigations**

271.    Although Plaintiffs did not know it at the time, Plaintiffs have since discovered that many of Defendants' associates including several of the Developer parties, have previously been involved in fraudulent activity and SEC investigations.

272.    Colliers International North Texas, LLC, and Colliers Nevada, LLC, which on information and belief are subsidiaries and agents of Defendants Colliers International Group, Inc. and Colliers International Holdings (USA) Inc., were named as Defendants in Case No. 2:22-cv-00486, *Somerset At Sahara LLC v. Colliers International North Texas LLC, et al.,* in the United States District Court for the District of Nevada.

273.    The plaintiff in that case alleged that Colliers' sales agents conspired in a fraudulent commercial real estate scheme.  Colliers agents brokered and sold commercial properties under commercial leases with a medical company tenant.  The tenant negotiated for and obtained generous allowances from the landlord for equipment acquisitions and renovations at the subject properties, but after receiving the money, immediately defaulted and failed to occupy the properties before substantially performing any of its lease obligations.  Colliers' sales agents in that case made false and misleading representations of fact to investors about the strength and quality of the tenant and received commissions on each sale.

274.    HSMG was named as a defendant in Case No. 21-107 in the Chancery Court for Maury County, Tennessee, in about March 2021.  In that case, the plaintiff alleged that HSMG or one of its affiliates or subsidiaries entered a 20-year commercial lease, arranged by American Development Partners, with the prior owner of a commercial property.  Plaintiff in that case then purchased the subject property and lease, and the HSMG-affiliated tenant defaulted almost immediately.

275.    An offering memorandum exists listing the subject property for sale by Colliers agent Jim Morris and with Colliers' name, branding, and logo, similar to the offering memoranda used in the Colliers/Long TIC Program.  On information and belief the plaintiff in that case relied on the Colliers-branded offering memorandum and purchased the subject property through Colliers with Colliers receiving a commission.

276.    On April 25, 2013, a federal court in New York found Joshua Constantin and his related brokerage firm jointly and severally liable for $2.49 million, and Constantin and his related holding company jointly and severally liable for over $760,000. The court issued an opinion finding Constantin liable for fraud; noted that Constantin and his colleague had made a "litany of misrepresentations" to clients; found that Constantin had "diverted" investor funds "to his own purposes"; and found that Constantin had "provided clients with misleading documents to cover up the fraudulent nature of [his] investment scheme."

277.    The Colliers/Long parties knew or should have known that Joshua Constantin was found liable for fraud in his past investment scheme.

278.    As of November 27, 2013, Joshua Constantin was "indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment adviser, or from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, or transfer agent" in Case No. 1:11-cv-04642 in the United States District Court Southern District of New York.

279.    The Colliers/Long parties knew or should have known that Joshua Constantin was indefinitely barred by the SEC.

280.    Long justified this apparent oversight in a meeting on or about December 8, 2022, by admitting that "we're not in a practice of Googling individual executives of publicly traded companies."

281.    HSMG has defaulted on every operating lease in its portfolio—at least fourteen properties.

282.    Landes Capital was named as a defendant in a lawsuit styled Commodity Futures Trading Commission v. Financial Tree et al., case no. 2:20-cv-01184 in the United States District Court for the Eastern District of California. In this action, Financial Tree was found liable on claims of Commodity Option Fraud in Violation of 7 U.S.C. § 6c(b), Forex Fraud in violation of 7 U.S.C. § 6(b)(2)(A)-(C), among other claims. In this same action, Landes Capital was found liable on a claim of disgorgement for

having received ill-gotten funds for which Landes Capital did not provide legitimate services and to which Landes Capital did not have a legitimate claim.

283.    The Colliers/Long Parties knew or should have known that Landes Capital was found liable for having received ill-gotten funds for which Landes Capital did not provide legitimate services and to which Landes Capital did not have a legitimate claim.

284.    In or about October of 2006, Emanuel Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee Nashville Division, a breach of lease agreement case.

285.    The Colliers/Long Parties knew or should have known that Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee.

286.    In or about July 2022, Butera and his associated entity Redstone, LLC were named as defendants in a similar real estate investment scheme in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

287.    The Colliers/Long Parties knew or should have known that Butera was named as a defendant in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

288.    In or about April 2020, Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside, a breach of contract and fraud real estate investment scheme.

289.    With respect to this information, Plaintiffs allege that Colliers/Long Parties knew or should have known that Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside.

290.    Justin Smith is the sole member of Landes Capital Management, LLC. He also has "voting and dispositive control" of the HSH shares held by Landes and Compagnie Trust Prive KB.

291.    On information and belief, Justin Smith used Landes Capital Management, LLC and Landes and Compagnie Trust Prive KB as a façade for his personal operations, to siphon funds to himself, and/or promote fraud or injustice by siphoning funds away from HSMG to avoid its obligations under leases and contracts.

292.    With respect to this information, Plaintiffs allege that the Colliers/Long parties knew or should have known that Justin Smith was alleged to have used Landes entities for fraudulent purposes.

**MISREPRESENTATIONS AND OMISSIONS**

**Misrepresentations and Omissions in the Marketing Materials**

293.    Long, Strong, Machlis, Taylor, and McDougal provided written marketing materials, including materials in electronic form, to all of the Plaintiffs.

294. This included Offering Memoranda for each of the Draper, Pine Bluff, Lehi, and Crockett Properties, property descriptions on their website, and blog posts and other marketing materials.

295. Together, these materials are referred to herein as the "Marketing Materials."

296. The Colliers/Long Parties developed the Marketing Materials with input from the Developer Parties and the tenants and their affiliated entities at each of the subject properties, and the Developer Parties and the tenants and their affiliated entities were aware of and approved, either expressly or tacitly, all of the content of the Marketing Materials.

297. Long, Strong, Mark Machlis, Taylor, and McDougal reviewed and were made aware of the information contained in the Marketing Materials.

298. Long, Strong, Mark Machlis, Taylor, and McDougal distributed the Marketing Materials to each Plaintiff with whom they had contact by means including but not limited to:

    a. Emailing the Marketing Materials.

    b. Directing Plaintiffs to the Marketing Materials through the Millcreek website.

299.    Additionally, Long, Strong, Mark Machlis, Taylor, and McDougal verbally restated the representations in the Marketing Materials to Plaintiffs through phone calls and in-person meetings.

*Misrepresentations in the Pine Bluff Property Marketing Materials*

300.    The Pine Bluff Property Marketing Materials provided by the Colliers/Long Parties made at least the following representations of material fact:

a.  That tenant SARC (an HSH party) was under a 20-year long-term lease with annual rent increases and a 7.59% average annual return;

b.  That the lease was under a corporate guarantee from HSMG;

c.  That the tenant had a sophisticated business strategy to generate significantly higher operating margins;

d.  That the tenant was developing 350 care centers to create "the most extensive branded system in the country";

e.  That the lease was insured by Lloyds of London;

f.  That the lease was "Absolute NNN bonded" with "Zero" landlord responsibilities and insurance, taxes, CAM, and utilities to be paid for by the tenant; and

g.  That the investment satisfied IRS requirements for 1031 exchanges.

301.    These representations were false and misleading in that HSH was unable to service a long-term lease, its corporate guarantor was equally unable or unwilling to

make good on its obligations, there was no bond from Lloyds of London, HSH did not have sufficiently substantial business operations, and as a consequence potential investors would be and quickly were burdened with landlord responsibilities.

302.    These representations concerned issues of material facts, in that they altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial status of the tenant company, the due diligence done by the Colliers/Long Parties, and the tax-advantaged status of the Colliers/Long TIC interests, among others.

*Misrepresentations in the Draper Property Marketing Materials*

303.    The Draper Property Marketing Materials provided by the Colliers/Long Parties made at least the following representations of material fact:

a.    That the tenant HSH was under a long term, 20-year lease with rent increases built in and an average return of 7.6%;

b.    That the lease was under a corporate guarantee;

c.    That the property satisfied IRS requirements for 1031 exchanges;

d.    That the tenant had "the most extensive branded system" of its kind in the country;

e.    That tenant HSH was a "publicly-traded medical service and device company";

f.  That the tenant's unique business model would result in "significantly enhanced operating margins";

g.  That the lease was insured by Lloyds of London; and

h.  That the lease was "Absolute NNN bonded" with "Zero" landlord responsibilities for potential investors;

i.  That the investment satisfied IRS requirements for 1031 exchanges.

304.  These representations were false and misleading in that HSH was unable to service a long-term lease, its corporate guarantor was equally unable or unwilling to make good on its obligations, there was no bond from Lloyds of London, HSH did not have sufficiently substantial business operations, and as a consequence potential investors would be and quickly were burdened with landlord responsibilities.

305.  These representations concerned issues of material facts, in that they altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial status of the tenant company, the due diligence done by the Colliers/Long Parties, and the tax-advantaged status of the Colliers/Long TIC interests, among others.

*Misrepresentations in the Lehi Property Marketing Materials*

306.  The Lehi Property Marketing Materials provided by the Colliers/Long Parties made at least the following representations of material fact:

66

    a.  That tenant Neuragenex was "the nation's fastest growing healthcare brand and platform;"

    b.  That the tenant was under a 20-year long term lease with annual rent increases and an average return of 7.25%;

    c.  That the lease was under a corporate guarantee;

    d.  That the lease was "Absolute NNN" with "Zero" landlord responsibilities; and

    e.  That the investment satisfied IRS requirements for 1031 exchanges.

307.   These representations were false and misleading in that Neuragenex did not have sufficient business operations nor was financially able to service a long-term lease (much less grow its platform and brand), that the corporate guarantor was equally unreliable and unable or unwilling to meet its obligations, and there was a substantial likelihood that the investment was not 1031-compliant, among others.

308.   These representations concerned issues of material facts, in that they altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial status of the tenant company, the due diligence done by the Colliers/Long Parties, and the tax-advantaged status of the Colliers/Long TIC interests, among others.

*Misrepresentations in the Crockett Property Marketing Materials*

309.    The Crockett Property Marketing Materials provided by the Colliers/Long Parties made at least the following representations of material fact:

  a.  That the tenant Pulse Physician Organization, PLLC was under 15-year long term lease with periodic rent increases and an approximately 6% average annual return;

  b.  That the lease was under a "Full Corporate Guarantee;"

  c.  That the lease was triple-net;

  d.  That the tenant had a "well-performing vascular surgery portfolio;"

  e.  That there were no landlord responsibilities and insurance, taxes, CAM, and utilities would be the tenant's responsibility;

  f.  That the investment satisfied IRS requirements for 1031 exchanges;

310.    These representations were false and misleading in that the tenant did not have the ability to service a long-term lease, the corporate guarantor was equally unreliable with respect to its guarantee obligations, and the default of the tenant would quickly impose significant responsibilities and costs on owners.

311.    These representations concerned issues of material facts, in that they altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial status of the tenant company, the due diligence done by the Colliers/Long Parties, and the tax-advantaged status of the Colliers/Long TIC interests, among others.

**Omissions of Material Fact To All Plaintiffs**

312.    The Colliers/Long Parties made at least the following omissions of material fact:

313.    The Colliers/Long Parties omitted to disclose their sale of their TIC ownership in the Pine Bluff, Draper, Lehi, and Crockett Properties, despite representing to Plaintiffs and other investors that they retained ownership in the properties they sold.

314.    The Colliers/Long Parties omitted to disclose that public SEC filings stated that HSH underwent a reverse merger in order to go public.

315.    The Colliers/Long Parties omitted to disclose that public SEC filings stated that HSH's supposed assets disclosed as part of their reverse merger appear to be merely loans.

316.    The Colliers/Long Parties omitted to timely disclose that one of its affiliate entities, or other undisclosed and unknown entities and individuals, not Millcreek Commercial itself, held TIC interests in the Pine Bluff, Draper, Lehi, and Crockett Properties and would sell their TIC interests to Plaintiffs.

317.    The Colliers/Long Parties omitted to include financial reports about HSH in the due diligence materials for Pine Bluff and Draper.

318.    The Colliers/Long Parties omitted to disclose that the building on the Draper Property was an empty shell requiring near-total interior construction before it would be ready for a tenant.

319.    The Colliers/Long Parties omitted to disclose that both the sale prices and lease rates of the Pine Bluff and Draper Properties were dramatically overvalued compared to reasonable market lease rates for comparable properties.

320.    The Colliers/Long Parties omitted to disclose that Neuragenex and its corporate guarantor were shell companies with no substantial assets.

321.    The Colliers/Long Parties omitted to disclose that Neuragenex was not registered to do business in the state of Utah, where the Lehi Property is located.

322.    The Colliers/Long Parties omitted to disclose that Neuragenex's development agreements imposed unrealistic growth requirements and costs, including entering 500 leases of commercial real property during a 10-year term, an initial commitment of costs of about $1.5B, and a commitment to sign leases before the amount of rent was known.

323.    The Colliers/Long Parties omitted to disclose that $800,000 had been designated for medical equipment purchases at the Lehi Property with little or no oversight to ensure that the funds would be disbursed properly and the medical equipment would be obtained.

324.    The Colliers/Long Parties omitted to disclose that both the sale price and lease rate of the Lehi Property were dramatically overvalued compared to reasonable market lease rates for comparable properties.

325.    The Colliers/Long Parties omitted to disclose that Pulse Healthcare and its corporate guarantor were shell companies with no substantial assets.

326.    The Colliers/Long Parties omitted to disclose that, as of December 31, 2022, Pulse Healthcare had a negative working capital balance of nearly $4.4MM.

327.    The Colliers/Long Parties omitted to disclose that in July 2022, the assets of Pulse Healthcare and its guarantors (Achy Legs Clinics, LLC and Spectre Innovations, LLC) had been secured by a UCC lien filed by a creditor.

328.    The Colliers/Long Parties omitted to disclose that there was little or no oversight to ensure that $2MM designated for medical equipment purchases at the Crockett Property were disbursed properly to obtain the medical equipment.

329.    The Colliers/Long Parties omitted to disclose that both the sale price and lease rate of the Crockett Property were dramatically overvalued compared to reasonable market lease rates for comparable properties.

330.    The Colliers/Long Parties omitted to disclose that there was no business reason to support the valuation of the Pine Bluff, Draper, Lehi, and Crockett TIC investments they sold to Plaintiffs.

331.    The Colliers/Long Parties omitted to disclose that they had performed little or no due diligence on HSH, Neuragenex, or Pulse Healthcare, nor on their respective corporate guarantors, and that the Colliers/Long Parties had no reasonable basis to believe that the tenants would be able to pay long term leases or that the corporate guarantors would step in and fulfill their obligations.

332.    These omissions concerned issues of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, *inter alia*, the viability of each tenant and the likelihood that each would be able to pay a long term lease, the likelihood that Plaintiffs could re-tenant the Properties or re-sell their interest in them at the value marketed to them by the Colliers/Long Parties, the level of risk that Millcreek took on in the investment, and the reliability and accuracy of the Colliers/Long Parties' other representations.

### Misrepresentations and Omissions Made to Induce John and Gayle Weber's Investment

333.    In about early 2020, John Weber and Gayle Weber were referred to Kevin Long and the Colliers/Long TIC Program by Cody Black of Colliers.

334.    In part because of John and Gayle Weber's advanced age and health issues, communications meant to induce John and Gayle Weber's investment often occurred through John and Gayle's son, Ross Weber.

