Andrew G. Deiss (Utah Bar # 7184)
Corey D. Riley (Utah Bar # 16935)
DEISS LAW PC
375 W 200 S, Suite 201
Salt Lake City, UT 84101
Telephone: (801) 433-0226
deiss@deisslaw.com
criley@deisslaw.com
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| WEBER, et, al,<br>*Plaintiffs,*<br><br>v.<br>COLLIERS INTERNATIONAL GROUP, INC., et, al,<br><br>*Defendants.* | **OPPOSITION TO LEW CRAMER, MATTHEW HAWKINS, GIL BOROK, AND DAVID JOSKER'S MOTION TO DISMISS**<br><br>Case No. 2:25-cv-00162-DBB-DBP<br><br>Judge: David Barlow<br><br>Chief Magistrate Judge Dustin B. Pead |

Plaintiffs hereby oppose Defendants Lew Cramer, Matthew Hawkins, Gil Borok, and David Josker's Motion to Dismiss the Second Amended Complaint (ECF No. 249). For the reasons set forth below, the Motion should be denied.

## INTRODUCTION

This case concerns an integrated investment program, not a collection of unrelated corporate acts. The Second Amended Complaint ("SAC") alleges that the Colliers/Long Parties developed and operated a program through which they

marketed tenant-in-common interests as safe, stable investments supported by financially sound tenants, long-term leases, corporate guarantees, insurance, meaningful due diligence, and Colliers' institutional oversight. SAC ¶¶ 134–54, 293–311. Colliers supplied the Program with the name, personnel, brokerage services, due-diligence functions, marketing support, and sales training necessary to give those representations institutional credibility. *Id.* ¶¶ 140–52, 293–311.

The SAC identifies the Moving Defendants' respective roles in that operation. Cramer was Chief Executive Officer of Colliers' Utah division. *Id.* ¶ 139. Acting on Colliers' behalf, he approved the arrangement through which Colliers partnered with Kevin Long and his affiliates to operate the TIC Program through brokerage, due diligence, and marketing. *Id.* ¶ 150. Cramer also mentored the sales agents employed in the Program. *Id.* ¶ 152. Those allegations describe Cramer's approval and implementation of the operating relationship through which the offerings were developed and marketed—not his mere association with other Defendants.

The SAC likewise alleges more than the titles of Hawkins, Borok, and Josker. Borok and Hawkins managed Colliers Intermountain; Borok led Colliers' United States operations; Hawkins exercised legal and regulatory oversight over Colliers' North American subsidiaries; and Josker directed the performance and

entrepreneurial initiatives of Colliers' western-region brokerage offices, including Utah. *Id.* ¶¶ 9–15. Josker also approved draw payments for agents selling TIC offerings through the Program. *Id.* ¶ 16. The SAC further alleges that Hawkins, Borok, and Josker exercised substantial authority over the participating Colliers subsidiaries and agents, approved or ratified the use of Colliers' branding, and failed to regulate, train, monitor, or supervise the operation. *Id.* ¶¶ 713–17.

The Motion does not confront that operation as pleaded. It isolates selected allegations, separates the Moving Defendants from the entities and agents whose conduct they allegedly approved or supervised, and characterizes their operational conduct as routine corporate activity. But the Court has already held that the SAC plausibly alleges a close partnership and joint business operation between Colliers and Millcreek, securities fraud against the Colliers entities, and an underlying tort sufficient to support civil conspiracy. Memorandum Decision and Order, ECF No. 216 (the "Weber Order"), at 15–18, 58–59. Read as a whole and in Plaintiffs' favor, the SAC plausibly alleges each Moving Defendant's participation in, control over, or negligent performance of the functions through which that operation was conducted. The Motion should therefore be denied or, alternatively, Plaintiffs should be granted leave to amend.

## ARGUMENT

### I. GOVERNING PLEADING STANDARDS

A complaint survives Rule 12(b)(6) when it contains sufficient factual matter, accepted as true, to state a facially plausible claim for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the pleaded facts permit the reasonable inference that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678. The Court must accept Plaintiffs' well-pleaded allegations as true, draw all reasonable inferences in their favor, and may not weigh competing factual explanations at the pleading stage. *McNellis v. Douglas County School District*, 116 F.4th 1122, 1130–31 (10th Cir. 2024).

Rule 9(b) requires the circumstances of fraud to be pleaded with particularity but permits intent, knowledge, and other conditions of mind to be alleged generally. Fed. R. Civ. P. 9(b); *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).

The Private Securities Litigation Reform Act ("PSLRA") additionally requires Plaintiffs to identify the statements alleged to be misleading, explain why they were misleading, and plead particularized facts supporting a strong inference of scienter. 15 U.S.C. § 78u-4(b)(1)–(2). Scienter includes intent to defraud or recklessness reflecting a conscious disregard of a known or obvious

risk that investors would be misled. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1149–50 (10th Cir. 2015).

The scienter inquiry is holistic. The Court must consider the allegations collectively rather than scrutinize each in isolation. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24, 326 (2007). The inference need not be irrefutable or the most plausible inference; it is sufficient when it is cogent and at least as compelling as an opposing innocent inference. *Id.* at 324. These standards require the Court to evaluate each Moving Defendant's alleged conduct within the coordinated Program described by the SAC, not as a series of disconnected acts.

## II. THE SAC PLAUSIBLY ALLEGES A PRIMARY § 10(b) VIOLATION BY CRAMER

Cramer moves to dismiss Count I because he claims he did not personally make a representation to Plaintiffs and because he claims his approval of the Colliers/Long relationship and mentorship of its sales agents were not deceptive acts. ECF No. 249 at 7–12. That argument separates Cramer's conduct from the enterprise he approved and helped operate. Plaintiffs plead a coordinated scheme to develop, market, and sell TIC interests by representing that the properties were safe, stable, and thoroughly vetted; supported by financially sound tenants and guarantors; protected by long-term leases, corporate guarantees, and, for Pine Bluff and Draper, Lloyd's of London bonds; and

suitable for § 1031 exchanges. SAC ¶¶ 116–38, 232–38, 293–311, 600. The Program concealed that the properties and lease rates were inflated, the tenants and guarantors lacked the represented financial strength, the promised bonds did not exist, and little or no due diligence had been performed. *Id.* ¶¶ 312–32.