335.    In or about early 2020 through April 2020, through phone calls, emails, and other communications, Kevin Long made at least the following representations of material fact to John Weber and Ross Weber in order to induce John and Gayle Weber's investment through their entity Club Fitness, Inc.:

a.    That "[t]o protect [John's] exchange I proposed putting him into Pine Bluff with a guaranteed transfer to Draper next year," per an email correspondence in or about April 2020;

b.    That "[t]hat [by putting John into Pine Bluff] he starts earning 6.25% immediately," per an email correspondence in or about April 2020;

c.    That "**The Pine Bluff deal is awesome,**" per an email correspondence in or about April 2020 (emphasis in original);

d.    That "[**t]he building is currently owned by Dr. Mamood Sadeem the Chief Medical Officer for HSI,**" per an email correspondence in or about April 2020 (emphasis in original);

e.    That "**we [Colliers/Long] are undertaking an $8mm renovation that will add an additional 2,700 SF and renovate about 8,000 Sf [sic] of the existing building into a state of the art fully certified Ambulatory Surgery Center,**" per an email per an email correspondence in or about April 2020 (emphasis in original);

73

    f.   That "**[w]hile we are renovating HSI will be paying a rent amount equal to 40% of the finished value rent,**" per an email correspondence in or about April 2020 (emphasis in original);

    g.   That "[t]he difference [between building purchase price and the price at which it was sold to potential investors] is in the renovation costs for which I [Long] have full accountability and responsibility," per an email correspondence in or about April 2020;

    h.   That "I would further agree that in the event Draper is not completed as represented within a year I would buy this interest back," per an email correspondence in or about April 2020;

    i.   That the Pine Bluff Property had a long-term lease in place with HSH as a tenant, which was financially stable and reliable;

    j.   That the lease type was "Absolute NNN bonded," per marketing materials provided in an email on or about April 21, 2020;

336.    With respect to Long's representations to induce John and Gayle Weber's investment, Plaintiffs allege that these representations were false and misleading, in that, *inter alia*, HSH had no significant financial reserves or business operations, the corporate guarantee and Lloyds of London bond were fictional, that the property and lease were overvalued, and little or no due diligence had been done by Defendants as to the reliability of the tenant or other safeguards.

337.    Long's representations were material in that they altered the mix of information available to John Weber as he considered investing, and John Weber reasonably relied on Long's representations as he made the decision to invest.

### Misrepresentations and Omissions Made to Induce Ross Weber and Yolanda Altagracia Cosme de Weber's Investment

338.    In about early 2020, Kevin Long and Spencer Strong began to communicate with Ross Weber about his and Yolanda Altagracia Cosme de Weber's potential investment in the Colliers/Long TIC Program.

339.    In addition to the misrepresentations specifically made to induce their investment, Ross Weber and Yolanda Altagracia Cosme de Weber additionally relied on the misrepresentations made to induce John and Gayle Weber's prior investment.

340.    Through phone calls, webinars/conference calls, and emails in about early 2020, Kevin Long made at least the following representations of material fact to induce Ross Weber and Yolanda Altagracia Cosme de Weber's investment:

    a.    That "[Colliers/Long] have a publicly traded tenant that we are building for right now that signs 20 year leases with 2% rate increases," per an email correspondence in or about August 2020;

    b.    That "Healthcare Solutions Holdings [sic] This is the asset that we currently offer with the best opportunity for appreciation," per an email correspondence in or about September 2020;

     c.   That Millcreek Commercial had thoroughly vetted the tenants at the Draper Property; and

     d.   That Millcreek Commercial retained ownership interest in the Draper Property, giving it an interest in the long-term success of the investment.

341.    Through phone calls and emails in about early 2020, Spencer Strong made at least the following representations of material fact to induce Ross Weber and Yolanda Altagracia Cosme de Webers' investment:

     a.   That "[w]e [Millcreek] are beginning the build out of the Draper, UT Surgery Center at the end of this month and HSH will begin paying rent on the building beginning of December," per an email correspondence in or about November 2020;

     b.   That "[w]e [Millcreek] just received the final bids this week for the interior renovations of Draper so we should have a total purchase price number end of day today," per an email correspondence in or about December 2020;

     c.   That Millcreek was willing to buy back any interest Ross Weber and Yolanda Altagracia Cosme de Weber bought; and

     d.   That Strong did not expect the Draper deal "to last longer than another week" and so they should invest quickly.

342.    Long and Strong made at least the following omissions of material fact to Ross Weber and Yolanda Altagracia Cosme de Weber as they induced their investment in the Draper Property:

a.  Long and Strong failed to disclose that the Draper Property required renovations for which bids had not yet been offered or accepted at the time of Ross Weber and Yolanda Altagracia Cosme de Weber's closing in early December 2020.

b.  Long and Strong failed to disclose the full scale of the renovations required, as the Draper Property was essentially a shell lacking substantial internal construction such as internal walls, plumbing, and gas lines.

c.  Long and Strong failed to provide the due diligence materials for Draper until January 22, 2021, over a month after Ross Weber and Yolanda Altagracia Cosme de Weber had signed the purchase and sale agreement in early December of 2020.

d.  The due diligence materials provided by Long and Strong did not include financial information about the solvency of the tenant.

e.  Long and Strong failed to disclose that HSH's business model and operations were untested and had no substantial history of successful operation.

f.  Long and Strong failed to disclose that the Draper Property was missing its "state of the art" surgical equipment.

g.  Long and Strong failed to disclose that at least some rent payments they purported to have come from HSH were being paid by Millcreek.

h.  Long and Strong failed to disclose that, at least until April 2021, HSH did not have any meaningful operations to generate the revenue necessary to sustain their purported growth.

i.  Long and Strong failed to disclose that the bond for the Draper Property had never been issued.

j.  Long and Strong failed to disclose that the "publicly traded company" they had bought into only became public through a reverse merger that was completed three months after they closed.

k.  Long and Strong failed to disclose that neither Millcreek nor Colliers would own or retain a majority shareholder percentage of ownership in the Draper Property.

l.  Long and Strong failed to disclose that the property management company would be "Commercial Asset Management Services", not "Colliers Asset Management Services."

343.  These omissions concerned issues of material fact, in that it altered the mix of information available to Ross Weber and Yolanda Altagracia Cosme de Weber in

making their investment decisions, including, *inter alia*, the viability of each tenant and the likelihood that each would be able to pay a long term lease, the likelihood that Plaintiffs could re-tenant the Properties or re-sell their interest in them at the value marketed to them by the Colliers/Long Parties, the level of risk that Millcreek took on in the investment, and the reliability and accuracy of the Colliers/Long Parties' other representations.

344.    With respect to Long and Strong's representations to Ross Weber and Yolanda Altagracia Cosme de Weber, Plaintiffs allege that these representations were false and misleading, in that, *inter alia*, HSH had no significant financial reserves or business operations, the corporate guarantee and Lloyds of London bond were fictional, and little or no due diligence had been done by Defendants as to the reliability of the tenant or other safeguards.

345.    Long and Strong's representations were material in that they altered the mix of information available to Ross Weber and Yolanda Altagracia Cosme de Weber as they considered investing, and they reasonably relied on their representations as they made the decision to invest.

**Misrepresentations and Omissions Made to Induce James Blaisdell's Investment**

346.    In about September 2020, James Blaisdell was referred to Spencer Strong and the Colliers/Long TIC Program by Robert M. Levenson of Blackacre 1031 Exchange Services.

347.    Robert Levenson knew that James Blaisdell was a member of the armed forces and used James Blaisdell's call sign in email communications to him in order to build trust.

348.    By email and other communications, Levenson recommended that Blaisdell invest in the Colliers/Long TIC Program with Spencer Strong.  He endorsed the members of the Colliers/Long TIC Program, saying that they had "good Mormon work ethics and values."  Levenson also endorsed the deal as a whole, saying that the deal was good and the Utah market was great for these kinds of investments.

349.    Levenson omitted to mention that he would receive a commission for referring Blaisdell to the Colliers/Long TIC Program, and Blaisdell did not discover Levenson's commission until after the sale closed.

350.    In fact, on a later occasion, Levenson specifically told Blaisdell that he did not take commissions.

351.    Levenson omitted to disclose until the last minute that another unknown entity would be involved in performing Blaisdell's 1031 exchange.  At all material times, Levenson represented that he would be performing Blaisdell's exchange.

352.    Levenson omitted to disclose that he had previously been a defendant in multiple civil cases alleging 1031-exchange related fraud against himself and Blackacre 1031 Exchange Services, including one where the court appointed a receiver for

Blackacre 1031 Exchange Services and another where default judgment was entered against Levenson.

353.    These omissions concerned issues of material fact, in that it altered the mix of information available to James Blaisdell in making his investment decisions, including, *inter alia*, the viability of the Colliers/Long TIC Program, the trustworthiness of the individuals running the Program and the Program as a whole, Levenson's reliability in making a referral and his incentives to conceal material facts or mislead Blaisdell, Levenson's willing participation in the Colliers/Long TIC Program, and the reliability and accuracy of the Colliers/Long Parties' representations.

354.    Through phone calls and emails, Spencer Strong made at least the following representations of material fact to Blaisdell in order to induce his investment:

    a.    The building had a fully vetted 'solid' tenant by Colliers International;

    b.    That the tenant was 'publicly traded', a "profitable company," and the 20-year lease had a 'corporate guarantor';

    c.    That HSH had the cash on hand to meet its financial obligations;

    d.    A paying tenant had commenced the lease;

    e.    That there were some "minor renovations" that were being finished up;

    f.    That the surgery center was a "state of the art" surgery center;

g. There was a bond, insured by Lloyds of London, so that, in the case of a tenant default, payments wouldn't be interrupted;

h. That this investment would be hands off;

i. That it was very easy to get out of the investment;

j. That it was common for owners in the building to buy out other owners;

k.  That if an another owner did not buy out his share in the event he wanted to sell his investment, Millcreek would buy back his ownership percentage;

l. That the investment was 1031-compliant.

355.   With respect to Strong's and Levenson's representations to Blaisdell, Plaintiffs allege that these representations were false and misleading, in that, *inter alia*, HSH had no financial reserves and had no meaningful operations, the corporate guarantee and other financial safeguards were fictional, there was no bond from Lloyds of London, the tenant had no ability to service a 20-year lease, there was a substantial likelihood that the investment was not 1031-compliant, and little or no due diligence had been done by Defendants as to the reliability of the tenant or other safeguards.

356.   Strong's and Levenson's representations were material in that they altered the mix of information available to Blaisdell as he considered investing, and

Blaisdell reasonably relied on Strong's and Levenson's representations as he made the decision to invest.

### Misrepresentations and Omissions Made to Induce David Elton and Alyce Weber's Investment

284.    At least by July 2021, David Elton and Alyce Weber were referred to the Colliers/Long TIC Program.

285.    In addition to the misrepresentations specifically made to induce their investment, David Elton and Alyce Weber additionally relied on the misrepresentations made to induce the prior investments of their family members, John and Gayle Weber and Ross Weber and Yolanda Altagracia Cosme de Weber.

286.    Through the Marketing Materials, including the Draper Property Offering Memorandum, Spencer Strong made the previously recited representations of material fact, and additionally omitted to disclose the previously recited material facts to David and Alyce Elton in order to induce their investment.

287.    With respect to the representations made to David Elton and Alyce Weber, Plaintiffs allege that these representations were false and misleading, in that, *inter alia*, HSH had no financial reserves, the corporate guarantee and other financial safeguards were fictional, and little or no due diligence had been done by Defendants as to the reliability of the tenant or other safeguards.

288.    These representations were material in that they altered the mix of information available to David Elton and Alyce Weber as they considered investing, and David Elton and Alyce Weber reasonably relied on these representations as they made the decision to invest.

**Misrepresentations and Omissions Made to Induce Bryson and Kristine Ockey's Investment**

289.    In about July 2022, Bryson Ockey was referred to the Colliers/Long parties by Mark Machlis.

290.    Through phone calls, texts, and emails, Mark Machlis made at least the following representations of material fact to the Ockeys in order to induce their investment:

    a.  That Machlis had had numerous successful investments he had made with the Colliers/Long Parties;

    b.  That Machlis "work[s] closely with Kevin on both the development side (building the products) and also placing 1031 clients into long term investments," per an email correspondence in or about July 2022;

    c.  Machlis stated that the Lehi tenant was fully responsible for all maintenance on the property, as "that's what a triple net lease provides";"

d. That Machlis "THINK[S] WE [Machlis and Millcreek] WILL COMPLETE CONSTRUCTION IN LESS THAN TWO MONTHS [sic]," per an email correspondence in or about July 2022;

e. That "THE TENANT BEGINS HIS PAYMENTS AFTER HE RECEIVES A CERTIFICATE OF OCCUPANCY [sic]," per an email correspondence in or about July 2022;

f. That "[w]e [Machlis and Millcreek] expect CO and rent to start in early October," per an email correspondence in or about August 2022;

g. Later, Machlis stated that the estimated date of issuance of the Certificate of Occupancy was "October 1st," per a text correspondence in or about August 2022;

h. That "Lehi will be sold out in the next few days. We have a small window to place our desired purchase with them," per an email correspondence in or about October 2022;

291.    From about July to November 2022, Bryson met with Machlis and Long several times.  At these meetings, Machlis and Long made at least the following representations of material fact to Bryson Ockey to induce his investment:

a. That Millcreek had vetted all of the people involved in their deals;

b. That NGX is a "credit card running machine" that was "booking up lots of patients right now" in or about November 2022;

85

    c.   That the Ockey's couldn't delay making the investment, that "[they've] got to do it now," in or about November 2022;

    d.   That Machlis himself had negotiated the lease contracts with Neuragenex and "had NGX take over these locations," in or about November 2022; and

    e.   That "we [Millcreek] don't take a commission. It's an $800 flat fee," in or about November 2022.

    f.   That the "exit strategy is extremely easy, the first right of refusal goes to the other owners and then to the open market. For your children after inheritance, they can sell or one can sell and one can stay in, it is up to them," in or about November 2022.

292.   Lady Mira Blue Machlis was present at a meeting between the Ockeys and Mark Machlis on about July 31, 2022.  There, she represented to the Ockeys that Mark Machlis' representations about the Colliers/Long TIC offerings were accurate.

293.   During that meeting, Lady Mira Blue Machlis represented to Kristine Ockey that she and Mark were experienced with TIC investments, had worked in real estate for over 30 years, and that they had been very successful themselves with such investments.

294.   Mark Machlis, Lady Mira Blue Machlis, and Kevin Long made at least the following omissions of material fact to Bryson Ockey as they induced his investment in the Lehi Property:

a.  That 13 Investments LLC, Machlis' entity, was a landlord for the Lehi Property;

b.  That the money used to purchase equipment for the Lehi Property was built into the purchase price of the buildings;

c.  Machlis failed to include financial reports when providing due diligence materials to the Ockey's;

295.    These omissions concerned issues of material fact, in that it altered the mix of information available to the Ockey's in making their investment decisions, including, *inter alia*, the realistic market value of the Lehi Property and its lease, the viability of the tenant, Mark Machlis' risk profile in the investment and interests with regard to the Ockey's investment, and the reliability and accuracy of the Colliers/Long Parties' other representations.