Primary liability under Rule 10b-5 is not limited to the person who drafted or uttered a statement. In *Lorenzo v. SEC*, the Supreme Court held that defendants who disseminate false or misleading statements as part of a scheme may be primarily liable under Rule 10b-5(a) and (c), even if they are not the "maker" of the statements under subsection (b). 587 U.S. 71, 78–83 (2019). The Tenth Circuit applied that principle in *Malouf v. SEC*, confirming that scheme liability reaches those who participate in "an artful stratagem or plan devised to defraud investors," 933 F.3d 1248, 1260–61 (10th Cir. 2019).

This Court has held that scheme liability requires a deceptive or manipulative act performed by the defendant in furtherance of the scheme, with scienter and reliance. ECF No. 216 at 7. It is not enough merely to associate a defendant with a fraudulent enterprise. *Id.* at 12–13. Cramer's involvement, however, was not merely associative.

Cramer was Colliers' agent and the Chief Executive Officer of its Utah division. SAC ¶¶ 63, 139. Acting for Colliers, he approved the terms under which Colliers partnered with Kevin Long and his affiliates to operate the TIC Program

through brokerage, due-diligence, and marketing activities. *Id.* ¶ 150. He also personally mentored the sales agents employed in that Program. *Id.* ¶ 152.

The MOU identifies what Cramer approved. Addressed directly to him, it projected approximately $100 million in annual transactions through Colliers and described TIC investments intended for retirement accounts and § 1031 exchanges. MOU at 1. It made the Kevin Long Team, through Colliers, the Fund's exclusive acquisition agent; required acquisition commissions to be processed through Colliers; placed the TIC resale product under a perpetual Colliers listing agreement; and entitled Colliers to commissions from the sales. *Id.* at 1–2.[1]

The MOU also integrated Colliers and Cramer into the sales operation. Colliers management would participate in selecting and hiring the agents, Colliers would advance their compensation, and Cramer would help mentor them. MOU at 2–3. Colliers would be identified as the broker on all brokerage marketing materials and would support acquisitions by developing the due-diligence packages. *Id.* at 3–4. At the same time, property evaluation would be performed by Fund Management outside the commissions processed through

[1] The Court may consider the MOU because the SAC refers to and relies upon the agreement, it is central to Plaintiffs' claims, and its authenticity is not disputed. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

Colliers, and the agreement sought to exclude Colliers from underwriting liability and indemnify it against problems arising from property selection. *Id.* at 2.

That structure was deceptive because it presented Colliers' institutional name and supposed due diligence to investors while placing the actual property-evaluation function elsewhere and attempting to insulate Colliers from responsibility for it. The structure operated as designed. Colliers was presented as Millcreek's partner; its representatives communicated through Colliers email accounts; and its logo appeared beside Millcreek's on each Offering Memorandum. SAC ¶¶ 148–49, 232–37. Those materials represented that the tenants, guarantors, leases, bonds, returns, and investment risks had been meaningfully evaluated. *Id.* ¶¶ 293–311, 600. In fact, little or no due diligence had been performed on the tenants or guarantors, and there was no reasonable basis to believe they could satisfy the long-term leases and guarantees. *Id.* ¶¶ 317, 331. Plaintiffs relied on the Colliers-branded representations when they purchased the TIC interests. *Id.* ¶¶ 238, 357–76, 604–05.

Cramer also took an affirmative role in implementing that structure. The MOU did not assign him a generic personnel function. It made his mentorship part of the joint program through which Colliers, the Kevin Long Team, and Millcreek would recruit, train, and support a new sales force supplied with

products, marketing materials, investor contacts, and direct supervision. MOU at 2–3. Cramer then mentored Taylor, McDougal, and Strong, the agents employed to sell the TIC interests. SAC ¶ 152. Those agents reviewed the Marketing Materials, distributed them to Plaintiffs, and repeated their representations during telephone calls and in-person meetings. *Id.* ¶¶ 293–99. Thus, after approving the structure that used Colliers' name and purported due diligence to create investor confidence, Cramer personally helped prepare the sales agents who carried that structure into effect. His mentorship was an affirmative act in furtherance of the scheme, and its deceptive character arises from the function it served: enabling the Program to communicate Colliers-backed assurances of diligence and safety while property evaluation was performed elsewhere and Colliers sought protection from underwriting responsibility. SAC ¶¶ 150, 152, 293–331; MOU at 2–4.

The same facts support a strong inference of scienter, which includes reckless disregard of a substantial likelihood that investors will be misled and must be assessed from the allegations collectively. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007)

The MOU placed Cramer directly on notice that Colliers' name, sales agents, marketing support, brokerage authority, and due-diligence packages

would be used to sell these investments. MOU at 1–4. Cramer nevertheless approved the arrangement and mentored the agents who implemented it. SAC ¶¶ 150, 152. The innocent inference proposed by his motion—that this was merely routine corporate approval and mentoring—is not more compelling than the inference that Cramer recklessly disregarded the obvious risk that investors would treat Colliers' branding and purported due diligence as assurance that Colliers had vetted the offerings.

Reliance and loss causation follow from the same pleaded sequence. Plaintiffs relied on the Colliers-branded Offering Memoranda and the representations concerning the properties, tenants, guarantees, bonds, valuations, due diligence, and investment risks when purchasing the TIC interests. SAC ¶¶ 232–38, 293–311, 357–76, 604–05. The concealed risks then materialized: the tenants defaulted, the guarantees and promised bonds failed, and the properties proved substantially overvalued. *Id.* ¶¶ 397–439, 455–76, 487–503. Those failures deprived Plaintiffs of the income, security, and value they had been promised and caused their investment losses. *Id.* ¶ 609. Count I therefore states a primary § 10(b) claim against Cramer.

## III. THE SAC PLAUSIBLY ALLEGES CONTROL-PERSON LIABILITY AGAINST CRAMER

Cramer argues that Count III fails because the SAC does not identify a primary violator whose management or policies he possessed the power to

direct. ECF No. 249 at 12–14. But the SAC identifies both the primary violator and Cramer's means of control.