296.    With respect to the Machlis' and Long's representations to Bryson Ockey, Plaintiffs allege that these representations were false and misleading, in that, *inter alia*, NGX had no financial reserves, the corporate guarantee and other financial safeguards were fictional, and little or no due diligence had been done by Defendants as to the reliability of the tenant or other safeguards.

297.    The Machlis' and Long's representations were material in that they altered the mix of information available to Ockey as he considered investing, and

Ockey reasonably relied on the Machlis' and Long's representations as he made the decision to invest.

**Misrepresentations and Omissions Made to Induce Eric Stamm and Claudia Griffin's Investment**

298.    In or about October 2022, Eric Stamm and Claudia Griffin were referred to Blake McDougal, Spencer Taylor, and the Colliers/Long TIC Program.

299.    Through phone calls and emails in about late 2022, Blake McDougal made at least the following representations of material fact to induce Eric Stamm and Claudia Griffin's investments in the Lehi and Crockett Properties:

a. That a Millcreek Commercial 1031 Exchange had "Greater Income Potential", where "[e]xchangers can sell residential rental property earning 4.5% or even negative cash flow raw land and exchange into a NNN leased **investment grade** commercial building paying 6%," per a marketing email sent in or about October 2022 (emphasis in original);

b. That a Millcreek Commercial 1031 Exchange allowed an exchange to "exchange out of a **Tenants, Toilets, and Trash** residential rental nightmare and into a triple net investment grade **dream**," per a marketing email sent in or about October 2022 (emphasis in original);

c. That "[o]ur model allows multiple buyers to co-own high quality commercial real estate through a Tenant-in-Common structure," per a marketing email sent in or about October;

d. That "[Millcreek's] approach gives you access and flexibility," per a marketing email sent in or about October 2022;

e. That "[e]ach buyer... benefits from all of the income, tax shelters, and appreciation it provides," per a marketing email sent in or about October 2022;

f. That the Lehi tenant, NGX, was a financially stable and reliable tenant, with a lease backed by a corporate guarantee;

g. That the Crockett tenant, Pulse Healthcare, was a financially stable and reliable tenant, with a lease backed by a corporate guarantee;

h. That the Crockett tenant, Pulse Healthcare, was "expanding with the goal of becoming a Preferred Provider with Medicare";

i. That Millcreek had oversight ensuring proper use of $2MM paid for surgical equipment and tenant improvements at the Crockett Property;

j. That the development of the Lehi and Crockett Property TIC investments adhered to Colliers' rigorous due diligence standards;

k.  That "[t]he Lehi location of Neuragenex opened for business last week and this week has a fully booked schedule," per an email correspondence in or about November 2022;

l.  That the price of the building was so expensive because "[w]ith medical build to suits the cost is always high per sf. It is because there is often equipment of higher standards for medical build outs that have much higher costs," per an email correspondence in or about November 2022;

m.  That the Crockett tenant was fully responsible for all maintenance on the property; and

n.  That Lehi had many potential buyers actively looking to execute purchase and sale agreements and that if Eric Stamm and Claudia Griffin did not hurry, "it may be fully sold," per an email correspondence in or about November 2022.

300.  Through emails to Eric Stamm and Claudia Griffin in or about November 2022, Spencer Taylor made at least the following representations of material fact:

a.  That any maintenance or upgrades listed on the property inspection report had been completed by the Crockett tenant;

b.  That the Crockett tenant had been compliant with achieving the maintenance obligations of its triple-net lease;

c.  That the Crockett tenant had executed a long-term lease;

90

     d.  That the Lehi tenant had executed a long-term lease; and

     e.  That McDougal's representations of fact were accurate.

301.    With respect to McDougal's and Taylor's representations to Eric Stamm and Claudia Griffin, Plaintiffs allege that these representations were false and misleading, in that, *inter alia*, neither Neuragenex nor Pulse Healthcare were backed by a legitimate corporate guarantor who could or would make good on their obligations, the funds for equipment at the Crockett and Lehi Properties were misused under Defendants' watch with no surgery center equipment acquired, that the Lehi Property was anything but an exclusive or worthwhile investment, and little or no due diligence had been done by Defendants as to the reliability of the tenants or other safeguards.

302.    McDougal's and Taylor's representations were material in that they altered the mix of information available to Eric Stamm and Claudia Griffin as they considered investing, and they reasonably relied on McDougal's and Taylor's representations as they made the decision to invest.

### PLAINTIFFS INVEST IN THE COLLIERS/LONG TIC PROGRAM

357.    Relying on the misrepresentations, omissions, and general deception of the Colliers/Long Parties, their Advisors, HSH Parties, Neuragenex, Pulse Healthcare, the Developer Parties, and their principals, the Plaintiffs invested into the Draper, Pine Bluff, Lehi, and Crockett Properties.

358.    John Weber and Gayle Weber, through Club Fitness, Inc., invested no less than $1,509,250.

359.    Ross Weber and Yolanda Altagracia Cosme de Weber, through Compostela, invested no less than $520,000, plus their $10,411.41 payment in response to a capital call.

360.    David Elton and Alyce Weber invested no less than $533,400.81.

361.    James Blaisdell invested no less than $612,574.71, plus his $12,266.01 payment in response to a capital call.

362.    Bryson and Kristine Ockey invested no less than $837,657.65.

363.    Claudia Griffin and Eric Stamm through the Betty L. Griffin 1999 Revocable Trust invested no less than $550,803.68 in the Lehi Property and $200,800 in the Crockett Property.

364.    Collectively, the Plaintiffs invested no less than $4.7MM in the Draper, Pine Bluff, Lehi, and Crockett Properties.

**Commissions**

365.    In connection with almost all of Plaintiffs' purchases in the Pine Bluff, Draper, Lehi, and Crockett Properties, commissions and similar compensation payments were made to third parties in each transaction.

366.    Plaintiffs did not know about these commissions and similar compensation payments until they saw settlement statements for their respective transactions.

367.    Almost all of the Plaintiffs' settlement statements listed commissions to Colliers.

368.    Almost all of the Plaintiff's settlement statements stated that commissions were paid to a broker party.

369.    Almost all settlement statements stated that Millcreek received a "marketing fee" from the seller as part of the transaction.

370.    Ross Weber and Yolanda Altagracia Cosme de Weber had at least the following commissions or other payments made in their settlement statement for the Draper Property:

    a.    Colliers received at least $20,800.00 in commissions.

    b.    Millcreek received at least $15,600.00 in commissions.

    c.    An assignment fee of $52,325.71 paid, on information and belief, to Millrock.

371.    David Elton and Alyce Weber had at least the following commissions or other payments made in their settlement statement for the Draper Property:

    a.    Colliers received at least $21,304.03 in commissions.

    b.    Millcreek received at least $15,975.02 in commissions.

      c. An assignment fee of $50,158.07 paid, on information and belief, to Millrock.

372.    James Blaisdell had at least the following commissions or other payments made in his settlement statement for the Draper Property:

      a. Colliers received at least $9,433.65 in commissions.

      b. Millcreek received at least $ 10,024.78 in commissions.

      c. Robert M. Levenson received $18,377.24 in commissions.

      d. A $66,807.00 assignment fee paid, on information and belief, to Millrock.

373.    Bryson and Kristine Ockey had at least the following commissions or other payments made in their settlement statement for the Lehi Property:

      a. Millcreek received at least $16,200.00 in commissions.

      b. Green Ivy Real Estate received at least $44,550.00 in commissions.

374.    Claudia Griffin and Eric Stamm had at least the following commissions or other payments made in their settlement statement for the Lehi Property:

      a. Colliers received at least $5,500.04 in commissions.

      b. Millcreek received at least $11,000.07 in commissions.

375.    Claudia Griffin and Eric Stamm had at least the following commissions or other payments made in their settlement statement for the Crockett Property:

      a. Colliers received a commission of at least $2,000.00.

      b. Millcreek received a commission of at least $4,000.00.

**Plaintiffs' Final Ownership Percentages and Total Investments**

376.    According to their respective closing documents, Plaintiffs purchased the following TIC percentages in each of the Pine Bluff, Draper, Lehi, and Crockett Properties:

a.    Plaintiffs John and Gayle Weber through Club Fitness, Inc. purchased a 11.508% interest in the Pine Bluff Property in about April 2020.

b.    Ross Weber and Yolanda Altagracia Cosme de Weber through Compostela Limited purchased a 2.515% interest in the Draper Property in about January 2021.

c.    David Elton and Alyce Weber purchased a 2.5354% interest in the Draper Property in or about November 2021.

d.    James Blaisdell purchased a 2.963% interest in the Draper Property in or about January 2021.

e.    Bryson and Kristine Ockey purchased a 14.0433% interest in the Lehi Property in about late 2022.

f.    Claudia Griffin and Eric Stamm through the Betty L. Griffin 1999 Revocable Trust purchased a 9.5356% interest in the Lehi Property in about late 2022.

g. Claudia Griffin and Eric Stamm through the Betty L. Griffin 1999 Revocable Trust purchased a 2.1041% interest in the Crockett Property in about late 2022.

377. When Plaintiffs closed on their purchases of their TIC interests in this case, they discovered that one or more third-party persons or entities, not Millcreek Commercial or Colliers, were the owners selling to Plaintiffs.

378. For the Crockett Plaintiffs and the Lehi Plaintiffs, the entity was Millrock Investment Fund 1.

379. For Draper Plaintiffs, this entity from which they purchased was SARC Draper, LLC.

380. Although the Draper Plaintiffs signed purchase and sale agreements with Millrock Investment Fund 1, on information and belief, Millrock Investment Fund 1 assigned the purchase and sale to SARC Draper, LLC, which was the entity that appeared as seller on the Draper Plaintiffs' settlement statements.

381. Steve Caton, the managing member of SARC Draper, LLC, is a longtime development partner on other properties in the Colliers/Long TIC Program portfolio, such as the Kennesaw Property in Georgia and the Naperville Property in Illinois, both of which had HSH as an advertised tenant.

382. At the Kennesaw Property, he was responsible for $500,000 in equipment funds that went missing and are still unaccounted for.

383.    At the Naperville Property in Illinois, after HSH defaulted on its lease, he urged the Naperville owners to accept Neuragenex as a tenant, which defaulted at Naperville at nearly the same time that it defaulted at the Lehi Property in this case.

384.    Steve Caton collaborated in the Colliers/Long TIC Program personally and through several entities owned or controlled by him, including SARC US, Inc., SARC USA., Inc, and SARC Draper, LLC.

385.    On information and belief, Steve Caton or SARC Draper LLC also received additional financial compensation for their involvement in the Colliers/Long TIC Program and the Draper Property in particular.

**THE FAILURE OF PLAINTIFFS' INVESTMENTS**

**HSH Parties are Late Paying Rent at Pine Bluff and Draper**

386.    In or about December 2021, HSMG was late paying their rent at all HSH-leased properties in the Colliers/Long TIC Program, including the Draper and Pine Bluff Properties.

387.    However, Mary Street and Kevin Long represented to owners that they had resolved the issue with HSMG and the owners could expect their rent plus late fees.

388.    Upon information and belief, starting in approximately December 2021, Millrock Investment Fund 1 and ADP began paying HSMG's portion of the rent

obligations at the Draper Property, including the late fees incurred in the month of December.

389.    In or about August 2022, HSMG disclosed to Millcreek that they needed "cash flow relief". These problems with cash flow caused HSMG to be late with rent payments and they "incurred certain late fees."

390.    On or about August 5, 2022, Millrock and HSMG entered into a Loan Agreement and Promissory Note, called the "Millrock/HSMG Agreement".

391.    "The Millrock/HSMG Agreement contemplated that through the Agreement, Millrock would provide HSMG with cash flow relief and assist HSMG with its obligations under the Leases."

392.    "Pursuant to the Millrock/HSMG Agreement, Millrock loaned HSMG the principal amount of $350,000."

393.    On information and belief, the total amount that Millrock either paid HSMG or its affiliates or fronted on their behalf was in fact much larger, but at least this sum.

394.    "Pursuant to the Millrock/HSMG Agreement, HSMG's also agreed that within ten days of August 5, 2022, it would cause the Leases to be secured by the Bonds."

395.    "Under the Millrock/HSMG Agreement, Millrock and HSMG agreed that if any obligation under the Agreement were not timely met, the remaining unpaid principal balance and interest would become due immediately at Millrock's option."

**Capital Call at the Draper Property**

396.    In about July 2021, Ross Weber and David Elton visited the Draper Property with Defendant Spencer Strong.

397.    It was apparent from the visit that renovations had not advanced as far as the Draper Plaintiffs had been told by the Colliers/Long Parties.

398.    Shortly after, Brent Smith told Draper owners that the promised renovations were over-budget by $285,419.64, mostly due to tenant-requested upgrades, and behind schedule, mostly due to COVID-related supply chain and permitting difficulties.  Accordingly, Brent Smith said, it was possible that Millcreek would make a capital call on the Draper owners to fund the budget overrun.

399.    Brent Smith also said that, since the increased costs were factored directly into the lease rate, the tenant's yearly rent would rise from $1,318,613.26 to $1,345,014.58, resulting in a higher monthly payment to each owner.

400.    In or about October 2021, Brent Smith told Draper Property owners that because of the increase in project costs, the expected date of the completion of the Draper Property's renovations had been pushed back to "mid to late December 2021."

401.    Brent Smith and the Colliers/Long Parties implied, and intended Plaintiffs and other TIC owners to believe and rely upon their representations to that effect, that this was a minor issue that had been resolved and that the fundamental structure of the investment, including the reliability of the tenant, expected cash flow, the corporate guarantee, the bond, and other key aspects of the deal were intact and reliable.

402.    Brent Smith informed them that Millcreek would be holding a capital call to fund the budget overruns.  If owners did not meet the capital call, Brent Smith said, their existing ownership percentages would be diluted.

403.    Brent Smith provided the specific amounts due under the capital call from each owner, to be paid, he instructed, directly to Millrock Investment Fund 1.

404.    Continuing to rely on the misrepresentations, omissions, and general deception of the Colliers/Long Parties, Ross Weber, Yolanda Altagracia Cosme de Weber, and James Blaisdell met the capital call to preserve their ownership percentages, with Ross Weber and Yolanda Altagracia Cosme de Weber paying another $10,411.14 and James Blaisdell paying another $12,266.01.

**HSH Defaults and the Guarantee and Bond Fail at Pine Bluff and Draper**

405.    By at least September 2022, the HSH Parties were in default at the Pine Bluff Property.

406.    By October 2022, the HSH Parties were in default at the Draper Property, as well as every other HSH-tenanted property in the Colliers/Long TIC Program.

407.    As the Colliers/Long Parties had represented during the sales process, Plaintiffs' investment was to be hands-off, with Mary Street and CAMS Realty managing responsibilities like collecting rent from the tenant.

408.    Mary Street and representatives of Millcreek assured owners that they were diligently representing owners' interests in pursuing rent and late fees from the tenants, and at all times led Plaintiffs to believe that they were acting in Plaintiffs' best interests.  At all times they deliberately led owners to believe that the fundamentals of their investments were, as promised all along, "safe, secure, and stable."

409.    At the Pine Bluff Property, the lease had been entered by ADP-Millcreek 3, LLC, a Millcreek-affiliated entity, and SARC by HSI: Pine Bluff, AR Inc., representing the HSH Parties.