To state a claim under § 20(a), Plaintiffs must plead "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). Plaintiffs need not plead that the controlling person actually or culpably participated in the primary violation. *Id.* Control includes the direct or indirect power to direct or cause the direction of another person's management and policies, whether through ownership, contract, or otherwise. *Id.* Because control ordinarily presents a factual question, dismissal is appropriate only when the complaint contains no facts supporting a reasonable inference of control. *Id.* at 1306.

The Court has already held that Count I remains pending against the Colliers Defendants and that those entities may qualify as primary violators for purposes of Count III. ECF No. 216 at 33–34, 68. The Court specifically determined that Kevin Long, Spencer Strong, and Blake McDougal acted as Colliers agents when making and disseminating the misrepresentations and that their conduct could therefore be attributed to the Colliers Defendants. *Id.* at 13–16. Colliers International Intermountain, LLC, the Utah-based Colliers entity

through which that sales operation functioned, remains a primary violator. SAC ¶¶ 1–5; ECF No. 216 at 68.

Cramer plausibly controlled that entity and its sales operation. He was not merely a Colliers employee or an outside participant in the Program. He was Chief Executive Officer of Colliers' Utah division. SAC ¶ 139. Acting on Colliers' behalf, Cramer approved the terms under which Colliers partnered with Kevin Long and his affiliates to conduct the TIC Program through brokerage, due diligence, and marketing. *Id.* ¶ 150. He also mentored the sales agents employed in the Program, including McDougal and Strong, whose misrepresentations the Court attributed to the Colliers Defendants. *Id.* ¶ 152; ECF No. 216 at 13–16.

The MOU confirms that Cramer's authority was operational rather than merely titular. The agreement was directed to Cramer and placed Colliers within the Program's acquisition, brokerage, marketing, commission, due-diligence, hiring, and sales-training functions. MOU at 1–4. Colliers management would participate in selecting and hiring the sales agents, Colliers would advance their compensation, and Cramer would personally mentor them. *Id.* at 2–3. Colliers would also appear as the broker on the marketing materials and support the development of the due-diligence packages used to sell the investments. *Id.* at 3–4. Cramer's approval of those terms on Colliers' behalf and his subsequent role in training the sales force support a reasonable inference that he possessed the

power to direct Colliers' Utah sales operation and the manner in which it participated in the Program.

The same allegations preserve another basis for control-person liability: Cramer's control over the Colliers sales agents he mentored. McDougal and Strong are named as primary violators in Count I, and the Court has already held that they acted as Colliers agents when they made and disseminated the challenged representations. SAC ¶¶ 46, 49, 597–609; ECF No. 216 at 13–16. This theory does not rest on mentorship alone. Cramer was the CEO of Colliers' Utah division and approved Colliers' participation in the Program. SAC ¶¶ 139, 150. Under the structure he approved, Colliers management participated in selecting and hiring the sales agents, Colliers advanced their compensation, and Cramer personally mentored them. MOU at 2–3. Cramer then mentored McDougal and Strong while they reviewed, distributed, and repeated the Marketing Materials to Plaintiffs. SAC ¶¶ 152, 293–99. Taken together, Cramer's executive position, authority over Colliers' participation in the Program, and assigned role within the agents' selection, compensation, training, and mentorship support a reasonable inference that he possessed at least the indirect power to direct their conduct in Colliers' sales operation.

This distinguishes Cramer from the defendants whose control claims the Court previously dismissed. The Court found that Thomas Smith's alleged

leadership and training activities were not tied to authority over the management or policies of an identified primary violator. ECF No. 216 at 35–36. Cramer's authority is tied directly to one. He served as CEO of Colliers' Utah division, acted for Colliers in approving the Program's governing commercial relationship, and participated personally in preparing the Colliers sales agents who implemented it. SAC ¶¶ 139, 150, 152. Those allegations do not rely on title or mentorship alone. Together, they show an executive exercising authority over the Utah Colliers operation that the Court has already recognized as a primary violator.

Whether Cramer ultimately exercised control over every statement or transaction is a factual question. Section 20(a) requires the power to control the primary violator, not culpable participation in each underlying violation. *Maher*, 144 F.3d at 1305–06. Cramer's executive authority, approval of Colliers' participation in the Program, and operational involvement with its sales force plausibly establish that power. Count III should not be dismissed.

## IV. THE SAC PLAUSIBLY ALLEGES THAT CRAMER VIOLATED UTAH CODE § 61-1-1

Cramer argues that Count IV fails because the SAC attributes no materially false statement, actionable omission, or deceptive act to him. ECF No. 249 at 14–15. Section 61-1-1, however, prohibits not only material misstatements and omissions, but also employing a "device, scheme, or artifice to defraud" and

engaging in an "act, practice, or course of business" operating as a fraud or deceit in connection with a securities transaction. Utah Code § 61-1-1(1), (3). This Court has recognized that § 61-1-1 "mirrors Rule 10b-5 almost exactly" and that the other securities-fraud provisions identified in Count IV are nearly identical or materially similar to those provisions. ECF No. 216 at 38, 43.

Accordingly, for the reasons stated regarding Count I, *supra*, Cramer affirmatively furthered the fraudulent sales operation. Acting for Colliers, he authorized Colliers to supply its brokerage platform, institutional branding, marketing support, due-diligence packages, and sales personnel to the TIC Program. SAC ¶¶ 139, 150; MOU at 1–4. Cramer also personally participated in the sales operation by mentoring McDougal and Strong while they reviewed, distributed, and repeated the deceptive Marketing Materials to Plaintiffs. SAC ¶¶ 46, 49, 152, 293–99. Through these acts, Cramer placed Colliers' institutional credibility and sales force behind the TIC offerings and helped convey the Program's representations to investors. That affirmative conduct plausibly constitutes participation in a fraudulent scheme and course of business under § 61-1-1 and the materially similar provisions of applicable state law. Count IV should not be dismissed against Cramer.

## V. COUNT VI PLAUSIBLY ALLEGES CRAMER'S LIABILITY UNDER APPLICABLE STATE SECURITIES LAWS

Cramer argues that Count VI does not connect him to a statutory category or securities transaction. ECF No. 249 at 15–18. But Count VI alleges that he materially aided the primary violations as an officer, agent, control person, or employee of a Liable Person. SAC ¶¶ 646–49. Cramer led Colliers' Utah division, authorized Colliers' participation in the TIC Program, and trained the agents who sold the investments. *Id.* ¶¶ 63, 139, 150, 152; MOU at 1–4.