410.    On information and belief, SARC by HSI: Pine Bluff, AR Inc., the tenant on the Pine Bluff Lease is not a registered business entity at all.

411.    At the Draper Property, the tenant entity on the lease was SARC by HSI - DRAPER, UT Inc., purportedly a Delaware corporation, representing the HSH Parties.

412.    On information and belief, SARC by HSI - DRAPER, UT Inc. is not a registered business entity at all.

413.    Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that the HSH-affiliated tenant named on these lease agreements were unregistered entities.

414.    Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that the HSH Parties were shell companies with insufficient revenue or business operations and were unable to service their rent obligations under the lease.

415.    Owners including Plaintiffs discovered, often for the first time, that the monthly "rent" payments they had received thus far had not come from the tenant at all.  They had come from Millcreek, Millrock, ADP, or another of Millcreek's affiliates.

416.    What Millcreek had billed as the "tenant of your dreams" became the tenant of the Plaintiffs' nightmares.

417.    On information and belief, the tenant has never produced any revenue at the Draper Property.

418.    HSMG, the corporation that purportedly had backed the tenant with a guarantee on the lease, was unwilling or unable to make good on its guarantees.

419.    Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that HSMG was a shell company with insufficient revenue or business activities and was unable to fulfill its obligations on the guarantee.

420.    There was no bond from Lloyd's of London guaranteeing the leases at the Pine Bluff or Draper properties.

421.     Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that no bond from Lloyd's of London had been issued backing the leases at the Pine Bluff and Draper Properties.

422.     Under a triple-net lease like the ones bundled with the Pine Bluff and Draper Properties, the tenant pays for taxes, maintenance costs, and insurance.

423.     After the tenant defaulted, Plaintiffs at the Pine Bluff and Draper Properties were burdened with the need to pay for taxes, maintenance, and insurance.

424.     As of about September 2023, HSH was forced into involuntary bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware, case no. 23-11458-JTD.

425.     Plaintiffs further discovered that the Draper Property was missing $2.5MM of promised surgical equipment.

426.     The Draper Property in its current state is not ready for occupancy from a medical tenant.

### Plaintiffs Discover the Pine Bluff and Draper Property Values and Lease Rates Were Overinflated

427.     The Pine Bluff and Draper Plaintiffs discovered that the Pine Bluff and Draper Properties were worth a fraction of what Defendants had represented.

428.     In the Offering Memorandum the Colliers/Long Parties gave to Plaintiffs during the sales process, the value of the Pine Bluff Property was represented to be $13MM.

429.     The Jefferson County Tax Assessor lists the estimated market value for the Pine Bluff Property is $2MM, and the original purchase price of the building was about $2.7MM.

430.     In the Offering Memorandum the Colliers/Long Parties provided to Plaintiffs during the sales process, the value of the Draper Property was represented to be $22MM.

431.     Millrock later confirmed that $4.5MM, not $22MM, was the amount for which the Draper Property was purchased before it was sold to investors.

432.     On information and belief, the lease terms that the HSH Parties agreed to pay under the Pine Bluff and Draper leases were overvalued compared to accurate market rates.

433.     As marketed by the Colliers/Long Parties, the lease value at Pine Bluff was about $35/sq ft.

434.     As marketed by the Colliers/Long Parties, the lease value at Draper was about $65/sq ft.

435.     On information and belief, the reasonable market lease value of the Pine Bluff and Draper Properties is far less.

436.    A new tenant occupied the Draper Property in about late 2024, but is paying a lease rate that is fraction of what the Colliers/Long Parties said HSH was able to pay.

437.    The Colliers/Long Parties knew or should have known that re-tenanting the Pine Bluff and Draper Properties with the same lease rate that the HSH parties had agreed to would be impossible.

438.    Not only were Pine Bluff and Draper Plaintiffs stuck without a tenant for significant periods of time and with endless empty promises from the Colliers/Long Parties, but due to the overinflated rent rate and property value, finding a new tenant to occupy the Pine Bluff and Draper Properties or selling their TIC ownerships at the same rate was simply not feasible.

439.    The Pine Bluff and Draper Plaintiffs lost the expected value of their investment—a reliable tenant, a long-term lease backed by a guarantee and bond, a monthly stream of income, the value of the properties themselves, the scheduled rent increases over the term of the leases, the capitalization rate over the term of the leases, and the "safe, secure, and stable" investment they were repeatedly promised.

440.    After HSH defaulted, James Blaisdell, relying on Spencer Strong's assurances that Millcreek would either buy back his share or help him resell it, asked Kevin Long to honor that obligation.  Kevin refused, stating that the property was now

worthless and Millcreek was not in a position to help relist Blaisdell's TIC interest or act as broker.

441.    Later, on a phone call on or about February 5, 2024, Kevin Long promised Blaisdell that Millcreek would list Blaisdell's TIC interest and act as broker, if Blaisdell agreed to approve a lease with a new proposed tenant.  Blaisdell agreed.

442.    On a followup email, Kevin Long confirmed that Millcreek would list Blaisdell's TIC interest for sale and act as broker on the transaction, and asked Blaisdell to keep the arrangement secret from the other owners.

443.    Subsequently,  Kevin Long did not fulfill his promise to have Millcreek list Blaisdell's TIC interest and act as broker.

### Discrepancies in the Titling and Other Purchase Documents at the Pine Bluff and Draper Properties

444.    At Pine Bluff, the Colliers/Long Parties, through ADP-Millcreek 3, LLC, purchased 100% of the Pine Bluff Property in conjunction with Club Fitness, Inc., which is John and Gayle Weber's entity.

445.    John and Gayle Weber, through Club Fitness, put up approximately $1.5MM for that purchase, which was over half of the purchase price.

446.    However, Club Fitness was assigned only about 11.5% of the interest in the Pine Bluff Property, with the other approximately 88.5% interest going to ADP-Millcreek 3, LLC, despite its much smaller financial contribution.

447.    Club Fitness' assigned percentage of about 11.5% was assigned not on the upfront purchase price, but on the inflated price that the Colliers/Long Parties later marketed to other investors.

448.    That is, John and Gayle Weber were induced to fund most the Colliers/Long Parties original acquisition of the Pine Bluff Property but given only a fractional share of ownership predicated on the inflated property value for which the Pine Bluff Property was later marketed to other investors.

449.    County parcel records for the Pine Bluff TIC shares that the Colliers/Long Parties sold show Club Fitness' name as a seller on each transaction, suggesting that the Colliers/Long Parties may have sold TIC interests in Club Fitness' name without its knowledge or consent.

450.    Further discrepancies exist in the chain of title for Club Fitness: the Millcreek-affiliated entity on Club Fitness' warranty deed (ADP-Millcreek 3, LLC) is different from the Millcreek-affiliated entity on Club Fitness' purchase and sale agreement (Millrock Investment Fund 1).

451.    For the the Draper Plaintiffs' purchase and sale agreements, Millrock Investment Fund 1 is the seller, but SARC Draper is the seller on the settlement statements.

452.    On information and belief, SARC Draper paid Millrock an assignment fee and executed an agreement with Millrock to make SARC Draper a successor in interest to each owner's purchase and sale agreement with Millrock.

**Neuragenex Defaults and the Guarantee Fails at the Lehi Property**

453.    In about October and November 2023, Neuragenex had difficulties making its rent payments.

454.    Starting in about October 2023, owners were told that Neuragenex had been experiencing "a problem with their Electronic Medical Records system".

455.    Street relayed that Donald Hulke, a representative of Neuragenex, had said that "he believes it will take them 3 months to restore the cash flow they have from insurance reimbursements. He envisions a scenario where any missed rent payments during this period are repaid as additional rent over a series of months."

456.    In or about October 2023, Brent Smith told owners in an email that "[a]ll [Neuragenex] locations are still operational and growing."

457.    Later, owners were told, Neuragenex "received a loan" that allowed them to pay rent for October and November 2023.

458.    The fact that a Neuragenex was only able to pay rent for October and November 2023 through a loan was not disclosed to owners until in or about January 2024, when owners were informed that the rent in December 2023 had never been paid.

459.    In or about January 2024, Neuragenex announced that it would file for bankruptcy.  Proceedings are ongoing in case no. 2:24-bk-00631-EPB in the United States Bankruptcy Court for the District of Arizona.

460.    In or about May 2024, Kevin Long told owners that Millcreek and two other entities had "loaned NGX $450,000 in January of 2024 in order to keep Bluffdale and three other [Neuragenex] locations open."

461.    In the same email, Long said that, "[s]ix days later NGX closed all four locations."

462.    Significant discrepancies exist in the deeds and other paperwork for purchases of the Lehi Property, including the Lehi Plaintiffs'.

463.    Some marketing material and paperwork, such as Claudia Griffin and Eric Stamm's final settlement statement and Bryson and Kristine Ockey's 1031 exchange instructions, state that the Lehi Property address is 1010 S. 1100 W.

464.    1010 S. 1100 W. is the address of a different parcel adjacent to the Lehi Property.

**Plaintiffs Discover the Lehi Property Values and Lease Rates Were Overinflated**

465.    The Lehi Property turned out to be worth a fraction of what Defendants had represented.

466.    In the Offering Memorandum the Colliers/Long Parties gave to Plaintiffs during the sales process, the value of the Lehi Property was represented to be nearly $6MM.

467.    On information and belief, the realistic market value for the property is $1.2 MM or less.

468.    The lease terms that Neuragenex agreed to pay under the Lehi lease was wildly overvalued compared to accurate market rates.

469.    As marketed by the Colliers/Long Parties, the lease value at Lehi was about $100.90/square foot.

470.    On information and belief, the realistic market value of a comparable lease is less than $32/square foot.

471.    Long knew or should have known that re-tenanting the Lehi Property Properties with the same lease rate that Neuragenex had agreed to would be impossible.

472.    After Neuragenex was evicted from the property, they removed the $800,000 of medical equipment installed at Lehi.

473.    After conversations with Millcreek and CAMS, Neuragenex agreed to let the owners retrieve access to the medical equipment.

474.    Upon closer inspection, the medical equipment in the Lehi building did not match what was described in the corresponding invoices. The invoices described

14 pieces of medical equipment with serial numbers; of the equipment actually present in the Lehi building only one serial number matched those on the invoices.

475.    Not only were Lehi Plaintiffs stuck without a tenant and with endless empty promises from the Colliers/Long Parties, but due to the overinflated rent rate and property value, finding a new tenant to occupy the Lehi Property or selling their TIC ownerships was simply not feasible.

476.    The Lehi Plaintiffs lost the expected value of their investment—a reliable tenant, a long-term lease backed by a guarantee and bond, a monthly stream of income, the value of the properties themselves, the scheduled rent increases over the term of the leases, the capitalization rate over the term of the leases, and the "safe, secure, and stable" investment they were repeatedly promised.

### Pulse Healthcare Defaults and the Guarantee Fails at the Crockett Property

477.    In October 2023, tenant Pulse Physician Organization, PLLC, failed to pay rent at the Crockett Property.

478.    Long and other Colliers/Long Parties initially claimed the delay was due to the sudden death of Pulse's CFO. Then, it was blamed on issues with the tenant's billing systems.

479.    Long assured Plaintiffs that the lease was "guaranteed" by a profitable doctor's practice known as Achy Legs Clinics, LLC as well as Spectre Innovations, LLC, the holding company for all Pulse locations.

480.    On November 15, 2023, Long acknowledged that Pulse and its principal Dr. Aggwarala "has not followed through on his plans to open the surgery center."

481.    The reality was that despite the representations in the Offering Memorandum the Crockett Property had never been an operational surgery center.

482.    Long stated in an email to owners that neither he nor the property manager, Mary Street, had even been aware that the facility at the Crockett Property was not operating.

483.    Plaintiffs were sold TIC investments in the Crockett Property on the representation that the tenant was secure and stable with a successful operating history, not a startup enterprise.

484.    In June 2024, Pulse Healthcare filed for bankruptcy.  Proceedings are ongoing in case no. 24-32860 in federal bankruptcy court in Texas.

485.    Long further stated that "Mary [Street's] role is to administer the lease – not manage the property."

486.    This was directly contrary to the representations of Long and other Colliers/Long Parties that the Crockett Property, like all properties in the Colliers/Long TIC Program, would be fully managed.

487.    Long also revealed that neither Millcreek nor its affiliates held any interest in the Crockett Property.

488. County parcel records appear to show that TIC percentages in the Crockett Property were oversold by approximately .6310%.

489. The Crockett Plaintiffs also were told that $2MM dollars of equipment money for the Crockett Property had gone missing.

### Plaintiffs Discover the Crockett Property Values and Lease Values Are Overinflated

490. The Crockett Property was worth a fraction of what Defendants had represented, as were reasonable market lease rates at the Crockett Property.

491. In the Offering Memorandum the Colliers/Long Parties gave to Plaintiffs during the sales process, the value of the Crockett Property was represented to be $9.5MM.

492. An independent broker opinion estimates that the Crocket Property is only worth about $2M.

493. The lease rate advertised by the Colliers/Long Parties in the Offering Memorandum was about $50/square foot.

494. On information and belief, the fair market lease rate for comparable properties is far less than $50/square foot.

495. Not only were Crockett Plaintiffs stuck without a tenant and with endless empty promises from the Colliers/Long Parties, but due to the overinflated rent rate

and property value, finding a new tenant to occupy the Crockett Property or selling their TIC ownerships was simply not feasible.

496.    The Crockett Plaintiffs lost the expected value of their investment—a reliable tenant, a long-term lease backed by a guarantee and bond, a monthly stream of income, the value of the properties themselves, the scheduled rent increases over the term of the leases, the capitalization rate over the term of the leases, and the "safe, secure, and stable" investment they were repeatedly promised.

### MARY STREET'S ROLE IN THE FRAUDULENT ENTERPRISE

497.    After purchasing their TIC interests through the Colliers/Long' TIC Program, Plaintiffs and other owners were introduced to Mary Street and CAMS Realty, the property manager for upwards of 32 properties offered by the Colliers/Long Parties.

498.    All properties in the Millcreek/Commercial TIC Program were marketed as being managed by a property manager "with extensive experience in property management" that would work to "provide the safety, security, and stability that is expected by each Millcreek Commercial Owner."

499.    Managing commercial property is time-consuming and complicated.  A commercial property manager's responsibilities often include overseeing the operations, maintenance, and profitability of the property, understanding and navigating lease agreements, coordinating tenant move-ins, enforcing the lease

according to local law, handling rent collection and disbursement, tracking expenses, and keeping owners informed.  In a property with TIC ownership such as those offered by the Colliers/Long Parties, the property manager is the *de facto* representative of the owners and their interests, and an instrumental part of the promise of the Colliers/Long Program that Plaintiffs' investments would be hands-off.

500.    After their purchases, Mary Street and CAMS Realty were presented to Plaintiffs as a property manager who could be trusted to deliver on the promises of the Colliers/Long TIC Program and defend the interests of the new property owners.  She was in a position of superior knowledge, experience, and authority relative to Plaintiffs and their investments in the Colliers/Long TIC Program.

501.    In reality, as Plaintiffs later discovered, Mary Street had a long history of association with Kevin Long, Millcreek Commercial, Colliers International, and the other Colliers/Long Parties and had an integral role in the planning, development and execution of the Colliers/Long TIC Program.

502.    Plaintiffs were compelled to rely on and did in fact rely on Mary Street due to her superior knowledge, expertise, and her position of authority and responsibility as the lease manager at the Pine Bluff, Draper, Lehi, and Crockett Properties.