### a. Utah

Utah Code § 61-1-22(4)(a) imposes joint and several liability upon every partner, officer, director, or person occupying a similar status or performing similar functions for a liable seller or buyer. It separately reaches employees, broker-dealers, and agents who materially aid the sale or purchase. Utah Code § 61-1-22(4)(a). An officer or director need not personally participate in the particular transaction. *Steenblik v. Lichfield*, 906 P.2d 872, 879–80 (Utah 1995). The statute instead places on the secondary actor the burden of proving that he did not know, and in the exercise of reasonable care could not have known, the facts giving rise to the violation. Utah Code § 61-1-22(4)(a); *Steenblik*, 906 P.2d at 879–80.

Cramer falls within these provisions. He was Chief Executive Officer of Colliers' Utah division and acted as Colliers' agent and representative. SAC ¶¶

63, 139. Colliers International Intermountain, LLC has its principal place of business in Utah, operates through Colliers' Utah offices, and is one of the Colliers entities whose agents sold the TIC interests. *Id.* ¶¶ 1–8. The Court has already held that Kevin Long, Spencer Strong, and Blake McDougal plausibly acted on behalf of Colliers when they marketed and sold those interests. ECF No. 216 at 13–16. Cramer's position as chief executive of that Utah operation plausibly placed him within the statute's officer or similar-function category.

Cramer also materially aided the sales. He authorized the operating arrangement through which Colliers supplied the Program's brokerage, marketing, due-diligence, staffing, and sales-training functions. SAC ¶¶ 150, 753(a)–(c); MOU at 1–4. He then personally trained the sales agents employed in the Program, including Strong and McDougal. SAC ¶ 152. Those agents used Colliers-branded marketing materials, represented that Colliers had vetted the properties and tenants, and sold the TIC interests to Plaintiffs. *Id.* ¶¶ 293–311, 338–56. Cramer did not merely approve an unrelated corporate transaction. He established and staffed the mechanism through which the securities were marketed and sold. That is material aid under § 61-1-22(4)(a).

Further, the statute makes lack of knowledge and reasonable care an affirmative defense on which Cramer bears the burden. Utah Code § 61-1-

22(4)(a); *Steenblik*, 906 P.2d at 879–80. Count VI should therefore proceed under Utah law.

**b. Washington**

Washington law imposes joint and several liability upon a person who controls a liable seller or buyer; a partner, officer, director, or person occupying a similar status or performing similar functions; an employee who materially aids the transaction; and certain securities professionals who materially aid the transaction. Wash. Rev. Code § 21.20.430(3). In *Hines v. Data Line Systems, Inc.*, the Washington Supreme Court held that the statute "imposes liability on separate classes of individuals, independent of each other" and that directors may be liable by virtue of their status, subject to the statutory lack-of-knowledge defense. 114 Wash. 2d 127, 142–44, 787 P.2d 8, 16–18 (1990). The court emphasized that the material-aid requirement applicable to employees does not appear in the statute's officer-and-director provision. *Id.* at 142–43, 787 P.2d at 17.

For the same reasons discussed above, Cramer occupied an executive or similar position in the Colliers operation that sold the TIC interests and materially aided those sales. SAC ¶¶ 1–8, 63, 139, 150, 152. The connection to the Washington transaction is direct. Washington residents David Elton and Alyce Weber purchased an interest in the Draper Property after receiving Colliers-

branded Marketing Materials and representations from Strong, one of the sales agents Cramer trained. *Id.* ¶¶ 86, 152, 284–88. Cramer furnished that sales operation with Colliers' brokerage services, marketing support, due-diligence packages, and trained personnel. *Id.* ¶¶ 150, 152; MOU at 1–4. These facts plausibly establish liability under Wash. Rev. Code § 21.20.430(3).

**c. Wyoming**

Count VI states a claim under the portions of the Wyoming statute Cramer cites. Subsection (g)(i) imposes liability on a person who directly or indirectly controls a person subject to primary liability. Wyo. Stat. § 17-4-509(g)(i). For the same reasons discussed above, the SAC plausibly alleges that Cramer exercised authority over Colliers' Utah sales operation and the agents through whom Colliers sold the TIC interests. Cramer was the Chief Executive Officer of Colliers' Utah division, authorized Colliers' participation in the TIC Program, and occupied an assigned role in the selection, compensation, training, and mentorship of the Program's sales agents. SAC ¶¶ 63, 139, 150, 152; MOU at 1–4. Those facts support a reasonable inference that Cramer possessed at least the indirect power to direct Colliers' participation and the conduct of its agents.

Subsection (g)(iv) separately imposes liability on a broker-dealer, agent, investment adviser, or investment adviser representative who materially aids the conduct giving rise to primary liability. Wyo. Stat. § 17-4-509(g)(iv). The SAC

identifies Cramer as Colliers' agent and representative. SAC ¶ 63. He materially aided the sales by establishing the arrangement through which Colliers supplied the Program's brokerage services, marketing support, due-diligence packages, compensation advances, and trained sales personnel. *Id.* ¶¶ 150, 152; MOU at 1–4. Cramer then personally trained the agents who used those resources and Colliers' institutional credibility to sell the investments. SAC ¶ 152. These allegations plausibly satisfy the control and material-aid provisions on which Cramer's motion relies.

But Cramer's motion also materially misstates Wyoming law. It asserts: "Unlike Utah and Washington, Wyoming does not separately impose liability merely because an individual is an officer or director." ECF No. 249 at 17. In support, Cramer cites only subsections (g)(i) and (g)(iv). *Id.* The two provisions he omits expressly impose the liability he claims Wyoming law does not recognize.

Subsection (g)(ii) imposes liability on "[a] managing partner, executive officer, or director of a person liable under subsections (b) through (f) of this section, including an individual having a similar status or performing similar functions." Wyo. Stat. § 17-4-509(g)(ii). Subsection (g)(iii) separately reaches "[a]n employee of or associated with a person liable under subsections (b) through (f) of this section and who materially aids the conduct giving rise to the

liability." *Id.* § 17-4-509(g)(iii). Wyoming therefore does impose liability based on executive or similar status, and it also reaches employees and associated persons who materially aid the violation.