503.    Mary Street dispensed advice to Plaintiffs and other owners from her position of superior knowledge, expertise, authority, and responsibility. She deliberately gave

the impression that she was acting in their best interests in managing the leases and properties for them.

504.    In reality, in her position as lease manager and through her prior planning and development of the Colliers/Long TIC Program with the other Colliers/Long TIC Parties, she served the interests of the Colliers/Long Parties through concealment of material information including accurate and timely accountings, faulty advice, failure to perform her duties in the best interests of the new owners, posturing as a third-party acting in the interest of Plaintiffs and other owners, and a general pattern of manipulation designed to maneuver Plaintiffs and other owners into decisions favorable to the Colliers/Long Parties.

505.    Among other actions, when certain Crocket Property owners attempted to visit the Crockett Property to confirm its condition, Mary Street refused to provide them with keys to the Property, unreasonably depriving them of the ability to access their own investment property.

506.    Further, Mary Street refused to release the bank statements for the Crockett Property, even after multiple owners had requested her to do so.

507.    From at least November 2023 to January 2024, Mary Street charged her crisis rate for her management services at the Crockett Property, despite the fact that rent payments, or payments purporting to be rent from the tenant, appear to have been received during that time.

508.  At the Pine Bluff Property, a new lease with MSMM, LLC, represented by Sadeem Mahmood, an individual formerly affiliated with HSH, was eventually renegotiated in about June 2023.

509.  Under this lease, Sadeem Mahmood and MSMM as tenant agreed to make monthly payments.

510.  Each month thereafter for at least fourteen months, Mary Street skimmed $20,000 off of the tenant's monthly payments and routed them to Millrock.

511.  The Pine Bluff owners did not know Mary Street was doing this, nor had they authorized her to do so.

512.  Mary Street's purported reason for rerouting $20,000 of tenant payments each month was an alleged agreement by which Millrock would be repaid for filling the role of the bond company after about August or September of 2022.

513.  The Pine Bluff owners did not know about this agreement, nor had they authorized such an agreement.

514.  Additionally, Millrock filed suit against Talisman, the bond company at Pine Bluff and Draper, to recover the amounts due under the unfulfilled bond, meaning that Millrock might be doubly enriched, first, by the $20,000 each month surreptitiously rerouted by Mary Street, second, by potential recovery from Talisman for the same funds.

515.    On about April 18, 2024, when a Lehi owner asked Mary Street to explain why the lease rates for the Lehi Property were overvalued relative to the surrounding market, Mary Street deflected the question and justified the overvaluation by comparing the Lehi Property's build-to-suit arrangement with Walgreens, when she knew or should have known that a tenant like Walgreens had nothing material in common with the Lehi Property's medical purpose and tenant.

516.    On about July 11, 2024, Mary Street informed the Lehi TIC owners that they could default on property taxes for up to five years without severe repercussions, and subsequently failed to make a tax payment in November 2023.

517.    Mary Street had not disclosed to Lehi owners that she had failed to collect any property taxes or insurance premiums from Neuragenex for the Lehi Property.

518.    Owners then discovered penalties and interest had accrued on the missing tax payments, which owners were then compelled to pay, along with insurance premiums.

### THE PROPERTIES' LIKELY NON-COMPLIANCE WITH IRS REGULATIONS

519.    Defendants' individual representations and representations in marketing materials that the Colliers/Long TIC offerings were compliant with applicable regulations governing 1031 exchanges were material to Plaintiffs' decision to invest.

520.    Since their investments, it has become apparent that Plaintiffs' investments were plagued by numerous factors and conditions which may render their

investments non-compliant in the eyes of the IRS and impose unknown and potentially enormous tax burdens and other legal consequences upon them.

521.    These factors and conditions include, among others, the following:

a.  That construction and renovation during the exchange period may have subjected Plaintiffs' exchanges to additional requirements that were not met;

b.  That the leases at the Pine Bluff, Draper, Lehi, and Crockett Properties were not fair market value leases;

c.  That the TIC interests Plaintiffs purchased in Pine Bluff, Draper, Lehi, and Crockett Properties Properties were not sold at fair market rates;

d.  That the owners of the Pine Bluff, Draper, Lehi, and Crockett Properties were required by the TIC Agreements to participate in all management decisions;

e.  That equipment purchases were bundled with the sale of the Lehi and Crockett Properties;

f.  That Mary Street's compensation was based upon profits generated by the Pine Bluff, Draper, Lehi, and Crockett Properties; and

g.  That the TIC interests sold to Plaintiffs are securities.

522.    These factors and conditions, and others with a substantial likelihood of compromising the 1031-compliant status of Plaintiffs' investments, either existed at the

time Plaintiffs invested or were reasonably foreseeable by those Defendants who induced Plaintiffs' investment into the Colliers/Long TIC Program, who knew of, should have known, and/or should have reasonably investigated whether the properties offered by the Colliers/Long TIC Program were compliant with applicable IRS regulations governing 1031 exchanges.

523.    Because of these and other factors and conditions potentially jeopardizing the compliance of Plaintiffs' investments with applicable IRS regulations, Plaintiffs have been compelled to independently investigate and verify whether, and attempt to ensure that, their investments are compliant.

**RACKETEERING ACTIVITY**

524.    Defendants' conduct described herein constitutes multiple forms of "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

525.    These instances of racketeering activity were all related, because they shared common goals, targeted common victims, and were committed by the same group of associated individuals and entities.

526.    These instances of racketeering activity were not isolated or sporadic, but rather occurred over a substantial period of time spanning multiple years.

527.    Defendants' racketeering activity is also ongoing and threatens to continue indefinitely, evidenced in part by the fact that they have formed new entities to carry on the Colliers/Long TIC Program and similar schemes.

**Fraud-Related Acts**

*Schemes and Artifices to Defraud*

528.    Defendants have devised or intended to devise one or more schemes or artifices to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

529.    As alleged at length above, each Defendant has participated in the operation of the Colliers/Long TIC Program, through which they defrauded Plaintiffs and others of millions of dollars' worth of retirement savings.

530.    Additionally, the Referrers defrauded Plaintiffs into believing that their purchases of TIC interests through the Colliers/Long TIC Program would be 1031-eligible and they would incur no additional tax liability from these transactions.

531.    Moreover, long after Plaintiffs purchased their TIC interests, Defendants Kevin Long, the Mary Street Parties, and Brent Smith extracted further money from Plaintiffs through a fraudulent capital call for the Draper Property, insisting that Plaintiffs pay even more money for overpriced and behind-schedule renovations for the property.

*Wire Fraud*

532.    On multiple occasions, Defendants have used interstate wire communications to further the objectives of the Colliers/Long TIC Program, including phone calls, video calls, emails, and text messages.

121

533.    For example, each of Defendants' misrepresentations made to Plaintiffs located outside the state of Utah in order to induce their investments necessarily used interstate wire communications.

534.    Additionally, Defendants' misrepresentations made to Plaintiffs located in Utah in order to induce their investments likewise involved interstate wire communications because, on information and belief, they were routed through facilities located in another state.

535.    These interstate wire communications included, without limitation, the following communications previously detailed at length:

    a.    Defendants Kevin Long, Spencer Strong, Mark Machlis, Spencer Taylor, and Blake McDougal sent electronic versions of the Marketing Materials to all Plaintiffs in soliciting their purchases of TIC interests;

    b.    Defendant Kevin Long, acting as agent and representative of Colliers, made fraudulent misrepresentations to Plaintiffs John and Gayle Weber and Club Fitness, Inc. (and, by extension, David Elton and Alyce Weber) via phone and email from early 2020 through April 2020;

    c.    Defendant Kevin Long, acting as agent and representative of Colliers, made fraudulent misrepresentations to Plaintiffs Ross Weber and Yolanda Altagracia Cosme de Weber (and, by extension, David Elton and

Alyce Weber) via phone, webinar/conference call, and email in or about early 2020;

d. Defendant Spencer Strong, acting as agent and representative of Colliers, made fraudulent misrepresentations to Plaintiffs Ross Weber and Yolanda Altagracia Cosme de Weber (and, by extension, David Elton and Alyce Weber) via phone and email in or about early 2020;

e. Defendant Robert Levenson made fraudulent misrepresentations via phone and email to Plaintiff James Blaisdell in or around September 2020;

f. Defendant Spencer Strong, acting as agent and representative of Colliers, made fraudulent misrepresentations via phone and email to Plaintiff James Blaisdell in or around September 2020;

g. Defendant Mark Machlis, acting as agent and representative of 13 Investments, LLC and Green Ivy Realty, Inc., made fraudulent misrepresentations to Plaintiffs Bryson and Kristine Ockey via phone, text messages, and email in or around July 2022;

h. Defendant Blake McDougal made fraudulent misrepresentations to Plaintiffs Eric Stamm and Claudia Griffin via phone and email in or around late 2022;

> i. Defendant Spencer Taylor made fraudulent misrepresentations to Plaintiffs Eric Stamm and Claudia Griffin via email in or around November 2022.

536. On information and belief, the Colliers/Long Parties also used interstate wire communications amongst themselves in devising and executing their schemes and artifices to defraud.

537. Finally, Kevin Long, Brent Smith, and the Mary Street Parties used interstate wire communications with Plaintiffs after they purchased their TIC interests, including, for example, the following:

> a. Brent Smith made a fraudulent capital call to the Draper Owners via email in October 2021;
>
> b. Kevin Long, Brent Smith, and the Mary Street Parties made fraudulent misrepresentations and omissions via email to the Lehi Owners in or around October and November 2023 which created false impressions about the financial health and viability of their tenant, NGX; and
>
> c. Kevin Long made fraudulent misrepresentations and omissions via email to the Crockett Owners from around October 2023 to around February 2024 which created false impressions about the financial health and viability of their tenant, Pulse Healthcare, including that the company was "showing a profitability of $3 million," and had enough liquidity to

124

weather the billing system problems they were experiencing, when in

reality, the company was just a few months away from bankruptcy.

538.    Defendants have therefore transmitted, or caused to be transmitted,

writings, signs, signals, pictures, and/or sounds by means of interstate wire

communications for the purpose of executing their schemes and artifices to defraud,

which is indictable under 18 U.S.C. § 1343.

*Bank Fraud*

539.    The schemes and artifices described above involved obtaining moneys

and funds from Plaintiffs by means of false or fraudulent pretenses, representations,

or promises.

540.    The moneys and funds paid to purchase Plaintiffs' TIC interests were in

the custody or control of financial institutions.

541.    Additionally, Plaintiffs transferred money to the Mary Street Parties for,

among other things, lease administration fees at an elevated "crisis rate," compounded

on an already-inflated lease rate.

542.    In the case of the Crockett Property, unbeknownst to its owners, the Mary

Street Parties were charging double the elevated "crisis rate."

543.    The Mary Street Parties also diverted portions of rent payments received

from the Pine Bluff Property to Millrock, unbeknownst to its owners.

544.    Defendants' knowing execution of schemes and artifices to obtain moneys and funds in the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises, is indictable under 18 U.S.C. § 1344(2).

**Trafficking in Counterfeit Goods and Services**

545.    Defendants the Colliers/Long Parties represented to the Pine Bluff and Draper Plaintiffs, including in written marketing materials, that their purchases of TIC interests were underwritten by a bond from "Lloyd's of London" or "Lloyds of London," which would pay for one year of rent in the event HSH defaulted.

546.    Defendant Kevin Long later revealed that, in reality, there never was a bond from Lloyd's of London.

547.    On information and belief, Lloyd's of London never had any connection with the Colliers/Long TIC Program.

548.    The Colliers/Long Parties traffic or trafficked in services, namely, selling TIC interests in commercial real estate, which are or were (ostensibly) underwritten by an insurance bond.

549.    "Lloyd's of London" is an active Collective Service Mark ("the Lloyd's wordmark") registered with the United States Patent and Trademark Office and owned by The Lloyd's Corporation, a United Kingdom corporation with its principal place of

business in London; it bears the Serial Number 730687455 and the Registration Number 1118425. *See* Exhibit [].

550.    The Lloyd's wordmark "consists of standard characters without claim to any particular font style, size, or color." *Id.*

551.    The Lloyd's wordmark is used for "underwriting insurance by the underwriting members of Lloyd's, London." *Id.*

552.    The Colliers/Long Parties' spurious use of the Lloyd's wordmark (or a substantially similar mark) in connection with the same services for which it is registered and in a manner which was likely to (and did, in fact) deceive or cause confusion or mistake constitutes a "counterfeit mark," as that term is defined under 18 U.S.C. § 2320(f)(1)(A).

553.    The Colliers/Long Parties' knowing use of a counterfeit mark in connection with services in which they traffic is an indictable act under 18 U.S.C. 2320(a)(1).

**Obstruction of Justice**

554.    As alleged at length herein, many Defendants have made false statements and omitted material information related to Plaintiffs' investments, and have therefore engaged in misleading conduct, as that term is defined in 18 U.S.C. §§ 1515(a)(3)(A)-(B); in relevant part, this includes, but is not limited to, the following misrepresentations and omissions:

a. Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties failed to timely disclose tenant defaults.

b. Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties failed to timely disclose that Millcreek, Millrock, and others were lending money to tenants to cover rent payments.

c. Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties did not disclose that they expected that tenant defaults would expose Plaintiffs to a substantial risk of loss to the value of their investments, because the properties and leases were substantially overvalued.

d. Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties did not disclose the true condition of the properties, including that some were never operational and construction was far from complete on the Draper Property.

e. The Mary Street Parties failed to disclose that they were over-charging lease administration fees to the Crockett Owners, including by refusing to provide bank statements when the owners requested them.

f. The Mary Street Parties intentionally concealed material facts about the state of the Crocket Property from its owners by refusing to provide them with keys to access the Property when they requested them.

g. Millrock, Kevin Long, Brent Smith, and the Mary Street Parties failed to disclose that portions of rent payments on the Pine Bluff Property were being diverted to Millrock.

555. On information and belief, Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties' misleading conduct towards Plaintiffs and other TIC owners was undertaken with intent to delay, or prevent their testimony in an official proceeding; withhold testimony or a record, document, or other object, from an official proceeding; or to hinder, delay, or prevent the communication of information relating to the commission or possible commission of a Federal offense to a law enforcement officer or judge of the United States, which is indictable under 18 U.S.C. § 1512(b).

a. This is based, in part, on the fact that one or more of their associates had been sued for their involvement in schemes similar to the Colliers/Long TIC Program.

556. Additionally, Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties concealed from the TIC owners material information contained on documents and records, including, but not limited to, the following:

a. a promissory note between Millrock and HSH providing that, among other things, Millrock would pay HSH's financial obligations to the TIC owners;

b.  other documents evidencing loans made to tenants to cover rent payments;

c.  communications from ADP indicating that HSH was not cooperating with their efforts to obtain a bond;

d.  documents for a bond held by Millrock from Talisman, which included statements that the bond could not be sold, transferred, hypothecated, pledged, or otherwise encumbered;

e.  an agreement between the Mary Street Parties and Millrock that the Mary Street Parties would divert to Millrock portions of funds received as rent for the Pine Bluff Property; and

f.  bank statements which the Mary Street Parties refused to provide upon a request from the Crockett Owners, which would have indicated that they were overcharging the owners for lease administration fees.