Cramer falls within those provisions as well. He was Colliers' Utah chief executive and its agent and representative. SAC ¶¶ 63, 139. For the same reasons discussed above, he materially aided Colliers and its sales agents by establishing and staffing the brokerage, marketing, due-diligence, and sales operation through which they sold the TIC interests. *Id.* ¶¶ 150, 152; MOU at 1–4. Count VI thus states a Wyoming claim under the provisions Cramer addresses and under the provisions his motion omits.

**d. California**

In *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, the court did not recognize a private claim brought directly under § 25403. 158 Cal. App. 4th 226, 253–54, 70 Cal. Rptr. 3d 199, 221–22 (2007). But *Apollo* also explained that California expressly provides private remedies against persons who materially assist an underlying § 25401 violation through §§ 25504 and 25504.1. *Id.* at 254–58, 70 Cal. Rptr. 3d at 222–25.

The SAC pleads the necessary underlying violation. Count IV alleges that the Colliers entities and their sales agents sold the TIC interests through material misrepresentations and omissions in violation of § 25401. SAC ¶¶ 627–

34 & n.1. California resident James Blaisdell purchased a Draper interest after Strong represented that Colliers had fully vetted a solid tenant and made additional misrepresentations concerning the tenant, lease, guaranty, bond, renovations, and security of the investment. *Id.* ¶¶ 87, 353–56.

Cramer is secondarily liable for materially assisting that violation. Section 25504 imposes joint and several liability upon control persons, principal executive officers, persons performing similar functions, employees who materially aid, and broker-dealers or agents who materially aid the transaction. Cal. Corp. Code § 25504. Section 25504.1 separately reaches any person who materially assists a § 25401 violation with intent to deceive or defraud. *Id.* § 25504.1. Cramer led Colliers' Utah division, authorized and implemented the arrangement through which Colliers supplied the Program's brokerage, marketing, due-diligence, compensation, and sales-training functions, and personally trained Strong. SAC ¶¶ 63, 139, 150, 152; MOU at 1–4. Count VI further pleads that Cramer knew or recklessly disregarded the facts giving rise to the underlying violations. SAC ¶¶ 647–49.

Count VI states that the applicable secondary-liability statutes "include[] at least" those identified in its footnote. SAC ¶ 649 & n.3. It therefore does not confine Plaintiffs to a freestanding claim under § 25403. Read together, Counts IV and VI identify the underlying § 25401 violation, Cramer's executive and

agency relationship with the liable persons, and the acts through which he materially assisted the violation. If the Court nevertheless concludes that §§ 25504 and 25504.1 had to be identified expressly, Plaintiffs should receive leave to amend the statutory citation rather than dismissal with prejudice of the factually pleaded theory.

## VI. COUNT XII PLAUSIBLY ALLEGES THAT CRAMER JOINED THE CONSPIRACY

Civil conspiracy requires a combination of two or more persons, an object to be accomplished, a meeting of the minds, one or more unlawful overt acts, and resulting damages. *Pohl, Inc. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944. But "it is not necessary that each member of the conspiracy commit an unlawful act in furtherance of the conspiracy to be liable." *Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493. Thus, although conspiracy to defraud requires an underlying fraud, it does not require every conspirator to have personally committed that fraud. *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 12 n.4, 243 P.3d 508.

This Court has already applied those principles to this conspiracy. It held that the fraud committed by one participant supplies the underlying tort supporting the conspiracy claim against the other participants, even if the SAC does not state a direct fraud claim against every conspirator. ECF No. 216 at 58–59. The Court also held that the SAC adequately pleads fraud by multiple participants in the Colliers/Long TIC Program. *Id.* Cramer therefore cannot

obtain dismissal merely because the SAC does not attribute a particular misrepresentation or independently actionable tort to him.

The remaining question is whether Cramer agreed to the conspiracy's object. A meeting of the minds may be inferred from the parties' coordinated conduct and the surrounding circumstances. *See Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 35, 54 P.3d 1054. The SAC pleads that the conspirators combined to induce Plaintiffs' investments through the Colliers/Long TIC Program and continued concealing the scheme after the investments were made. SAC ¶¶ 703–05. It also identifies Cramer's individual assent and participation.

Cramer was Colliers' agent and the Chief Executive Officer of its Utah division. SAC ¶¶ 63, 139. Acting for Colliers, he approved the agreement through which Colliers joined Kevin Long and his affiliates in operating the TIC Program. *Id.* ¶ 150. That agreement placed Colliers within the Program's acquisition, brokerage, marketing, commission, due-diligence, and sales-training functions and assigned Cramer a role mentoring the sales agents. MOU at 1–4. Cramer then mentored Strong, McDougal, and the other agents who used Colliers' branding, Marketing Materials, and purported due diligence to sell the investments. SAC ¶¶ 148–52, 232–38, 293–311. Cramer thus authorized the

relationship, committed Colliers' institutional resources to it, and trained the agents through whom its object was accomplished.

Cramer argues that neither the SAC nor the MOU contains an express agreement to use shell tenants, nonexistent insurance, inflated valuations, or other fraudulent means. ECF No. 249 at 18–20. A conspiratorial agreement is rarely written in those terms, and Utah law does not require such a confession. The question is whether the pleaded circumstances support a reasonable inference of assent to the common course of action. Cramer's executive approval of the Program's operating structure, commitment of Colliers' branding and purported due diligence to the sales effort, financial arrangement for commissions, and personal role training the agents who carried it out plausibly establish that assent. Count XII should not be dismissed.

## VII. THE SAC ADEQUATELY PLEADS NEGLIGENCE AGAINST HAWKINS, BOROK, AND JOSKER

Hawkins, Borok, and Josker argue that Count XIV fails to plead a personal duty, individual participation, causation, or damages and is barred by Utah's economic-loss rule. ECF No. 249 at 20–24. Those arguments treat the claim as resting solely on Defendants' corporate titles. It does not. The SAC identifies the functions each Defendant performed, the affirmative conduct they undertook in connection with the TIC Program, and how that conduct enabled the offerings to be marketed and sold under Colliers' name.