557.   On information and belief, Millcreek, Millrock, Kevin Long, Brent Smith, and the Mary Street Parties concealed this information with the intent to impair their availability for use in an official proceeding, which is indictable conduct under 18 U.S.C. § 1512(c)(1).

**Illegal Money Transmitting**

558.   As lease administrators, the Mary Street parties were responsible for handling payments between the tenants and owners of each of the four properties in

which Plaintiffs invested, as well as many other properties offered under the Colliers/Long TIC Program.

559.    These services involved transferring funds on behalf of the public, which constitutes "money transmitting," as that term is defined under 18 U.S.C. § 1960(b)(2).

560.    Additionally, by engaging in the business of receiving money for transmission and transmitting money within the United States and to locations abroad, the Mary Street parties' performance of these services likewise constitutes "money transmission," as that term is defined under Utah Code § 7-25-102(9)(a).

561.    According to the Utah Department of Financial Institutions, all money transmitter licenses for the State of Utah are issued through the Nationwide Multistate Licensing System ("NMLS").

562.    A search of the NMLS database reveals that none of the Mary Street parties have been issued a money transmitter license.

563.    On information and belief, none of the Mary Street parties are conducting their money transmission services as authorized agents of a licensed money transmitter.

564.    The Mary Street parties' performance of money transmission services without a license is a violation of Utah Code § 7-25-201(1) and is punishable as a misdemeanor under Utah Code § 7-24-405(1)(a).

565.    Accordingly, the Mary Street parties' money transmission operation constitutes an "unlicensed money transmitting business," as that term is defined under 18 U.S.C. § 1960(b)(1)(a).

566.    The money transmission operation would also be classified as an "unlicensed money transmitting business," under 18 U.S.C. § 1960(b)(1)(c), because it involved funds which were known to them to have been derived from a criminal offense and/or were intended to be used to promote or support unlawful activity.

567.    The criminal offenses and unlawful activity in question include, without limitation, the other offenses described in this Amended Complaint.

568.    The Mary Street parties have thus knowingly conducted, controlled, managed, supervised, directed, and/or owned all or part of an unlicensed money transmitting business, which is an indictable act under 18 U.S.C. § 1960(a).

**Interstate Transportation of Stolen Property**

569.    As alleged above, Plaintiffs' settlement statements revealed, among other things, that their purchase included large commissions to Colliers, Millcreek, Millrock, and the Referrers.

570.    These commissions were obtained by fraud because they were never disclosed to Plaintiffs before their TIC interest purchases were closed; in fact, the Colliers/Long Parties and Referrers often represented that no commissions would be paid out of their purchase price.

571.    The total value of commissions received by each Defendant from Plaintiffs was $5,000 or more.

572.    On information and belief, most, if not all, of the commission payments were transferred in interstate or foreign commerce.

573.    Additionally, Defendants have engaged in other transactions involving the transfer or receipt in interstate or foreign commerce of $5,000 or more of funds stolen, converted, or taken by fraud from Plaintiffs, including but not limited to:

   a.    Millcreek and Millrock's transfer of large portions of Plaintiffs' invested funds and capital call payments to property development, construction, and medical equipment companies; and

   b.    the Mary Street Parties' diversion of portions of rent funds to Millcreek and Millrock.

574.    Defendants' transfers of $5,000 or more in interstate or foreign commerce knowing the same to have been obtained by fraud are indictable acts under 18 U.S.C. § 2314.

575.    Defendants' receipts of $5,000 or more in interstate or foreign commerce knowing the same to have been stolen, unlawfully taken, or converted are indictable acts under 18 U.S.C. § 2315.

**Money Laundering and Related Acts**

*Money Laundering*

133

576.    Defendants have conducted or attempted to conduct various financial transactions involving funds derived from their unlawful activities, including the other instances of racketeering activity described herein.

577.    In some cases, Defendants conducted or attempted to conduct these transactions knowing that they involved the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of specified unlawful activity, as that term is defined under 18 U.S.C. § 1956(c)(7).

578.    In other cases, Defendants conducted or attempted to conduct these transactions knowing that they involved the proceeds of some form of unlawful activity, and that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, as that term is defined under 18 U.S.C. § 1956(c)(7).

579.    These transactions included, without limitation:

a.    Kevin Long, Brent Smith, and the Mary Street Parties' capital call for the Draper Property, for over $250,000 to be paid to Millrock Investment Fund;

b.    Millcreek and/or Millrock's payment of purported monthly "rent" to Plaintiffs which was, in fact, derived from other sources;

c.    Millcreek and/or Millrock's loan of Plaintiff's invested funds to financially-distressed tenants;

     d.   Millcreek and/or Millrock's payment of commissions to various parties;

     e.   Millcreek, Millrock, Colliers, and the Referrers' receipt of commissions paid from Plaintiffs' invested funds;

     f.   the prior owners' (including SARC Draper, LLC; ADP-Millcreek 2, LLC; and ADP-Millcreek 3, LLC, and their principals) sale of TIC interests to Plaintiffs at inflated rates;

     g.   Millcreek and/or Millrock's transfer of large sums of money to property development, construction, and medical equipment companies; and

     h.   the Mary Street Parties' diversion of rent funds to Millcreek and Millrock.

580.    Defendants' conduct described herein is indictable under 18 U.S.C. § 1956(a).

*Transactions in Property Derived from Unlawful Activity*

581.    Defendants knowingly engaged or attempted to engage in multiple monetary transactions in criminally derived property of a value greater than $10,000, which is indictable under 18 U.S.C. § 1957(a).

582.    This includes, but is not limited to, Millcreek and/or its affiliated entities transferring large sums of Plaintiffs' invested funds to property development and construction companies, for example:

     a.   $2.5 million transferred to ADP for equipment purchases for the Draper Property;

b. $2 million transferred to ADP for equipment purchases for the Crockett Property; and

c. $800,000 transferred to 13 Investments, LLC for equipment purchases for the Lehi Property.

*Travel or Transportation in Aid of Racketeering*

583.    Defendants have traveled in interstate or foreign commerce, or used the mail or other facilities in interstate or foreign commerce, with intent to either distribute the proceeds of unlawful activity, or otherwise promote, manage, establish, or carry on any unlawful activity, or facilitate the same, which is indictable under 18 U.S.C. §§ 1952(a)(1) & 1952(a)(3).

584.    This includes, without limitation, traveling to visit the properties sold under the Colliers/Long TIC Program, transferring money to property development and construction companies for renovation work on the properties, and ordering medical equipment for tenants.

## FIRST CAUSE OF ACTION

*(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; 13 Investments LLC; Lady Mira Blue Machlis; Thomas Smith; Lew Cramer; Jerald Adam Long; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC Draper, LLC; Robert M.*

136

*Levenson; Blackacre 1031 Exchange Services, LLC; ADP-Millcreek 2, LLC; ADP-Millcreek 3, LLC; KGL Advisors, LLC)*

585.    Investment in TIC interests in the Pine Bluff, Draper, Lehi, and Crockett Properties was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, for example, the HSH Parties, Neuragenex Parties, and Pulse Healthcare Parties as tenants and guarantors, and the Colliers/Long Parties and their affiliates as those who developed and coordinated the TIC offerings.

586.    The Colliers/Long Parties made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

587.    The material misrepresentations and omissions were made in connection with the offer to sell a security.

588.    Such material misrepresentation and omissions include, as alleged more fully and specifically herein:

   a.  That the Colliers/Long Parties had conducted due diligence on the tenants for the Millcreek Properties;

   b.  The risk analysis of the Pine Bluff, Draper, Lehi, and Crockett Properties;

   c.  The average capitalization rate over the initial 15- or 20-year lease term;

d.  That Millcreek Commercial retained, and would continue to retain, an ownership interest in the Pine Bluff, Draper, Lehi, and Crockett Properties;

e.  That the tenants for the Colliers/Long Properties were "dream tenants;"

f.  That the guarantors were solvent companies;

g.  That there was a Lloyd's of London bond in place in case of tenant and guarantor default at the Pine bluff and Draper Properties;

h.  That renovations at the Draper Property were minor and would imminently be completed;

i.  That sufficient oversight was provided for the disbursement of equipment purchase funds and equipment acquisitions at the Lehi and Crockett Properties;

j.  That the investments sold to Plaintiffs would comply with applicable IRS regulations to be 1031-compliant;

k.  That the Colliers/Long Parties' TIC offerings did not constitute securities, and federal and state laws regulating the sale of securities did not apply.

589.  The Colliers/Long Parties all made the material misrepresentations and omissions either through verbal or written correspondence with the Plaintiffs, or through the Marketing Materials.

590.    The Colliers/Long Parties' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

591.    The Colliers/Long Parties acted knowingly in making material misrepresentations and omissions or should have known but acted with severe recklessness as to their truth.

592.    The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase interests in the Pine Bluff, Draper, Lehi, and Crockett Properties. The Plaintiffs would not have invested had they known the true facts.

593.    Plaintiffs justifiably relied on the foregoing misrepresentations.

594.    The statutory safe harbor and bespeaks caution doctrine that apply to forward looking statements under certain circumstances do not apply to this action because no meaningful cautionary statements were made regarding material risks and facts known by Defendants.

595.    The Colliers/Long TIC Program, including the development, marketing, and sale of the Pine Bluff, Draper, Lehi, and Crockett Properties to Plaintiffs in this case, was a device, scheme, or artifice to defraud Plaintiffs, and a series of acts, practices, and

a course of business that operated as a fraud or deceit upon Plaintiffs under the meaning of the Securities Exchange Act.

596.    All Defendants participated in, planned, furthered, and executed the Colliers/Long TIC Program as alleged more fully and specifically herein, including by:

    a.  The development of the Colliers/Long TIC Program;

    b.  Oversight of various component parts of the Colliers/Long TIC Program;

    c.  The selection of and negotiation with tenants;

    d.  The development of each TIC offering including lease terms, guarantees, bonds, projections, forecasts, and other aspects of each TIC offering as constituted and marketed;

    e.  Referring Plaintiffs to the Colliers/Long TIC Program and endorsing their investment in the same;

    f.  Planning, negotiations and oversight of equipment purchases, renovations, and construction;

    g.  The creation of marketing materials and their dissemination to Plaintiffs;

    h.  The investment of funds necessary to purchase TIC interests and otherwise operate the Colliers/Long TIC Program; and

     i.   The concealment of financial information, communications, and other material facts regarding Plaintiffs investment to prevent Plaintiffs' discovery of said facts and information.

597.    The foregoing misrepresentations, omissions, schemes and artifices to defraud, and actions and course of business on the part of Defendants caused Plaintiffs to suffer extensive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

***(Sale of Unregistered Securities Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Read Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Millrock Investment Fund 1, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Mark Machlis; Green Ivy Realty Inc; Lady Mira Blue Machlis; Steve Caton; SARC Draper, LLC; KGL Advisors, LLC)***

598.    Investment in TIC interests in the Pine Bluff, Draper, Lehi, and Crockett Properties was a security as defined in 15 U.S.C. § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, for example, the HSH Parties, Neuragenex Parties, and Pulse Healthcare Parties as tenants and guarantors, and the Colliers/Long Parties and their affiliates as those who developed and coordinated the TIC offerings.

599.    The TIC interests in the Pine Bluff, Draper, Lehi, and Crockett Properties which are the subject of this Complaint were not registered by the filing of a registration statement.

600.     During the time in which the Colliers/Long Parties marketed and sold TIC interests in the Pine Bluff, Draper, Lehi, and Crockett Properties, they made use of means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service—for the purpose of offering, selling, and delivering interests in the Pine Bluff, Draper, Lehi, and Crockett Properties, in violation of Section 5 (a) and 5 (c) of the Securities Act (15 U.S.C. § 77e (a) and (c)).

601.     Pursuant to Section 12 (a)(1) of the Securities Act (15 U.S.C § 77l (a)(1)), by reason of the Colliers/Long Parties' violation, the Colliers/Long Parties are liable to Plaintiffs in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon tender of such security. For purposes of this Cause of Action only, Plaintiffs hereby tender their investment interests in the Pine Bluff, Draper, Lehi, and Crockett Properties to the Colliers/Long Parties upon receipt of the amount specified in this paragraph, as may be proven at trial.

602.     In the alternative, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

603.     In either case, Plaintiffs are further entitled to an award of pre and post-judgment interest, attorney's fees as provided by contract or law, costs, and such further relief as the Court may deem appropriate under the circumstances.

## THIRD CAUSE OF ACTION

*(Control Person Liability Under the Securities Exchange Act Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; 13 Investments LLC; Lady Mira Blue Machlis; Thomas Smith; Lew Cramer; Jerald Adam Long; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC Draper, LLC; Robert M. Levenson; Blackacre 1031 Exchange Services, LLC; ADP-Millcreek 2, LLC; ADP-Millcreek 3, LLC; KGL Advisors, LLC)*

604.    Defendants named in Plaintiffs' First and Second Causes of Action are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons."

605.    At all times relevant to this Complaint, and as alleged specifically herein, the Defendants identified in this Third Cause of Action controlled the Liable Persons, as follows:

606.    Defendants were officers, directors, agents, or other control people of entities that are Liable Persons.

607.    Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood.

608.    Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position.

609.    Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.

610.    Defendants participated in the business operations of the Liable Persons generally.

611.    Defendants had power over the specific transactions and activities at issue in this Complaint.

612.    With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons which is the basis for the First Cause of Action.

613.    Pursuant to Section 20 (a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's First Cause of Action.

614.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as

consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### FOURTH CAUSE OF ACTION

***(State Law Securities Fraud Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; 13 Investments LLC; Lady Mira Blue Machlis; Thomas Smith; Lew Cramer; Jerald Adam Long; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC Draper, LLC; Robert M. Levenson; Blackacre 1031 Exchange Services, LLC; ADP-Millcreek 2, LLC; ADP-Millcreek 3, LLC; KGL Advisors, LLC )***

615.    The investments in Colliers/Long TIC Properties which are the subject of this Complaint are within the definition of securities under applicable provisions of state law.

616.    Section 61-1-1(2) of the Utah Uniform Securities Act (UUSA) makes it unlawful "for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to … make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

617.    As described herein, in connection with the Defendants' offer and sale of investments in the Pine Bluff, Draper, Lehi, and Crockett Properties, the Colliers/Long Parties made untrue statements of material fact to the Plaintiffs; omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or otherwise engaged in conduct that worked fraud or deceit upon the Plaintiffs in violation of applicable provisions of the UUSA and other applicable provisions of state law.[1]

618.    The Colliers/Long Parties engaged in the conduct violating the applicable laws with knowledge of their failure to make a full and fair disclosure to Plaintiffs.

619.    Plaintiffs did not know that the Colliers/Long Parties misrepresentations were false and were not aware of the material facts that the Colliers/Long Parties omitted to disclose in connection with their purchase of securities.

620.    Each untrue statement of a material fact or omission of a material fact, including but not limited to those specifically alleged herein, is alleged as a separate violation of Section 61-1-1(2) of the UUSA and other applicable provisions of state law.

621.    Section 61-1-1 of the UUSA makes it unlawful for any person to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the offer, sale, or purchase of any security, directly or indirectly.