**a. Hawkins, Borok, and Josker Owed Plaintiffs an Independent Duty**

To state a negligence claim, a plaintiff must plead duty, breach, causation, and damages. *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5 n.2, 275 P.3d 228. Utah's duty analysis proceeds in stages. First, Utah distinguishes misfeasance from nonfeasance. As *Graves* explains, "we all generally have a duty of due care in the performance of our affirmative acts," while a duty arising from nonfeasance ordinarily requires a special legal relationship. *Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 19, 345 P.3d 619 (citing *B.R. ex rel. Jeffs*, 2012 UT 11, ¶ 7). Second, where Utah law already recognizes the relevant categorical duty, the *Jeffs* framework does not apply; the question is instead whether the plaintiff falls within the "ambit of the duty of care" already recognized. *D.W. v. FPA Sandy Mall Assocs.*, 2024 UT 32, ¶¶ 21, 23, 25, 554 P.3d 1052. Only if the plaintiff seeks recognition of a previously unrecognized category of duty does the Court undertake the full *Jeffs* analysis. *Id.* ¶ 21.

The SAC first alleges affirmative conduct. Hawkins, Borok, and Josker exercised substantial control over Colliers' subsidiaries and agents and "instructed, ratified, and/or approved" Colliers' conduct in permitting and encouraging use of the Colliers name and institutional branding in connection with the TIC Program. SAC ¶¶ 713, 715. Josker also approved draw payments for agents selling TIC offerings through the Program. *Id.* ¶ 16. Those allegations

describe affirmative participation and approval, not merely a failure to protect Plaintiffs from a risk created by someone else. Having undertaken those acts, Defendants owed a duty to exercise reasonable care in performing them. *B.R. ex rel. Jeffs*, 2012 UT 11, ¶ 7; *Graves*, 2015 UT 28, ¶ 19.

That affirmative conduct created a foreseeable risk of investor harm. Colliers' branding supplied institutional credibility to the Offering Memoranda, Marketing Materials, and sales agents who presented the investments to Plaintiffs. SAC ¶¶ 5–8, 149, 293–311. By instructing, ratifying, and approving the use of that credibility in the TIC Program, Hawkins, Borok, and Josker participated in placing the investments before Plaintiffs. Josker further sustained the operation by approving compensation for its sales agents. *Id.* ¶ 16. Their duty thus arises from their own participation in the sales operation, not merely from their corporate titles.

If the Court instead views Count XIV principally as a claim based on nonfeasance, the alleged relationship closely resembles a categorical duty Utah already recognizes. Utah recognizes that an employer may owe a direct duty to a plaintiff to exercise reasonable care in hiring, training, supervising, and controlling its employees. *See Graves*, 2015 UT 28, ¶¶ 31–36; *Castellanos v. Tommy John, LLC*, 2014 UT App 48, ¶ 42, 321 P.3d 218. The SAC alleges that Borok and Hawkins managed Colliers International Intermountain, that Borok led Colliers'

United States operations, that Hawkins oversaw significant legal and regulatory matters involving Colliers' North American subsidiaries, and that Josker was responsible for western-region brokerage activities, including Utah. SAC ¶¶ 11–16. It further alleges that they failed adequately to regulate, control, train, monitor, and supervise the Colliers personnel and operations through which the TIC Program was marketed and sold. *Id.* ¶¶ 713–16. Those allegations are materially analogous to the supervisory relationship Utah has recognized as capable of supporting a duty to protect third parties from harm caused by those under the defendant's control.

Finally, if the Court concludes that Plaintiffs' theory falls within neither the affirmative-conduct rule nor a sufficiently analogous recognized supervisory-duty category, and therefore requires recognition of a new category of duty, the *Jeffs* factors favor recognizing one. Those factors are: "(1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations." *D.W.*, 2024 UT 32, ¶ 22 (cleaned up). They must be analyzed "at a broad, categorical level for a class of defendants rather than a factually intense

inquiry decided on a case-by-case basis." *Scott v. Utah County*, 2015 UT 64, ¶ 29, 356 P.3d 1172 (cleaned up).

The relevant category is corporate managers and executives who exercise supervisory or operational authority over a brokerage or investment-sales operation directed toward identifiable investors. The conduct associated with that category is not purely passive because such managers may affirmatively approve, authorize, fund, direct, or ratify the operations through which investments are marketed and sold. Their legal relationship with prospective investors is also substantially closer than that between strangers because they exercise authority over the personnel and institutional processes used to solicit and serve a defined class of investors. Here, Hawkins, Borok, and Josker exercised authority over the Colliers entities and agents operating the TIC Program, approved the use of Colliers' institutional identity in that Program, and, in Josker's case, authorized payments to its sales agents. SAC ¶¶ 11–16, 713–16.

Financial injury is categorically foreseeable when investment professionals market property interests using due diligence, tenant information, guarantees, bonds, and representations concerning investment safety and stability. Inadequate oversight of those functions predictably risks investor loss, and the prior lawsuit against Colliers International North Texas arising from a

materially similar transaction involving a nonpaying medical tenant further supports foreseeability. *Id.* ¶¶ 17–20. Public policy likewise favors placing responsibility on the managers controlling those internal processes because they are better positioned than outside investors to prevent or absorb losses caused by deficient supervision, approval, and institutional safeguards. Recognizing a limited duty in this setting would not impose liability on corporate officers merely because of their titles. It would apply only to managers whose undertaken operational responsibilities and affirmative authorization of an investment-sales operation place them in a position to prevent foreseeable harm to the investors that operation was designed to reach.

**b. The SAC Pleads Breach, Causation, and Damages**

Hawkins, Borok, and Josker breached that duty by authorizing and sustaining the Colliers-branded sales operation without reasonable safeguards. They knew or should have known that Colliers' subsidiaries and agents were developing and operating the unlawful TIC Program, yet they instructed, ratified, or approved the use of Colliers' branding and failed to regulate, train, monitor, or supervise the entities and agents using that branding to sell the investments. SAC ¶¶ 713–16. Josker continued that operation by approving draw payments for its sales agents. *Id.* ¶ 16.

Those failures are particularly significant in light of Defendants' positions with Colliers International North Texas, a Colliers subsidiary previously sued over a materially similar real-estate scheme involving a nonpaying medical tenant. Borok was its manager and director, Hawkins was its secretary, and Josker was its vice president. *Id.* ¶¶ 17–20. Their positions with the entity involved in that prior controversy support a reasonable inference that they had reason to appreciate the risks associated with inadequately supervised medical-tenant investment programs. Yet they approved Colliers' branding for the TIC Program and failed to implement the safeguards necessary to prevent the same type of investor harm.