---

[1] Applicable state law regarding securities fraud includes at least the following statutes: California, § 25401; Massachusetts, Mass. Gen. Laws Ch. 110A § 101; Delaware, DE Code § 73-201; Washington, RCW § 21.20.010; Arkansas, AR Code § 23-42-507; Wyoming, Wyo. Stat. § 17-4-501; Colorado, Colo. Rev. Stat. § 11-51-501; Utah, § 61-1-1.

622.    All Defendants participated in, planned, furthered, and executed the

Colliers/Long TIC Program as alleged more fully and specifically herein, including

by:

    a.  The development of the Colliers/Long TIC Program;

    b.  Oversight of various component parts of the Colliers/Long TIC Program;

    c.  The selection of and negotiation with tenants;

    d.  The development of each TIC offering including lease terms, guarantees, bonds, projections, forecasts, and other aspects of each TIC offering as constituted and marketed;

    e.  Planning, negotiations and oversight of equipment purchases, renovations, and construction;

    f.  The creation of marketing materials and their dissemination to Plaintiffs;

    g.  The investment of funds necessary to purchase TIC interests and otherwise operate the Colliers/Long TIC Program; and

    h.  The concealment of financial information, communications, and other material facts regarding Plaintiffs investment to prevent Plaintiffs' discovery of said facts and information.

623.    Section 61-1-7 of the UUSA makes it unlawful "for any person to offer or

sell any security in this state unless it is registered under this chapter, the security for

which a notice filing has been made pursuant to the provisions of Section 61-1-15.5."

624.     As described herein, Defendants have violated and continue to violate Section 61-1-7 of the UUSA by offering and selling securities in Utah that are not federal covered securities for which a notice filing has been made.

625.     By reason of Defendants' violations of applicable state statutes governing securities fraud, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs investment plus interest at applicable rates, less the value of what Plaintiffs received from the investment.

626.     Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, treble damages under applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## FIFTH CAUSE OF ACTION

*(State Law Securities Violation/Sale by Unlicensed Broker or Investment Adviser Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Millrock Investment Fund 1, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Mark Machlis; Green Ivy Realty Inc; Lady Mira Blue Machlis; Steve Caton; SARC Draper, LLC; KGL Advisors, LLC )*

627.     The investments in Colliers/Long TIC Properties which are the subject of this Complaint are within the definition of securities under applicable provisions of state law, including Section 61-1-3(1) of the UUSA.

148

628.    Section 61-1-3(1) of the UUSA makes it unlawful "to transact business in this state as a broker-dealer or agent unless the person is licensed under this chapter."

629.    As described herein, Defendants have violated and continue to violate Section 61-1-3(1) of the UUSA by, among other things, offering and selling securities in and from the State of Utah, in return for compensation, without a license.

630.    Defendants functioned as securities agents in selling the investment in Colliers/Long TIC Properties to the Plaintiffs.

631.    Defendants' conduct violates provisions of applicable state law which requires securities agents to be licensed.[2]

632.    By reason of Defendants' unlicensed participation in the sale of securities to the Plaintiffs, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs' investment plus interest at applicable rates, less the value of what Plaintiffs received from the investment.

633.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, treble

---

[2] Applicable state law regarding the licensing of securities agents includes at least the following statutes: California, § 25210; Washington, RCW § 21.20.040; Delaware, 6 DE Code § 73-202; Utah Code §61-1-3; AR Code § 23-42-501; Colo. Rev. Stat. § 11-51-301.

damages under applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTH CAUSE OF ACTION

*(Materially Aiding State-Law Securities Fraud Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; 13 Investments LLC; Lady Mira Blue Machlis; Thomas Smith; Lew Cramer; Jerald Adam Long; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC Draper, LLC; Robert M. Levenson; Blackacre 1031 Exchange Services, LLC; ADP-Millcreek 2, LLC; ADP-Millcreek 3, LLC; KGL Advisors, LLC )*

634.    The Defendants identified in Plaintiffs' Fourth and Fifth Causes of Action are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons."

635.    At all times relevant to this Complaint, the Defendants identified in this Cause of Action materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

a. Defendants were officers, directors, agents, or other control people of entities that are Liable Persons, and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

b. As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided

information, services, labor or funds that significantly advanced the

Liable Persons' unlawful conduct or purposes with respect to Plaintiffs.

c.  Defendants otherwise engaged in conduct materially aiding the Liable

Persons in accomplishing the unlawful sale of securities to the Plaintiffs.

636.    Defendants did not act in good faith, and Defendants knew or acted in

reckless disregard of the facts in carrying out their conduct relating to the sale of

securities to the Defendants.

637.    Pursuant to applicable state law relating to those who materially aid

securities violations,[3] Defendants are jointly and severally liable with and to the same

extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against

Defendants awarding damages in an amount to be proven at trial, but which is the

equivalent of any award determined under Plaintiff's Fourth and Fifth Causes of

Action.

638.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees where recoverable under contract, at law, or as

---

[3] Applicable state law regarding liability of those who materially aid fraud in a securities transaction includes at least the following: California, § 25403; Washington, RCW 21.20.430; Utah Code §61-1-22; WY Stat § 17-4-509.

consequential damages, treble damages under applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTH CAUSE OF ACTION

*(Common Law Fraud Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; Lady Mira Blue Machlis; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Robert M. Levenson; Blackacre 1031 Exchange Services, LLC; KGL Advisors, LLC )*

639.    Defendants made false statements about vital facts regarding Plaintiffs' investments in the Pine Bluff, Draper, Lehi, and Crockett Properties, including the representations within the Marketing Materials and the representations made to each individual Plaintiff, as well as false statements to Plaintiffs following their investments in the Colliers/Long TIC Program.

640.    Defendants made the statements knowing that they were false.

641.    Alternatively, Defendants made the statements recklessly and without regard for their truth.

642.    Defendants intended that the Plaintiffs would rely on the statements.

643.    Plaintiffs reasonably relied on the statements by investing in the Pine Bluff, Draper, Lehi, and Crockett Properties and in continuing to rely on the Colliers/Long Parties and Mary Street to guide and manage their investment.

644.    As a result of Defendants' conduct, Plaintiffs suffered damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

*(Negligent Misrepresentation Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Group, Inc.; Colliers International Holdings (USA), Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; Lady Mira Blue Machlis; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Robert M. Levenson; Blackacre 1031 Exchange Services, LLC; KGL Advisors, LLC )*

645.    Defendants had a duty to inspect and to disclose fully and fairly all facts that materially affected or related to the condition of the Pine Bluff, Draper, Lehi, and Crockett Properties, the viability of the investment, the legitimacy of the tenant and corporate guarantor, and compliance with applicable IRS regulations including Section 1031 and Revenue Procedure 2002-22.

646.    Defendants made false representations to Plaintiffs as detailed above.

647.    Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

648.    Defendants knew such representations were false or were negligent in making such representations.

649.    Defendants were negligent in investigating the tenant and the corporate guarantor.

153

650.    Defendants were negligent in ensuring and/or verifying that the investments complied with applicable IRS regulations for 1031 exchanges, including Revenue Procedure 2002-22.

651.    Defendants knew or should have known the misrepresentations were false.

652.    The Defendants made the misrepresentations in an effort to induce the Plaintiffs into purchasing the Pine Bluff, Draper, Lehi, and Crockett Properties for a grossly inflated price.

653.    The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase the Pine Bluff, Draper, Lehi, and Crockett Properties and their continued reliance on Mary Street and the Colliers/Long Parties thereafter.

654.    Plaintiffs would not have invested in the Pine Bluff, Draper, Lehi, and Crockett Properties, nor continued to rely on Mary Street and the Colliers/Long Parties to manage their investments, had they known the true facts.

655.    Plaintiffs justifiably relied on the foregoing misrepresentations.

656.    As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

***(Breach of Fiduciary Duty Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty, Inc; Lady Mira Blue Machlis; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Robert M. Levenson; Blackacre 1031 Real Estate, LLC; KGL Advisors, LLC)***

657.    Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiffs invested in the Pine Bluff, Draper, Lehi, and Crockett Properties.

658.    Defendants expected that Plaintiffs would put particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely on their judgment and skill regarding their TIC investments in the Pine Bluff, Draper, Lehi, and Crockett Properties.

659.    The TIC investment structure and IRS rules made Plaintiffs weaker parties with unique vulnerabilities, including, *inter alia*, Plaintiffs' age, experience, abilities, disabilities as applicable, and the fact that that Plaintiffs were prohibited from actively managing their investments.

660.    Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with Defendants.

661.    Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiffs' benefit.

662.    Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

663.    Defendants accepted that trust and confidence from Plaintiffs.

664.    Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

665.    Defendants were also Plaintiffs' agents.

666.    Defendants also had access to superior and exclusive knowledge about the Pine Bluff, Draper, Lehi, and Crockett investment opportunities, such as information about the financial performance of the tenants, their affiliate entities, the flow of funds to and from those entities, the status of promised renovations and equipment purchases, and the investments' degree of likely compliance with applicable IRS regulations for 1031 exchanges.

667.    Defendants breached their fiduciary duties to Plaintiffs by, *inter alia*, failing to do any investigation into the legitimacy of the tenant and guarantor or else concealing their knowledge regarding the same and by making the materially false or misleading representations or omissions alleged above, by actively concealing information concerning Plaintiffs' investments from them, and otherwise acting in the best interests of parties other than Plaintiffs.

668.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

***(Concealment/Fraudulent Nondisclosure Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty, Inc; Lady Mira Blue Machlis; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Robert M. Levenson; Blackacre 1031 Real Estate, LLC; KGL Advisors, LLC )***

669.    As alleged more fully herein, a special relationship existed between Plaintiffs and the Colliers/Long Parties, in that the Colliers/Long Parties had and held themselves out as having superior knowledge, expertise, and access to information concerning all aspects of the TIC investments they developed, marketed, and sold to Plaintiffs, and Plaintiffs were in a uniquely vulnerable position due to their lack of relative experience, knowledge, and access to information, including due to IRS regulations governing the timing, management, and other conditions of 1031 exchanges.

670.    The Colliers/Long Parties knew the truth of their numerous misrepresentations and omissions alleged herein, including concerning the absence of the advertised bond, the financial and operational state of the tenant and guarantor; the reliability and trustworthiness of the Developer Parties, HSH Parties, Neuragenex Parties, Pulse Healthcare Parties, and others with whom they partnered in the Colliers/Long TIC Program; the status of renovations and equipment acquisitions; the

157

many factors giving rise to a substantial likelihood that Plaintiffs' investments were not 1031-compliant; and others, but failed to disclose these facts to Plaintiffs.

671.    As alleged more fully herein, special relationship existed between Plaintiffs and Mary Street and CAMS Realty, in that Mary Street and CAMS Realty had agreed to act in Plaintiffs' best interests, had and held themselves out as having superior knowledge and experience concerning all aspects of their role as lease administrator and/or property manager, and held Plaintiffs' funds in the course of their administration of the Pine Bluff, Draper, Lehi, and Crockett Properties.

672.    Mary Street and CAMS Realty knew that the HSH Parties were not paying rent, that Millcreek or its affiliates were actually paying rent, that there was no bond from Lloyds of London at the Pine Bluff and Draper Properties, and that the Colliers/Long Parties had done little or nothing to vet Plaintiffs investment or act in their best interests with respect to their investments in the Colliers/Long TIC Program, and other material facts regarding Plaintiffs' investments, but failed to disclose these facts to Plaintiffs, as alleged more fully herein.

673.    As alleged more fully herein, a special relationship existed between Plaintiffs and each of their respective Referrers, in that they had and held themselves out as having superior knowledge and experience concerning all material aspects of the transactions they conducted on Plaintiffs behalf and Plaintiffs were in a uniquely vulnerable position due to their lack of relative experience, knowledge, and access to

158

information regarding, *inter alia*, the Colliers/Long TIC Program and IRS regulations governing the timing and other conditions of 1031 exchanges.

674.    The Referrers knew that they had done little or nothing to verify or ensure that Plaintiffs potential investments through the Colliers/Long TIC Programs were 1031-compliant or to verify the truth of the Colliers/Long Parties' representations about their TIC investments, and knew the truth of their other misrepresentations about the Colliers/Long TIC Program and their own credentials, experience, reliability, and services, and that they were receiving financial compensation for their referral, but failed to disclose these facts to the respective Plaintiffs with whom they interacted, as alleged more fully herein.

675.    Plaintiffs did not know the facts described above, including the lack of vetting for either the tenant or the investment as a whole, the absence of a Lloyd's of London bond, the likely non-compliance of the investments with IRS regulations, the unreliability of the corporate guarantor, and other material facts described more fully herein.

676.    Each of Defendants' failures to disclose the above-identified facts were a substantial factor in causing Plaintiffs' damages, the amount of which will be determined at trial.

**ELEVENTH CAUSE OF ACTION**

**(Elder Abuse/Abuse of Vulnerable Adults By Plaintiffs John Weber, Gayle Weber, and Claudia Griffin Against  Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Millrock Investment Fund 1, LLC; Blake McDougal; Spencer Taylor; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; KGL Advisors, LLC)**

677.    Plaintiffs John and Gayle Weber and Claudia Griffin were 65 or older at the time their investments were induced.

678.    At all relevant times herein, John and Gayle Weber and Claudia Griffin were "vulnerable adults" as that term is defined in Utah Code § 76-5-111 and are therefore entitled to the protections provided under Utah law.

679.    Defendants were in a position of trust and confidence or had a business relationship with these vulnerable adults, who put substantial trust and confidence in Defendants.

680.    Defendants knowingly, by deception, obtained or used these vulnerable adult's funds, credit, assets, or other property.

681.    Defendants intended to temporarily or permanently deprive the vulnerable adults of the use, benefit, or possession of the Plaintiffs' property, for their own benefit.

682.    Defendants were aware of and exploited Plaintiffs' dependency upon Defendants' purported knowledge, skills, and expertise.

683.    To sell the TIC investments to Plaintiffs, Defendants made misrepresentations of material facts as alleged herein. Defendants were motivated by greed and intended to generate fees and commissions for themselves by causing Plaintiffs to invest while exposing Plaintiffs to an unreasonable risk of harm.

684.    Defendants received commissions, fees, and other benefits on the sale of the TICs to Plaintiffs.

685.    Oftentimes, these commissions were not disclosed to Plaintiffs.

686.    Defendants have made written and oral misrepresentations of material facts in connection with the offer and sale of the TICs for the purpose of inducing Plaintiffs to invest.

687.    In engaging in such conduct, Defendants were motivated by purposes other than the well-being and interest of the Plaintiffs but acted with improper motives including at least greed and self-interest.

688.    In engaging in such conduct, Defendants intended to defraud Plaintiffs within the meaning of Utah's elder abuse statute.

689.    Under applicable state statutes and related tort principles, including the doctrine of *prima facie* tort or negligence *per se*, Defendants' conduct constitutes abuse of vulnerable persons for which the vulnerable Plaintiffs are entitled to a judgment awarding damages which may be measured by the amount of any damages recoverable

under other claims asserted herein, together with additional general damages as may be determined at trial.

690.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

### TWELFTH CAUSE OF ACTION

*(Conspiracy to Engage in Tortious Conduct Against  Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; 13 Investments LLC; Lady Mira Blue Machlis; Thomas Smith; Lew Cramer; Jerald Adam Long; KGL Real Estate Development, PLLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC Draper, LLC; Robert M. Levenson; Blackacre 1031 Exchange Services, LLC; ADP-Millcreek 2, LLC; ADP-Millcreek 3, LLC; KGL Advisors, LLC)*

691.    With respect to the tortious conduct alleged herein, the Colliers/Long Parties, other Defendants, and the HSH Parties and Developer Parties entered a combination to accomplish the object of the tortious behavior, namely fraudulently inducing Plaintiffs' investment in the Pine Bluff, Draper, Lehi, and Crockett Properties, and the continued concealment of the fraudulent scheme after Plaintiffs' investment.