The causal chain is neither obscure nor conclusory. Defendants authorized Colliers' name, logo, personnel, and brokerage operation to be used in the TIC Program. *Id.* ¶¶ 5–8, 15–16, 715. The resulting Marketing Materials and sales presentations used Colliers' institutional identity to communicate representations concerning the properties, tenants, leases, guarantees, insurance, valuations, due diligence, and investment risks. *Id.* ¶¶ 149, 293–311, 600–02. Plaintiffs relied on those representations when purchasing the TIC interests and would not have invested had they known the truth. *Id.* ¶¶ 604–05. When the represented protections failed and the properties proved substantially

overvalued, Plaintiffs suffered the resulting losses. *Id.* ¶¶ 357–76, 427–39, 465–76, 497–503, 609.

Defendants' insistence that the SAC identify which individual act caused each particular purchase demands more than Rule 8 requires. The SAC identifies each Defendant's operational authority, their affirmative approval and ratification of the Colliers-branded sales operation, Josker's authorization of compensation for its agents, the prior similar controversy involving an entity each Defendant managed, the representations delivered through the resulting operation, Plaintiffs' reliance, and their resulting losses. Those facts plausibly connect Defendants' conduct to Plaintiffs' injuries.

**c. The Economic-Loss Rule Does Not Bar Count XIV**

Defendants overstate Utah's economic-loss rule. The rule does not categorically prohibit negligence claims whenever the resulting damages are economic. It prevents a plaintiff from recasting the breach of a contractual duty as a tort claim unless the defendant owed an independent duty recognized by tort law. *Hermansen v. Tasulis*, 2002 UT 52, ¶¶ 15–17, 48 P.3d 235. When an independent duty exists, the economic-loss rule does not bar the tort claim. *Id.* ¶ 17; *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶¶ 27, 38, 221 P.3d 234.

That distinction accords with the modern Restatement, which cautions that courts have used the term "economic-loss rule" to describe several different propositions and rejects the broad formulation that tort law generally precludes recovery for purely economic loss. It instead adopts the narrower, majority formulation limited to parties whose relationship is governed by contract. *Restatement (Third) of Torts: Liability for Economic Harm* § 3 cmt. a (Am. L. Inst. 2020).

Indeed, *Hermansen* rejected the proposition that economic losses "cannot be recovered under any circumstance" and permitted purchasers to pursue negligence claims against real-estate professionals based on duties existing independently of contract. 2002 UT 52, ¶¶ 15–17, 20–23. Defendants therefore cannot obtain dismissal merely by characterizing Plaintiffs' losses as economic.

Nor do Defendants identify any contract that governed Hawkins's, Borok's, or Josker's duties to Plaintiffs or allocated the risk arising from the conduct underlying Count XIV. Plaintiffs do not seek to recast a breach of a contract as negligence. As established above, the SAC plausibly alleges that Hawkins, Borok, and Josker owed Plaintiffs duties arising independently under Utah tort law.

The absence of a contract with these Defendants does not by itself create a duty, but neither does it extinguish the independent duty established above.

Because Count XIV rests on that duty rather than an obligation derived from a contract governing Plaintiffs' investments, Plaintiffs need not additionally plead bodily injury or damage to other property. The economic-loss rule does not warrant dismissal.

## VIII. COUNT XVIII PLAUSIBLY ALLEGES UNJUST ENRICHMENT

Unjust enrichment requires a benefit conferred on the defendant, the defendant's knowledge of that benefit, and retention of the benefit under circumstances making it inequitable to do so without payment of its value. *Howard v. Manes*, 2013 UT App 208, ¶ 30, 309 P.3d 279. Plaintiffs must plausibly allege that each Defendant received a direct benefit, and the Court looks to the body of the SAC for supporting factual allegations. ECF No. 216 at 67 & n.434.

The SAC alleges that Plaintiffs' investments generated commissions and other compensation, that each Defendant received compensation or access to proceeds generated by those transactions, and that Defendants knew of and retained those benefits. SAC ¶¶ 757–60. Those allegations are supported by Defendants' identified roles in the revenue-generating operation. Cramer authorized an arrangement projected to generate approximately $100 million in annual transactions through Colliers, with commissions processed through Colliers and Colliers receiving additional commissions from TIC resales. SAC ¶¶ 139, 150; MOU at 1–2. Hawkins and Borok managed Colliers International

Intermountain, Borok led Colliers' United States operations, and Josker directed the Western Region Brokerage and approved draw payments for the agents selling the TIC interests. SAC ¶¶ 11–16. These allegations support a reasonable inference that Defendants knowingly received compensation or other direct financial benefits generated by the sales operation they authorized and managed.

The precise amounts and manner in which those proceeds were distributed are matters within Defendants' possession and may be determined through discovery. At this stage, the Court must accept the allegation that each Defendant received transaction-generated compensation and draw reasonable inferences in Plaintiffs' favor. Permitting Defendants to retain compensation generated by the unlawful sales operation would be inequitable. Count XVIII should not be dismissed.

## **CONCLUSION**

The SAC ties each Moving Defendant to the challenged conduct. It identifies Cramer's authorization and implementation of the Colliers/Long relationship and his training of its sales agents. It likewise identifies Hawkins's, Borok's, and Josker's authority over the relevant Colliers operations, their approval of Colliers' branding in the TIC Program, Josker's authorization of sales-agent payments, and their deficient supervision of the operation.

DATED this 18th day of September 2026.

DEISS LAW PC

*/s/ Andrew G. Deiss*
Andrew G. Deiss
Corey D. Riley
*Counsel for Plaintiffs*

**CERTIFICATION OF WORD COUNT**

Pursuant to DUCivR 7-1(a)(4), the undersigned certifies that this memorandum contains 7,464 words, excluding the caption and signature block, as calculated by the word-processing system used to prepare the memorandum.

DATED this 18th day of September 2026.