692.    Defendants' agreement to participate in the conspiracy is evident from the acts of each party, as outlined in the Causes of Action and other allegations herein, and was reached expressly in communications between the parties regarding the

Colliers/Long TIC Program, or was tacit or implied in the parties' intent as evidenced by their conduct.

693.    In carrying out the conspiracy, participants in the conspiracy committed one or more unlawful acts, including the acts described in the Causes of Action above and alleged more fully herein.

694.    By reason of Defendants' participation in the civil conspiracy, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of property that Plaintiffs actually received.

695.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### THIRTEENTH CAUSE OF ACTION

***(Aiding and Abetting Tortious Conduct Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Blake McDougal; Spencer Taylor; Spencer Strong; Brent Smith; Mark Machlis; Green Ivy Realty Inc; 13 Investments LLC; Lady Mira Blue Machlis; Thomas Smith;***

*Lew Cramer; Jerald Adam Long; KGL Real Estate Development, PLLC; Mary Street;*
*CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC Draper,*
*LLC; Robert M. Levenson; Blackacre 1031 Exchange Services, LLC; ADP-Millcreek*
*2, LLC; ADP-Millcreek 3, LLC; KGL Advisors, LLC )*

696.    As set forth in the Causes of Action herein, certain Defendants have engaged in conduct constituting a tort for which Plaintiffs are entitled to recover damages.

697.    Defendants knowingly aided and abetted the underlying tortious conduct as set forth more fully herein, including by their various individual roles in the development, planning, and execution of the Colliers/Long TIC Program including its TIC offerings at the Pine Bluff, Draper, Lehi, and Crockett Properties; the concealment and perpetuation of the fraudulent scheme from Plaintiffs' knowledge before and after Plaintiffs' purchase, and other conduct alleged herein.

698.    Defendants engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware of and familiar with the development, planning, and execution of the Colliers/Long TIC Program and the TIC offerings marketed and sold thereunder; the operations and financial weaknesses of the tenants; the true state of the tenants' finances before and after Plaintiffs' purchases; negotiations of loans and other inter-party transactions and the receipt of financial information; the true facts regarding the reliability of corporate guarantees at the

various properties in the Colliers/Long TIC Program; the lack of existence of a bond from Lloyds of London, and other facts set forth herein.

699.    By reason of Defendants' aiding and abetting the underlying tortious conduct, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of the property that Plaintiffs actually received.

700.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FOURTEENTH CAUSE OF ACTION

### (*Negligence against Colliers International Group, Inc; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Matthew Hawkins; Gil Borok; David Josker*)

701.    At all material times, Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Matthew Hawkins; Gil Borok; and David Josker had the authority to direct and exercised substantial control over the activities and affairs of Colliers' subsidiaries and agents, as set forth more fully herein.

165

702.    As set forth more fully herein, Colliers International Group, Inc; Colliers International Holdings (USA) Inc.; Matthew Hawkins; Gil Borok; and David Josker negligently allowed Colliers' subsidiaries and agents to plan, develop, and execute the fraudulent scheme that was the Colliers/Long TIC Program.  Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Matthew Hawkins; Gil Borok; and David Josker knew or should have known that their agents and subsidiaries were performing the unlawful acts alleged herein.

703.    Colliers International Group, Inc. and Colliers International Holdings (USA) Inc. permitted, encouraged, and/or instructed their subsidiaries and agents to use, at all material times, the uniform branding, logo, and name of "Colliers" and "Colliers International" in connection with the Colliers/Long TIC Program.  Colliers International Group, Inc and Colliers International Holdings (USA) Inc. did this with the express intent of inducing customers, clients, business partners, and others to rely on the deliberately created impression that Colliers International Group, Inc and Colliers International Holdings (USA) Inc. and their subsidiaries constitute a single global entity.  Matthew Hawkins; Gil Borok; and David Josker were aware of and instructed, ratified, and/or approved of this course of conduct.

704.    Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Matthew Hawkins; Gil Borok; and David Josker failed to regulate, control, observe, train, monitor, supervise, or maintain appropriate and necessary safeguards

166

to prevent or minimize the risk of their subsidiaries and agents conducting the fraudulent scheme alleged herein.

705.    By reason of Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Matthew Hawkins; Gil Borok; and David Josker's negligence, Plaintiffs have suffered damages in an amount to be proved at trial.

## FIFTEENTH CAUSE OF ACTION

### *(Violations of 18 U.S.C. § 1962(a) by All Plaintiffs Against Defendants Kevin Long; Spencer Taylor; Brent Smith; and Jerald Adam Long)*

706.    Plaintiffs plead each of the allegations stated or incorporated by reference under this cause of action in the alternative, to the extent any may be barred under 18 U.S.C. 1964(c).

707.    In November 2024, Kevin Long formed KGL Advisors LLC.

708.    Recently, Millcreek's website indicated that the business is closing, and it refers visitors directly to a website for KGL Advisors instead. On December 4, 2024, Millcreek's website consisted of a single page with the following message: "Our friends at KGL Advisors have agreed to assist Millcreek Commercial Clients. The Millcreek agents that moved to KGL Advisors can assist you with Tenant in Common Investments from that brokerage. We appreciate the trust our clients and partners have placed in us over the years."

709.    Kevin Long is also the principal of KGL Real Estate Development, which was recently identified as the one of the four principals of Millcreek at the time of its dissolution. KGL Advisors and KGL Real Estate Development are collectively referred to herein as "the KGL Companies."

710.    Millcreek's other principals at the time of its dissolution were Defendants Smart Cove, LLC; GTR Holdings, LLC; and Long Holdings, L.L.C.; these entities are controlled, in whole or in part, by Defendants Spencer Taylor, Brent Smith, and Adam Long, respectively. These entities are collectively referred to herein as "the Other Millcreek Members."

711.    In 2021 Axia Partners, LLC ("Axia"), a Delaware Limited Liability Company with its principal place of business in Lehi, Utah, was founded by Defendant Adam Long and others, and Adam Long has maintained leadership positions at Axia ever since.

712.    Axia is a commercial real estate investment company with a similar business model to Millcreek.

713.    Axia has promoted properties sold under the Colliers/Long TIC Program as "case studies" to potential investors in its development fund.

714.    Axia has also promoted Adam Long's role and experience at Millcreek and Colliers as evidence of its leadership team's successful track record.

715.    Axia is also affiliated with Colliers, which provides brokerage, market research, and property management services.

716.    One of Axia's "strategic partners" is Brandon Fugal, one of the principals of Colliers International Intermountain.

717.    As legal entities, the KGL Companies, the Other Millcreek Members, and Axia are each an "enterprise," as that term is defined under 18 U.S.C. § 1961(4).

718.    By purchasing, developing, and selling commercial real estate located in multiple states to customers both across the United States and internationally, the KGL Companies and Axia are engaged in interstate and/or foreign commerce.

719.    On information and belief, Kevin Long has received income derived, directly or indirectly, from a pattern of racketeering activity.

720.    On information and belief, Kevin Long used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and operating the KGL Companies, in violation of 18 U.S.C. § 1962(a).

721.    On information and belief, Spencer Taylor has received income derived, directly or indirectly, from a pattern of racketeering activity.

722.    On information and belief, Spencer Taylor used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and operating Smart Cove, LLC, in violation of 18 U.S.C. § 1962(a).

723.    On information and belief, Brent Smith has received income derived, directly or indirectly, from a pattern of racketeering activity.

724.    On information and belief, Brent Smith used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and operating GTR Holdings, LLC, in violation of 18 U.S.C. § 1962(a).

725.    On information and belief, including based on his roles at Colliers and his close involvement in the operation and management of Millcreek and the Colliers/Long TIC Program, Adam Long has received income derived, directly or indirectly, from a pattern of racketeering activity.

726.    On information and belief, Adam Long used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and operating Axia and Long Holdings, LLC, in violation of 18 U.S.C. § 1962(a).

727.    Defendants' violations of 18 U.S.C. § 1962(a) have proximately caused injury to Plaintiffs in several respects, including, but not limited to:

    a.    The Draper, Crockett, and Lehi Properties were unusable for any tenant in their current state, forcing their owners to sell or re-lease the properties at a substantial discount, but not before they had already incurred significant losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

    b.   The Draper and Lehi Properties have never been occupied, and their owners are incurring ongoing losses by bearing the cost of commercial real estate agents, legal fees, taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

    c.   Plaintiffs' invested funds have been diverted to other purposes to the detriment of the value of their TIC interests.

    d.   Winding up Millcreek and transferring its assets and operations to other entities frustrates Plaintiffs' ability to discover evidence relevant to their claims and obtain recovery for their losses.

728.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to a judgment in their favor for an amount to be determined at trial.

729.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees, treble damages, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTEENTH CAUSE OF ACTION

***(Violations of 18 U.S.C. § 1962(c) by All Plaintiffs Against Colliers International Intermountain, LLC; Colliers International Holdings (USA), Inc.; Colliers International Group, Inc.; Kevin Long; Jerald Adam Long; Brent Smith; Spencer Taylor; Spencer Strong; Blake McDougal; Mark Machlis; Robert Levenson; Mary Street; Steve Caton; Millcreek Commercial Properties, LLC; KGL Advisors, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, L.L.C.; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC;***

*Green Ivy Realty, Inc.; 13 Investments LLC; CAMS Realty, LLC; Mountain West Commercial, LLC; SARC Draper, LLC; ADP-Millcreek 2, LLC; and ADP-Millcreek 3, LLC)*

730.    Plaintiffs plead each of the allegations stated or incorporated by reference under this cause of action in the alternative, to the extent any may be barred under 18 U.S.C. 1964(c).

731.    The Colliers/Long TIC Program consists of a union or group of individuals associated in fact by virtue of their participation in the planning and execution of the Program, including each of the Defendants named in this action, and as such, constitutes an "enterprise," as that term is defined under 18 U.S.C. § 1961(4).

732.    Alternatively, the Colliers/Long TIC Program involved the participation of multiple legal entities, which are themselves "enterprises," as that term is defined under 18 U.S.C. § 1961(4).

733.    For purposes of this cause of action, the Colliers/Long TIC Program and Millcreek Commercial Properties are collectively and interchangeably referred to as "the enterprise."

734.    The enterprise engaged in both interstate and foreign commerce, as evidenced by Plaintiffs and Defendants' respective domiciles and the locations of the Properties.

735.    As alleged at length above, since at least 2018 each Defendant identified in this cause of action has conducted or participated, directly or indirectly, in the

conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

736.    Defendants' violations of 18 U.S.C. § 1962(c) have proximately caused injury to Plaintiffs in several respects, including, but not limited to:

     a.  the loss of substantially all the value of their original investments caused by the complete and utter failure of their Colliers/Long TIC interests;

     b.  the immediate loss of the expected value of their original investments through the payment of undisclosed commission payments to themselves and third parties;

     c.  the loss of 20 years of progressively-increasing passive income due to Defendants' chronic inability to lease the properties;

     d.  exposure to increased tax liability and potential penalties for failing to comply with the requirements of a 1031 exchange; and

     e.  additional losses arising from or connected with the defaults of the original tenants of each property, including bearing the costs of taxes, maintenance, insurance, and elevated "crisis rate" lease administration fees for the vacant properties.

737.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to a judgment in their favor for an amount to be determined at trial.

738.   Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees, treble damages, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTEENTH CAUSE OF ACTION

*(Violations of 18 U.S.C. § 1962(d) by All Plaintiffs Against Colliers International Intermountain, LLC; Colliers International Holdings (USA), Inc.; Colliers International Group, Inc.; Kevin Long; Jerald Adam Long; Brent Smith; Spencer Taylor; Spencer Strong; Blake McDougal; Mark Machlis; Lady Blue Mira Machlis; Robert M. Levenson; Mary Street; Steve Caton; Thomas Smith; Millcreek Commercial Properties, LLC; KGL Advisors, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, L.L.C.; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Green Ivy Realty, Inc.; 13 Investments LLC; CAMS Realty, LLC; Mountain West Commercial, LLC; SARC Draper, LLC; ADP-Millcreek 2, LLC; and ADP-Millcreek 3, LLC)*

739.   Plaintiffs plead each of the allegations stated or incorporated by reference under this cause of action in the alternative, to the extent any may be barred under 18 U.S.C. 1964(c).

740.   Defendants' violations of 18 U.S.C. §§ 1962(a) & 1962(c) described above also constitute conspiracy to commit such violations, in that they participated in the planning and execution of the Colliers/Long TIC Program, in violation of 18 U.S.C. § 1962(d).

741.   Additionally, Defendants committed other acts in furtherance of this conspiracy not identified in the previous two causes of action, including but not limited to the following:

a. Defendant Lew Cramer approved the terms of an agreement whereby Colliers partnered with Kevin Long and his affiliates to execute the Colliers/Long TIC Program.

b. Colliers supported the Colliers/Long TIC Program through brokerage activities, due diligence activities, marketing, staffing and sales training.

c. Colliers also provided financial support to the Colliers/Long TIC Program, in which Defendant Colliers USA also participated by approving such payments.

d. Defendant Tom Smith provided "Oversight & Leadership" and "Accountability oversight", including sales training, as well as financial support, for the Colliers/Long TIC Program.

e. Defendant Steve Caton (and his affiliated entities, SARC US, Inc., SARC USA., Inc., and SARC Draper, LLC) collaborated in the Colliers/Long TIC Program and was heavily involved in the sale of TIC interests in the Draper Property.

f. Defendant Lady Mira Blue Machlis assisted Mark Machlis in persuading the Ockeys to invest in the Colliers/Long TIC Program.

742. On information and belief, Defendants had a meeting of the minds, based on the extent of their involvement in coordinating and executing the Colliers/Long TIC Program.

175

743.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to a judgment in their favor for an amount to be determined at trial.

744.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees, treble damages, and such further relief as the Court may deem appropriate under the circumstances.

## EIGHTEENTH CAUSE OF ACTION

### *(Unjust Enrichment of Defendants – All Defendants*)

745.    Plaintiffs conferred a benefit on the Defendants by making their investment in Colliers/Long TIC Properties.

746.    Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

747.    Defendants appreciated, acknowledged, or had knowledge of the benefits incurred upon them as they directly received money from the proceeds of the Plaintiffs' TIC investments or otherwise acted in concert to perpetuate the Colliers/Long TIC Program, obtain, and use funds from TIC investors, and divert invested money to purposes not benefiting Plaintiffs.

748.    Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs therefor.

749.    By reason of Defendants unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants.

750.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

1. An award of actual damages, treble damages under applicable statutes, punitive damages, attorney fees and costs, in an amount to be proven at trial, plus interest as set forth by applicable law.

2. Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

3. If the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

4. Such other relief as may be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable in this case.

RESPECTFULLY SUBMITTED this March 25, 2025.

DEISS LAW, P.C.

_/s/ Corey D. Riley._
Andrew G. Deiss
Corey D. Riley
Andrew D. Miller
*Attorneys for Plaintiffs*