DEISS LAW PC
*/s/ Andrew G. Deiss*
Andrew G. Deiss
*Attorney for Plaintiffs*

# EXHIBIT A

**MEMORANDUM OF UNDERSTANDING**

**TO:** LEW CRAMER

**FROM:** KEVIN G. LONG

**SUBJECT:** MILLROCK INVESTMENT FUND 1, LLC & MILLCREEK COMMERCIAL PROPERTIES

**DATE:** SEPTEMBER 18, 2020

**CC:** BRENT SMITH, J. ADAM LONG

# Basic Concepts

- We (the Smith family and the Long family) have formed a company to invest in quality long term debt free STNL properties (Millrock Investment Fund 1, LLC – "The Fund").
- Based on current fund capital the projected annual transaction volume to be processed through Colliers would be approximately $100 million.
- The fund acquires or develops real estate assets with the intent to market them for resale by syndicating them as real estate investments that fit a market need for appropriate investors in their IRAs and 401Ks as well as for 1031 exchange requirements of varying sizes.
- These high-quality assets are sold as Tenant-in-Common real estate with no debt when more than one investor is acquiring the property.
- The Fund retains The Kevin Long Team (via Colliers) as their exclusive agent for all acquisitions. The Fund documents allow the Kevin Long Team a minimum 2% commission for buyer representation on each acquisition.
- All acquisition commissions are processed through Colliers.
- The Fund lists the TIC resale product with The Kevin Long Team (via Colliers).
- The Fund is contracted with a marketing company (Millcreek Commercial Properties – "MCP") to brand the TIC properties and pays the unique marketing costs associated with this disruptive approach of marketing directly to non-conventional commercial real estate investors.
- Kevin Long in cooperation with J. Adam Long are the sole owners of the LLC that is the managing partner of the Fund (MillRock Investment Fund Management – "Fund Management").
- Both Kevin and Adam hold an equity stake in the Fund.

- The Fund pays Fund Management a fee to manage the assets in the Fund.
- The Fund also pays Fund Management fees for property evaluation outside of commissions run through Colliers. This is recognized as a clear delineation of Colliers exclusion from any liability in relation to the underwriting of properties for acquisition.
- The Fund documents specifically indemnify Colliers as the Broker from any issues arising out of property selection.
- Colliers recognizes that as the Fund Manager, Kevin Long may acquire properties in states where he is not licensed due to there being no licensing requirements related to self-representation. Kevin Long may at his sole discretion decide to partner with a local Colliers office at which time the MCA guidelines would apply.
- The Fund is not owned by or otherwise affiliated with Colliers outside of its relationship as a brokerage client.
- There is a perpetual standard listing agreement in place between the Fund and Colliers covering any properties being marketed for sale by the Fund.
- The standard listing agreement specifies that the Fund pay Colliers in favor of the Kevin Long Team a 4% commission on all sales. The listing agent can offer 3% to cooperating brokers and retain only 1% on certain transactions as they see fit. At the client's discretion they may pay a listing commission larger than 4% in order to provide greater incentive to any agent involved in the transaction.
- The Kevin Long Team is paid on the standard Colliers Pleasant Grove split structure.
- The Fund has a separate agreement with MCP where MCP is compensated for marketing and client services based on the sales volume of the fund. This arrangement is handled entirely outside of the relationship between Colliers and the Fund.
- In cooperation with Colliers, the Kevin Long Team and MCP agree to create, implement and manage a quality new agent training and mentoring program. It is our goal to create a sales team and ongoing training program that supports Collier's goal of developing promising Jr agents to supplement our current teams.
- These Jr agents will sign a one-year contract with the Kevin Long Team at the end of which time period each Jr agent may choose to remain with the Kevin Long Team or move to another brokerage team within Colliers.
- **As part of this training Program MCP and Kevin Long will provide**
  - Product for agents to sell
  - A quality academic training platform
  - Mentoring from Kevin Long
  - Direct agent supervision and daily training
  - Marketing and contacts for the trainees
  - Recruiting of quality candidates

- A guarantee of agents' draws to Colliers
- Other material, incentives, and tools as MCP deems necessary

- **As part of the training program Colliers will provide:**
  - A $2,500 per month per new associate commission advance from Colliers but guaranteed by Kevin Long. Colliers will advance the money against future production of each of up to four high quality Jr agent recruits which Colliers management will be closely integrated in the selection and hiring thereof. If at the end of year one for each Jr agent there is not a clear path to making Colliers financially whole, Kevin Long's commissions may be held to cover this expenditure leaving no risk to Colliers. Once a trainee has their draw repaid that draw can be assigned to another recruit. With the total draw outstanding balance not allowed to exceed $100,000.
  - Commissions to these individuals will be paid according to the Kevin Long Team split in conjunction with the Colliers Utah Junior Agent program.
  - General desk costs.
  - Support in the training program, including mentoring from Lew Cramer and Adam Long.

- Kevin Long currently receives an agent assistant allowance in the amount of $2,000 monthly. Said allowance shall increase to $2,500 per month beginning once the Team GCI exceeds $1 million in a calendar year, and shall adjust to covering a fully covered dedicated support team member when the team surpasses and maintains $1.5 million in annual GCI.

- MCP shall be charged office rent for individuals not directly associated with Colliers. The rental schedule for this space is as follows:
  1. Cubicle - $250 per month
  2. Interior office - $500 per month
  3. Exterior office - $1,000 per month

- Rent shall be deducted from the monthly agent assistant allowance.

- At the writing of this memo, one interior office is utilized by the deputy fund manager and the investor relations manager. Therefore, the team is charged for one interior office and receives a net administrative assistant credit of $1,500 monthly.

- Colliers provides ongoing marketing support for listings according to their current policy related to sign expenditures calculated as a percentage of the potential Colliers commission. For avoidance of doubt, this amount shall be calculated based on the minimum 1% commission that Colliers can receive. According to Colliers policy, said marketing expenditures can be allocated to different mediums if usual signage is not required.

- All hard costs associated with the unique direct marketing approach will be born by the client through their marketing agreement with MCP. These include but are not

limited to bulk printing costs, web page development and hosting for fund product, travel, hosting client events, and direct advertising costs.

- Colliers is identified as the broker on all brokerage marketing material in accordance with applicable state law and real estate commission requirements.
- Colliers provides standard support for all acquisition activities including the development of due diligence packages.
- The Kevin Long Team will still have access to all general Colliers pooled services such as GIS, graphic design, and general support. However, their utilization will likely be limited due to the support provided by MCP.